**Hearing Date and Time: To be determined.**
**Response Deadline: October 25, 2019**
**Reply Deadline: November 15, 2019**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Tel: 212-373-3000
Fax: 212-757-3990
Andrew N. Rosenberg
Aidan Synnott
William A. Clareman

*Counsel for the Ad Hoc Defendants*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 15 |
| PERFORADORA ORO NEGRO, S. DE R.L. DE C.V., *et al*. | Case No. 18-11094 (SCC) (Jointly Administered) |
| Debtors in a Foreign Proceeding. | |
| GONZALO GIL-WHITE, PERSONALLY AND IN HIS CAPACITY AS FOREIGN REPRESENTATIVE of PERFORADORA ORO NEGRO, S. DE R.L. DE C.V. AND INTEGRADORA DE SERVICIOS PETROLEROS ORO NEGRO, S.A.P.I. DE C.V. | Adv. Pro. No. 19-1294(SCC) |
| Plaintiff, | |
| -against- | |
| ALP ERCIL; ALTERNA CAPITAL PARTNERS, LLC; AMA CAPITAL PARTNERS, LLC; ANDRES CONSTANTIN ANTONIUS-GONZÁLEZ; ASIA RESEARCH AND CAPITAL MANAGEMENT LTD.; CQS (UK) LLP; FINTECH ADVISORY, INC.; DEUTSCHE BANK MEXICO, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE; GARCÍA GONZÁLEZ Y BARRADAS ABOGADOS, S.C.; GHL INVESTMENTS (EUROPE) LTD.; JOHN FREDRIKSEN; KRISTAN BODDEN; MARITIME FINANCE COMPANY LTD.; NOEL BLAIR HUNTER COCHRANE, JR; ORO NEGRO PRIMUS | |

PTE., LTD.; ORO NEGRO LAURUS PTE., LTD.;
ORO NEGRO FORTIUS PTE., LTD.; ORO NEGRO
DECUS PTE., LTD.; ORO NEGRO IMPETUS PTE.,
LTD.; PAUL MATISON LEAND, JR.; ROGER
ALAN BARTLETT; ROGER ARNOLD HANCOCK;
SEADRILL LIMITED; SHIP FINANCE
INTERNATIONAL LTD.; and DOES 1-100

                    Defendants.

**AD HOC DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ...................................................................... 5

 A. Relevant Parties and Agreements ................................................ 5

  1. Pemex ........................................................................ 5

  2. Oro Negro ................................................................... 6

  3. The Pemex Contracts and Bareboat Charters ........................... 7

  4. The Oro Negro Drilling Bond Agreement and Mexican Trust
   Agreement .................................................................. 8

  5. The Ad Hoc Group of Oro Negro Bondholders ........................ 10

 B. Pemex's Demand to Amend the Oro Negro Contracts ...................... 10

  1. Pemex's Threats to Breach the Agreements ........................... 10

  2. Negotiations with Pemex After the Formation of the Ad Hoc
   Group ...................................................................... 12

 C. Perforadora's and Integradora's *Concurso* Proceedings ................... 15

 D. Allegations Regarding Pemex in January 2018 .............................. 19

 E. Criminal Investigations Concerning Oro Negro and Its Former
  Management ...................................................................... 19

  1. Investigation into Fraudulent Administration of the Mexican Trust
   Account .................................................................... 20

  2. Investigation into Payments to Sham Companies ..................... 21

 F. The Chapter 15 Proceeding ................................................... 23

 G. The Adversary Proceeding ..................................................... 24

i

ARGUMENT ................................................................................................ 25

I.  PLAINTIFFS' CLAIMS SHOULD BE DISMISSED ON FORUM NON
    CONVENIENS GROUNDS ................................................................. 27

    A.  Plaintiffs' Choice of Forum Deserves No Deference ........................... 28

    B.  Mexico Is an Adequate Alternative Forum ......................................... 31

    C.  Private and Public Interest Factors Favor Dismissal .......................... 34

        1.  Private Factors Weigh in Favor of Dismissal ............................ 34

        2.  Public Factors Weigh in Favor of Dismissal ............................ 36

II. PLAINTIFFS' CLAIMS ARE BARRED BY THE ACT OF STATE DOCTRINE ........ 41

    A.  The Pemex Claims Are Barred by the Act of State Doctrine ............... 44

        1.  Pemex's Termination of the Pemex Contracts and Decisions
            Concerning Its Business Relations With Oro Negro Were
            Sovereign Acts ........................................................................ 44

        2.  Plaintiffs' Claims Would Require the Court to Invalidate Pemex's
            Official Acts ............................................................................ 47

    B.  The Act of State Doctrine Bars Plaintiffs' Claims Stemming From the
        Criminal Proceedings, Including the Seizure and Restitution Orders ......... 50

        1.  Administration of Criminal Justice Is a Sovereign Act ............... 50

        2.  Plaintiffs' Claims Would Require this Court to Invalidate Mexico's
            Sovereign Acts to Enforce Its Criminal Laws ........................... 50

III. MEXICAN LAW GOVERNS PLAINTIFFS' TORT CLAIMS, AND
     PLAINTIFFS FAIL TO STATE A CLAIM UNDER MEXICAN LAW ...................... 53

    A.  Plaintiffs' Tort Claims Are Governed by Mexican Law and Therefore the
        New York Law Claims Should be Dismissed ...................................... 54

        1.  Mexican Law Governs Plaintiffs' Tortious Interference Claims ......... 55

        2.  Mexican Law Governs Plaintiffs' Abuse of Process Claims .................. 58

    B.  Plaintiffs' Claims Under Mexican Law Fail to State a Claim on Which
        Relief May Be Granted ...................................................................... 60

        1.  Mexican Tort Law .................................................................... 60

2.    Plaintiffs' Claims Related to Pemex Fail Because Mexican Law
Does Not Recognize Tortious Interference With Contract or
Business Relations ..................................................................... 62

3.    Plaintiffs' Claims for Allegedly "Sabotaging" Oro Negro's
Reorganization Efforts Fails ...................................................... 63

4.    Plaintiffs' Fail to State a Claim for Abuse of Process Under
Mexican Law .............................................................................. 64

5.    Plaintiffs' Claims for Tortious Interference with Contract and
Business Relations Related to the Bareboat Charters and Singapore
Rig Owners Fail to State a Claim Under Mexican Law ............ 66

IV.   SHOULD THE COURT APPLY NEW YORK LAW, PLAINTIFFS FAIL TO
STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED .................................... 66

A.    Perforadora Fails to State a Claim for Tortious Interference with the
Pemex or Bareboat Contracts (Counts One and Thirteen) ................... 67

1.    Perforadora Fails to State a Claim for Tortious Interference With
the Pemex Contracts ................................................................... 67

2.    Plaintiffs Fail to State a Claim for Tortious Interference With the
Bareboat Charters ....................................................................... 70

B.    Plaintiffs Fail to State a Claim for Tortious Interference With Business
Relations With Pemex or the Singapore Rig Owners ........................... 72

1.    Plaintiffs Fail to State A Claim for Tortious Interference With
Their Business Relationship With Pemex ................................... 73

2.    Plaintiffs Fail to State a Claim for Tortious Interference With a
Business Relationship With the Singapore Rig Owners ............. 75

C.    Plaintiffs Fail to State a Claim for Conspiracy to Commit Tortious
Interference ........................................................................................... 76

D.    Plaintiffs Fail to State a Claim for Abuse of Process Under New York Law ....... 77

E.    Plaintiffs Fail to State a Claim for Prima Facie Tort ............................ 78

1.    Plaintiffs' Prima Facie Tort Claim Should Be Dismissed, Because
it Merely Recycles Other Claims ............................................... 78

2.    Plaintiffs' Allegations That the Ad Hoc Defendants Had Economic
Motivations Is Fatal to Their Prima Facie Tort Claim .............. 79

F.    Plaintiffs Fail to State a Claim for Negligence ................................... 80

G.      Plaintiffs Fail to State a Claim for Unjust Enrichment ......................................... 81

V.      PLAINTIFFS FAIL TO STATE A CLAIM FOR A VIOLATION OF 11 U.S.C. §
        1520 OR THE "COMITY ORDER" ................................................................................. 83

VI.     THERE IS NO BANKRUPTCY COURT JURISDICTION FOR GIL'S
        INDIVIDUAL CLAIMS AND HE LACKS STANDING TO BRING ANY
        CLAIMS UNDER CHAPTER 15 ..................................................................................... 83

        A.      No U.S. Bankruptcy Jurisdiction Exists Over Gil's Claims And They Must
                Be Dismissed ....................................................................................................... 83

        B.      Gil Lacks Standing to Bring Claims Under Chapter 15 ....................................... 85

VII.    THIS ADVERSARY PROCEEDING IS INCONSISTENT WITH THE
        PURPOSE OF CHAPTER 15 AND SHOULD BE DISMISSED ................................... 86

CONCLUSION ....................................................................................................................... 90

iv

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*2002 Lawrence R. Buchalter Alaska Trust* v. *Phila. Fin. Life Assur. Co.*,
  96 F. Supp. 3d 182 (S.D.N.Y. 2015)................................................................54, 55

*Abogados* v. *AT&T, Inc.*,
  223 F.3d 932 (9th Cir. 2000) ........................................................................56, 62

*Abullahi* v. *Pfizer, Inc.*,
  562 F.3d 163 (2d Cir. 2009)................................................................................27

*Ace Arts, LLC* v. *Sony/ATV Music Pub., LLC*,
  56 F. Supp. 3d 436 (S.D.N.Y. 2014)...................................................................72

*AdvanFort Co.* v. *Cartner*,
  No. 1:15 Civ. 220, 2015 WL 12516240 (E.D. Va. Oct. 30, 2015) .........................48

*Aguinda* v. *Texaco, Inc.*,
  303 F.3d 470 (2d Cir. 2002)................................................................................34

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  No. 06-MDL-1775 JG VVP, 2010 WL 10947344 (E.D.N.Y. Sept. 22, 2010)........46

*In re Air Crash Near Peixoto De Azeveda, Brazil, on Sept. 29, 2006*,
  574 F. Supp. 2d 272 (E.D.N.Y. 2008), *aff'd sub nom. Lleras* v. *Excelaire
  Servs. Inc.*, 354 F. App'x 585 (2d Cir. 2009).........................................................36

*AJW Partners LLC* v. *Itronics Inc.*,
  892 N.Y.S.2d 46 (1st Dep't 2009) .......................................................................80

*In re Aluminum Warehousing Antitrust Litig.*,
  90 F. Supp. 3d 219 (S.D.N.Y. 2015)....................................................................26

*Am. Lecithin Co.* v. *Rebmann*,
  No. 12 Civ. 929(VSB), 2017 WL 4402535 (S.D.N.Y. Sept. 30, 2017)...................55

*Aquila* v. *Fleetwood, R.V., Inc.*,
  2014 WL 1379648 (E.D.N.Y. Mar. 27, 2014) .......................................................39

*In re Arbitration Between Monegasque De Reassurances S.A.M.* v. *Nak Naftogaz
  of Ukraine*,
  311 F.3d 488 (2d Cir. 2002)................................................................................31

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) ................................................................................25, 65

*ATSI Commc'ns, Inc.* v. *Shaar Fund Ltd.*,
    493 F.3d 87 (2d Cir. 2007) .....................................................................25

*Banco Nacional de Cuba* v. *Sabbatino*,
    376 U.S. 398 (1964) ...........................................................................42, 43

*In re Bancredit Cayman Ltd.*,
    2008 WL 5396618 (Bankr. S.D.N.Y. Nov. 25, 2008) ................................... passim

*Bandes* v. *Harlow & Jones, Inc.*,
    852 F.2d 661 (2d Cir. 1988) .....................................................................42

*Base Metal Trading SA v. Russian Aluminum*,
    253 F.Supp.2d 681 (S.D.N.Y. 2003) ............................................................28

*Becker* v. *Club Las Velas*,
    No. 94 CIV. 2412 (JFK), 1995 WL 267025 (S.D.N.Y. May 8, 1995) ........................33, 34, 35

*Belsky* v. *Lowenthal*,
    62 A.D.2d 319 (1st Dep't 1978) ..............................................................78, 79

*Benihana of Tokyo, LLC* v. *Angelo, Gordon & Co., L.P.*,
    259 F. Supp. 3d 16 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) ..................71, 72

*In re Bernard L. Madoff Inv. Sec. LLC*,
    440 B.R. 282 (Bankr. S.D.N.Y. 2010) ..........................................................70

*Bigio* v. *Coca-Cola Co.*,
    239 F.3d 440 (2d Cir. 2000), *cert. denied*, 133 S. Ct. 952 (2013) .....................................43, 76

*Blanco* v. *Banco Indus, de Venez.*,
    S.A., 997 F.2d 974 (2d Cir. 1993) ............................................................35

*Bourbia* v. *S.C. Johnson & Son, Inc.*,
    375 F. Supp. 3d 454 (S.D.N.Y. 2019) ........................................................81

*Braka* v. *Bancomer, S.N.C.*,
    762 F.2d 222 (2d Cir. 1985) .....................................................................42

*In re British Am. Ins. Co. Ltd.*,
    2014 WL 793105 (Bankr. S.D. Fla. Feb. 27, 2014) ..............................................87

*In re British Am. Ins. Co., Ltd.*,
    488 B.R. 205 (Bankr. S.D. Fla. 2013) ..........................................................88

*Buday* v. *New York Yankees Partnership*,
    486 F. App'x 894 (2d Cir. 2012) ...................................................................26

*Burns Jackson Miller Summit & Spitzer* v. *Lindner*,
    59 N.Y.2d 314 (1983) ...................................................................79

*Catskill Dev., L.L.C.* v. *Park Place Entm't Corp.*,
    547 F.3d 115 (2d Cir. 2008)...................................................................72

*Cheng* v. *Boeing Co.*,
    708 F.2d 1406 (9th Cir. 1983) ...................................................................29

*In re Citigroup Inc. Sec. Litig.*,
    987 F. Supp. 2d 377 (S.D.N.Y. 2013)...................................................................57

*In re Condor Ins. Ltd.*,
    601 F.3d 319 (5th Cir. 2010) ...................................................................89

*Confido Advisors, LLC* v. *USAA Real Estate Co.*,
    No. 17 Civ 5632, 2018 WL 4265900 (S.D.N.Y. Sept. 6, 2018) ......................................72, 74

*Connolly* v. *Wood-Smith*,
    No. 11 Civ. 8801 (DAB)(JCF), 2012 WL 7809099 (S.D.N.Y. May 14, 2012)................72, 73

*Cooney* v. *Osgood Mach., Inc.*,
    81 N.Y.2d 66 (1993) ...................................................................53, 54

*Corsello* v. *Verizon New York, Inc.*,
    18 N.Y.3d 777 (2012) ...................................................................81

*Curiano* v. *Suozzi*,
    63 N.Y.2d 113 (1984) ...................................................................78

*Curley* v. *AMR Corp.*,
    153 F.3d 5 (2d Cir. 1998)...................................................................60

*Davis* v. *Costa-Gavras*,
    580 F. Supp. 1082 (S.D.N.Y. 1984)...................................................................56, 58

*Desarrolladora Farallon S. de R.L. de C.V.* v. *Cargill Fin. Servs. Int'l, Inc.*,
    666 F. App'x 17 (2d Cir. 2016) ...................................................................63

*Dinesol Bldg. Prod., Ltd.* v. *Tapco Int'l Corp.*,
    No. 06 Civ. 2919, 2008 WL 11483087 (N.D. Ohio 2008) ....................................................58

*Do Rosario Veiga* v. *World Meteorological Organisation*,
    486 F. Supp. 2d 297 (S.D.N.Y. 2007)...................................................................34, 36

*Du Daobin* v. *Cisco Sys., Inc.*,
　2 F. Supp. 3d 717 (D. Md. 2014) ................................................................51

*Duchow* v. *United States*,
　No. CIV.A. 95-2121, 1995 WL 425037 (E.D. La. July 19, 1995), *aff'd*, 114
　F.3d 1181 (5th Cir. 1997) ........................................................................50

*Elmaliach* v. *Bank of China Ltd.*,
　110 A.D.3d 192 (1st Dep't 2013) ...............................................................53

*In re Fairfield Sentry*,
　458 B.R. 665 (S.D.N.Y. 2011) ..................................................................88

*Fed. Deposit Ins. Corp.* v. *Bank of New York Mellon*,
　369 F. Supp. 3d 547 (S.D.N.Y. 2019) ....................................................25, 26

*Fed. Treasury Enter. Sojuzplodoimport, OAO* v. *Spirits Int'l B.V.*,
　809 F.3d 737 (2d Cir. 2016) ...............................................................42, 46,

*Figueiredo Ferraz E Engenharia de Projeto Ltda.* v. *Republic of Peru*,
　665 F.3d 384 (2d Cir. 2011) ......................................................................40

*Fin. One Pub. Co.* v. *Lehman Bros. Special Fin., Inc.*,
　414 F.3d 325 (2d Cir. 2005) ......................................................................53

*Firebird Republics Fund, Ltd.* v. *Moore Capital Management LLC*,
　No. 09 Civ. 303, 2009 WL 2043885 (S.D.N.Y July 14, 2009) .............................32

*First Hill Partners, LLC* v. *BlueCrest Capital Mgmt. Ltd.*,
　52 F. Supp. 3d 625 (S.D.N.Y. 2014) ............................................................54

*Foster* v. *Churchill*,
　87 N.Y.2d 744 (1996) ..............................................................................71

*Garrison* v. *Toshiba Bus. Sols. (USA) Inc.*,
　907 F. Supp. 2d 301 (E.D.N.Y. 2012) ..........................................................78

*Geller* v. *Delta Airlines*,
　717 F. Supp. 213 (S.D.N.Y. 1989) ..............................................................53

*Gertler* v. *Goodgold*,
　107 A.D.2d 481 (1st Dep't 1985) ................................................................78

*GlobalNet Financial.Com, Inc.* v. *Frank Crystal & Co.*,
　449 F.3d 377 (2d Cir. 2006) ......................................................................53

*Goel* v. *Bunge, Ltd.*,
　820 F.3d 554 (2d Cir. 2016) ......................................................................26

*Gulf Oil Corp.* v. *Gilbert*,
    330 U.S. 501 (1947).................................................................................................34

*Heany* v. *Purdy*,
    29 N.Y.2d 157 (1971)..............................................................................................58

*In re Hellas Telecomm. (Luxembourg) II SCA*,
    524 B.R. 488 (Bankr. S.D.N.Y.), 526 B.R. 499 (Bankr. S.D.N.Y. 2015) ..............53

*Honduras Aircraft Registry, Ltd.* v. *Gov't of Honduras*,
    129 F.3d 543 (11th Cir. 1997) .................................................................................46

*Hunt* v. *Mobil Oil Corp.*,
    410 F. Supp. 10 (S.D.N.Y. 1975), *aff'd*, 550 F.2d 68 (2d Cir. 1977) ......................43

*Hunt* v. *Mobil Oil Corp.*,
    550 F.2d 68 (2d Cir. 1977)........................................................................................43

*IMG Fragrance Brands LLC* v. *Houbigant, Inc.*,
    679 F. Supp. 2d 395 (S.D.N.Y. 2009).......................................................................71

*Int'l Ass'n of Machinists & Aerospace Workers* v. *OPEC*,
    649 F.2d 1354 (9th Cir. 1981) ..................................................................................45

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001)........................................................................................27,

*U.S.* v. *J.A. Jones Const. Group, LLC*,
    333 B.R. 637 (Bankr. E.D.N.Y. 2005).......................................................................87

*Kilkenny* v. *Greenberg Traurig, LLP*,
    No. 05 Civ. 6578(NRB), 2006 WL 1096830 (S.D.N.Y. Apr. 26, 2006) .................76

*Kirch* v. *Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006).............................................................................66, 72

*Kramer* v. *Pollack-Krasner Found.*,
    890 F. Supp. 250 (S.D.N.Y. 1995) ...........................................................................72

*Langsam* v. *Vallarta Gardens*,
    No. 08 CIV. 2222 WCC, 2009 WL 8631353, at *6-7 (S.D.N.Y. June 15,
    2009) .........................................................................................................................33

*LaSala* v. *Bank of Cyprus Pub. Co.*,
    510 F.Supp.2d 246 (S.D.N.Y. 2007).........................................................................33

*Leetsch* v. *Freedman*,
    260 F.3d 1100 (9th Cir. 2001) ..................................................................................32

*Leon* v. *Rockland Psychiatric Center*,
  232 F. Supp. 3d 420 (S.D.N.Y. 2017) ....................................................................26

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*,
  572 U.S. 118 (2014) ............................................................................................90

*In re LightSquared, Inc.*,
  504 B.R. 321 (Bankr. S.D.N.Y. 2013) ..................................................................76

*Loya* v. *Starwood Hotels & Resorts Worldwide, Inc.*,
  583 F.3d 656 (9th Cir. 2009) ...............................................................................36

*In re: Lyondell Chem. Co.*,
  543 B.R. 428 (Bankr. S.D.N.Y. 2016) ..................................................................60

*Lyondell-Citgo Ref., LP* v. *Petroleos de Venezuela, S.A.*,
  No. 02 CIV. 0795 (CBM), 2003 WL 21878798 (S.D.N.Y. Aug. 8, 2003) ............46

*In re Magnesium Corp. of Am.*,
  583 B.R. 637 (Bankr. S.D.N.Y. 2018) ..................................................................90

*Makarova* v. *United States*,
  201 F.3d 110 (2d Cir. 2000) ............................................................................26,

*Maricultura Del Norte, S. de R.L. de C.V.* v. *Umami Sustainable Seafood, Inc.*,
  769 F. App'x 44 (2d Cir. 2019) .......................................................................53, 61

*Mastafa* v. *Australian Wheat Bd. Ltd.*,
  No. 07 Civ. 7955, 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008) .........................35

*McNamee* v. *Clemens*,
  762 F. Supp. 2d 584 (E.D.N.Y. 2011) ..................................................................58

*Monegasque de Reassurances S.A.M.* v. *NAK Naftogaz of Ukraine and State of Ukraine*,
  158 F.Supp.2d 377 (S.D.N.Y. 2001) ....................................................................37

*Munaf* v. *Geren*,
  553 U.S. 674 (2008) ............................................................................................50

*N. Shipping Funds I, L.L.C.* v. *Icon Capital Corp.*,
  No. 12 Civ. 3584(JCF), 2013 WL 1500333 (S.D.N.Y. Apr. 12, 2013) .................67

*In re Nat'l Bank of Anguilla*,
  580 B.R. 64 (Bankr. S.D.N.Y. 2018) .........................................................28, 29, 39

*Navarrete De Pedrero* v. *Schweizer Aircraft Corp.*,
  635 F. Supp. 2d 251 (W.D.N.Y. 2009) ............................................................32, 33

*Niv* v. *Hilton Hotels Corp.*,
   710 F. Supp. 2d. 328 (S.D.N.Y. 2008)...................................................................29

*Nnaka* v. *Fed. Republic of Nigeria*,
   756 F. App'x 16 (D.C. Cir. 2019)......................................................................46

*Nocula* v. *UGS Corp.*,
   520 F.3d 719 (7th Cir. 2008) ...............................................................49, 50, 51

*Norex Petrol. Ltd.* v. *Access Indus., Inc.*,
   416 F.3d 146 (2d Cir. 2005)..............................................................................27

*Norte* v. *Worldbusiness Capital, Inc.*,
   No. 14 Civ. 10143(CM), 2015 WL 7730980 (S.D.N.Y. Nov. 24, 2015), *aff'd*
   *Maricultura Del Norte, S. de R.L. de C.V.* v. *Umami Sustainable Seafood,*
   *Inc.*, 769 F. App'x 44 (2d Cir. 2019) ........................................................... passim

*In re Operations NY LLC*,
   490 B.R. 84 (Bankr. S.D.N.Y. 2013).................................................................76

*Osuna* v. *Citigroup Inc.*,
   No. 17 Civ. 1434 (RJS), 2018 WL 6547205 (S.D.N.Y. Sept. 28, 2018).................33

*Otor, S.A.* v. *Credit Lyonnais, S.A.*,
   No. 04 Civ. 6978 (RO), 2006 WL 2613775, at *5 (S.D.N.Y. Sept. 11, 2006).........39

*Pasternack* v. *Lab. Corp. of Am. Holdings*,
   27 N.Y.3d 817 (2016) .....................................................................................80

*In re Perforadora Oro Negro, S. De R.L. de C.V.*,
   No. 19-01301 (June 24, 2019) .....................................................................8, 10

*In re Perforadora Oro Negro, S.*
   *e R.L. e C.V.*, Adv. Proc. No. 18-01693, Dkt. 25) ..............................................23

*Piper Aircraft Co.* v. *Reyno*,
   454 U.S. 235 (1981)....................................................................................27, 32

*Pisarri* v. *Town Sports Int'l, LLC*,
   No. 18 Civ. 1737, 2019 WL 1245485 (S.D.N.Y. March 4, 2019).........................79

*Plumbing Supply, LLC* v. *ExxonMobil Oil Corp.*,
   No. 14 Civ. 3674 (VB), 2016 WL 1249611 (Mar. 29, 2016) ................................82

*Pollux Holding Ltd.* v. *Chase Manhattan Bank*,
   329 F.3d 64 (2d Cir. 2003)..............................................................................29

*Procter & Gamble Co.* v. *Quality King Distributors, Inc.*,
    974 F. Supp. 190 (E.D.N.Y. 1997) ....................................................................80

*Ramiro Aviles* v. *S & P Global, Inc.*,
    380 F. Supp. 3d 221 (S.D.N.Y. 2019).............................................................82

*Restis* v. *Am. Coalition Against Nuclear Iran, Inc.*,
    53 F. Supp. 3d 705 (S.D.N.Y. 2014)................................................................66

*River Glen Assocs., Ltd.* v. *Merrill Lynch Credit Corp.*,
    743 N.Y.S.2d 870 (1st Dep't 2002) ...................................................................80

*Saudi Arabia* v. *Nelson*,
    507 U.S. 349 (1993)..........................................................................................49

*Schultz* v. *Boy Scouts of Am.*,
    65 N.Y.2d 189 (1985) ........................................................................................54

*Sea Breeze Salt Inc.* v. *Mitsubishi Corp.*,
    899 F.3d 1064 (9th Cir. 2018) .................................................................. passim

*Sharma* v. *Skaarup Ship Mgmt. Corp.*,
    699 F. Supp. 440 (S.D.N.Y. 1988) ...................................................................69

*Sharma* v. *Skaarup Ship Mgmt. Corp.*,
    916 F.2d 820 (2d Cir. 1990)..............................................................................66

*Solmetex, LLC* v. *Dental Recycling of N. Am., Inc.*,
    No. 17 Civ. 860 (JSR), 2017 WL 2840282 (S.D.N.Y. June 26, 2017)....................71

*In re Stanford Int'l Bank, Ltd.*,
    2012 WL 13093940 (N.D. Tex. July 30, 2012) ...............................................88

*Strategic Value Master Fund, Ltd.* v. *Cargill Fin. Servs., Corp.*,
    421 F. Supp. 2d 741 (S.D.N.Y. 2006)..........................................................32, 35

*In re Thelen LLP*,
    736 F.3d 213 (2d Cir. 2013)..............................................................................54

*Toumazou* v. *Turkish Republic of N. Cyprus*,
    71 F. Supp. 3d 7 (D.D.C. 2014) ........................................................................77

*In re TransCare Corp.*,
    592 B.R. 272 (Bankr. S.D.N.Y. 2018)..............................................................77

*Trikona Advisors Limited* v. *Chugh*,
    846 F.3d 22 (2017)............................................................................................87

*Turedi* v. *Coca-Cola Co.*,
   343 F. App'x 623 (2d Cir. 2009) ........................................................28

*U.S. for Use & Benefit of Evergreen Pipeline Constr. Co., Inc.* v. *Merritt*
   *Meridian Constr. Corp.*,
   95 F.3d 153 (2d Cir. 1996).................................................................79

*Union Carbide Corp.* v. *Montell N.V.*,
   No. 95 Civ. 0134(SAS), 1998 WL 474207 (S.D.N.Y. Aug. 12, 1998) ..................................82

*Urban Global* v. *Dibbsbarker*,
   No. 10-12615, 2011 WL 2802904 (E.D. Mich. July 18, 2011) ..............................................35

*Valley Lane Indus. Co.* v. *Victoria's Secret Direct Brand Mgmt., L.L.C.*,
   455 F. App'x 102 (2d Cir. 2012) ....................................................................................

*W.S. Kirkpatrick & Co.* v. *Envtl. Tectonics Corp., Int'l*,
   493 U.S. 400 (1990).........................................................................42,

*Wilson* v. *ImageSat Int'l N.V.*,
   No. 07 CIV. 6176 (DLC), 2008 WL 2851511 (S.D.N.Y. July 22, 2008), *as*
   *amended* (July 30, 2008), *aff'd sub nom. Wilson* v. *EcIkhaus*, 349 F. App'x
   649 (2d Cir. 2009)................................................................28

*Wilson* v. *Tarricone*,
   No. 12 Civ. 5337, 2013 WL 12084504 (S.D.N.Y. Sept. 26, 2013) ........................................79

*World Wide Minerals Ltd.* v. *Republic of Kazakhstan*,
   296 F.3d 1154 (D.C. Cir. 2002) ........................................................44, 48

## STATUTES

11 U.S.C. § 362...............................................................................23

11 U.S.C. § 1501.............................................................................87

11 U.S.C. § 1501(b)(2) .....................................................................87

11 U.S.C. § 1509(b) ..........................................................................88

11 U.S.C. § 1509(b)(1) ..............................................................85, 88, 89

11 U.S.C. §§ 1519, 1521.................................................................88

11 U.S.C. § 1520....................................................................23, 82, 84

11 U.S.C. § 1520(a) .........................................................................23

11 U.S.C. § 1520(a)(1)......................................................................82

28 U.S.C. § 1334(b) ............................................................................................4, 83

Fed. Civ. Code Article 1910 ............................................................................. passim

Fed. R. Civ. P. 12(b)(1).........................................................................................26

Fed. R. Civ. P. 12(b)(6).........................................................................................25,

UN Commission on International Trade Law 2014....................................................88

**OTHER AUTHORITIES**

Third Amendment...................................................................................................9

Foreign Sovereign Immunity Act ...........................................................................46

Alterna Capital Partners, LLC, AMA Capital Partners, LLC, Maritime Finance Company Ltd., Kristan Bodden, Paul Matison Leand, Jr., Asia Research and Capital Management, Ltd., CQS (UK), Alp Ercil, GHL Investments (Europe) Ltd., Ship Finance Company, Ltd., (the "Ad Hoc Defendants"), by and through their undersigned counsel, file this memorandum of law in support of their motion to dismiss the Adversary Complaint (the "Complaint") by Gonzalo Gil-White, personally and in his former capacity as the foreign representative of Integradora de Servicios Petroleros Oro Negro, S.A.P.I. de C.V. ("Integradora") and Perforadora Oro Negro, S.A.P.I. de C.V. ("Perforadora" and, together with Integradora, "Oro Negro").  For the reasons that follow, the Moving Ad Hoc Defendants respectfully request an order dismissing the Complaint in its entirety, with prejudice, pursuant to Fed. R. Civ. P. 12.[1]

## PRELIMINARY STATEMENT

This Adversary Proceeding is brought by two Mexican companies in liquidation in Mexico, and their former CEO, who is also a Mexican citizen.  The Complaint challenges the conduct of Oro Negro's international creditors located all over the world (domiciled almost entirely outside of the United States) through a supposed conspiracy with the Mexican government to "destroy Oro Negro."  It seeks to assign blame for Oro Negro's failure everywhere but on the executives that managed the company into bankruptcy.  The former CEO, who is reportedly facing criminal investigations and civil claims in Mexico for mismanagement of the companies, and whose personal interests lie in seeking recovery for the equity, filed this action both individually and in his former capacity as Oro Negro's foreign representative in the Chapter 15 case pending before this Court.

---

[1]    Notwithstanding anything in this Motion, the Ad Hoc Group Defendants reserve all rights concerning this Court's ability to enter a final order or judgment concerning the claims under Article III of the United States Constitution and do not consent to entry of such an order or judgment if it is later determined that the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

The Complaint asserts 21 causes of action against 24 defendants, mostly tort claims under Mexican and United States law arising out of the termination of various contracts and related conduct in Mexico, and alleged abuse of Mexican bankruptcy ("*concurso*") and criminal proceedings.  The only Bankruptcy Code claim under United State law alleges that Defendants violated this Court's Stay and Comity Orders in connection with a criminal investigation regarding Oro Negro in Mexico.  All of these claims center on events in Mexico, taken primarily by individuals in Mexico, allegedly in violation of Mexican law and orders by the *Concurso* Court overseeing Oro Negro's insolvency proceedings.  Each of the claims alleges wrongdoing by Mexican government officials, acting in their official capacities in Mexico, and several of the complained-of actions have been expressly upheld by Mexican Courts.

The Complaint should be dismissed for several independent reasons.

*First*, the forum non conveniens doctrine compels dismissal because this action, brought by Mexican companies and a Mexican citizen with no ties to New York, arises from acts taken in Mexico by private citizens and Mexican government officials governed by Mexican law.  The defendants are dispersed all over the world, and the alleged connections to this forum (in the form of "meetings and calls" with U.S.-based advisors) are incidental at best.  The claims allege tortious interference to induce breaches by Petróleos Mexicanos ("Pemex") of state oil drilling contracts governed by Mexican law, "sabotage" of Mexican bankruptcy proceedings, "abuse" of Mexican criminal process, and "collusion" by Pemex and the Ad Hoc Defendants to violate *Concurso* Court orders.  The majority of the evidence and witnesses are in Mexico; Plaintiffs' claims implicate Mexican legal proceedings and orders issued by Mexican courts and require the interpretation of Mexican law; and Mexico's sovereign interests in adjudicating these cases substantially outweighs those of New York or any other jurisdiction.  Plaintiffs choice of a

New York forum is not entitled to deference in these circumstances and Mexico has been repeatedly recognized by U.S. courts as an adequate alternative forum, and is the only appropriate forum in which to entertain these claims. Indeed, the subject matter of most of Plaintiffs claims is already pending before various Mexican courts.

*Second*, Plaintiffs' claims are barred by the act of state doctrine because they directly challenge official acts of the Mexican government and would require this Court to declare invalid numerous acts by that government within its own territory. The gravamen of the Complaint is a far-reaching conspiracy between the Ad Hoc Defendants and the Mexican state-owned oil company, Pemex, and officials in Mexico's criminal justice system, including prosecutors, judges, Mexico's tax authority, and countless others. To be successful, the Plaintiffs will need to prove widespread misconduct throughout numerous branches of the Mexican government. The claims seek to overturn Mexico's sovereign decisions regarding the management of its most valuable natural resource—oil—and the administration of its criminal justice system. These are precisely the sorts of challenges the act of state doctrine was intended to prevent.

*Third*, Plaintiffs have pled tort claims alternatively under New York and Mexican law. There is no basis to apply New York tort law to injuries allegedly suffered by Mexican companies based on conduct which predominantly occurred in Mexico. Under New York's choice of law principles, Mexican law applies and all of the New York tort law claims should be dismissed. In addition, the Mexican law claims should be dismissed because, as explained by defendants' expert Rodrigo Zamora and confirmed by numerous decisions by the Second Circuit and other U.S. courts, Plaintiffs' claims, as pled, fail to state a claim under Mexican law.

*Fourth*, even if New York law applies, the claims should be dismissed because Plaintiffs fail to plead plausible claims for relief. Plaintiffs allege tortious interference by an Ad Hoc Group of bondholders ("Ad Hoc Group") beginning in April or May 2017, yet allege that Pemex began threatening to breach in March 2017 based on Pemex's alleged animus toward Oro Negro, before the Ad Hoc Group or its members are alleged to have done anything. Pemex's conduct was preceded by a resolution by its board of directors instructing Pemex's management to "negotiate and agree to modification of contracts, suspensions, and early terminations" of its contracts—instructions which applied to Oro Negro, among other companies. The Ad Hoc Defendants could not plausibly have induced Pemex's breaches, which began before the Ad Hoc Group was allegedly formed or had meetings with Pemex. Plaintiffs' abuse of process claims arising from criminal investigations by Mexican prosecutors fail for the simple reason that, under New York law, an abuse of process claim may not be based on alleged abuse of a foreign country's process. Plaintiffs' remaining kitchen sink claims—prima facie tort, negligence, and unjust enrichment—are duplicative of their tortious interference and abuse of process claims and fail for the same reasons. To the extent Plaintiffs have pled conspiracy claims, those claims should be dismissed because the underlying claims fail, and because the Complaint does not plead wrongdoing by many of the Ad Hoc Defendants, relying instead on unattributed group pleading against the "Ad Hoc Group."

*Fifth*, the Court should dismiss Mr. Gil's individual claims because this Court lacks subject matter jurisdiction to hear them and because he lacks standing to bring any claims in a Chapter 15 case. Mr. Gil has brought three claims in his individual capacity, alleging torts under New York and Mexican law related to criminal proceedings in Mexico. His individual claims do not "arise in" or "under" title 11, nor are they "related to" a bankruptcy case; they are

collateral claims for damages by a non-debtor with no conceivable effect on the foreign debtors'

estates, leaving the jurisdictional requirements of 28 U.S.C. § 1334(b) unmet.  Moreover, Mr. Gil

lacks standing to bring any claims in a Chapter 15 proceeding because he is not the foreign

representative.  Only the foreign representative has the capacity to "sue and be sued" on behalf

of the foreign debtors' estates under Chapter 15.

       *Finally*, this action is, in its entirety, not properly maintained in a Chapter 15

court.  This Chapter 15 case is an ancillary proceeding designed to provide assistance to the

foreign main proceeding, which is a Mexican bankruptcy case that is now in the liquidation

stage.  The main proceeding entered a liquidation order requiring the debtors' assets to be sold to

facilitate *recovery for creditors* in the shortest amount of time.  This Adversary Proceeding

thwarts those objectives.  It was filed to enrich Oro Negro's former CEO, Mr. Gil, and the out-

of-the-money shareholders with whom he is aligned, and asserts claims against creditors who are

first in line for recovery and cannot be subordinated under Mexican law, or under U.S. law.  This

case will not serve any legitimate purpose in the liquidation; it has not been approved by the

foreign main proceeding; and it should not be permitted to proceed in this Court.

       For all of these reasons, the Complaint should be dismissed.

## STATEMENT OF FACTS

**A.    Relevant Parties and Agreements**

**1.    Pemex**

Pemex is a Mexican state-owned oil company that is "controlled by the Mexican

government" and is alleged, throughout the Complaint, to be "part of the government."[2]  (Compl.

¶ 5, 13, 158.)  It exerts monopoly-like power over oil in Mexico, and is "by far Mexico's largest

---

[2]      Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Complaint.

source of revenue." (Compl. ¶ 5.) Under Mexican law, Pemex is required to provide the State

the "best conditions available . . . in regards to price, quality, financing, [and] opportunity," and

"seek at all times to create economic value for the benefit of Mexican society."[3] Because all of

Mexico's oil belongs to the state, Pemex is the only customer for an oil drilling company in

Mexico, such as Oro Negro.[4] (Compl. ¶ 5.)

### 2.    Oro Negro

Integradora is a Mexican oil-drilling company established in 2012 by Mr. Gil. He

is  "a well-known entrepreneur[]," and is allegedly now a resident of Florida. (Compl. ¶ 3, 17.)

Mr. Gil is also a principal of Axis Capital Management ("Axis"), an investment firm which has

invested, on behalf of its clients, in 47% of Integradora's equity, in addition to its principal

investment. (Compl. ¶ 429 n.18.)[5] Perforadora is a wholly-owned operating subsidiary of

Integradora, and is also incorporated in Mexico. (Id. ¶ 96.)

Before its bankruptcy, Integradora indirectly owned five oil-drilling jack-up rigs

(the "Rigs") through five Singaporean special purpose vehicles (the "Singapore Rig Owners").

(Id. ¶¶ 99–100.) The Singapore Rig Owners were owned directly by Oro Negro Drilling Pte.

("Oro Negro Drilling"), which, pre-bankruptcy, was a subsidiary of Integradora, and is also

incorporated in Singapore. (Id. ¶¶ 99, 100.)

Oro Negro's only business was operating the Rigs in Mexican waters in the Gulf

of Mexico. Pemex was Oro Negro's only customer. (Id. ¶ 141.)

---

[3]    Regulations to the Petróleos Mexicanos Law Art. 4; Constitución Política de los Estados Unidos Mexicanos ("Mex. Const.") Art. 134. A copy of the Mexican Constitution is attached to the Declaration of Rodrigo Zamora ("Zamora Decl.") as Exhibit 4. A copy of the Regulations to the Petróleos Mexicanos Law is attached as Exhibit 50 to the Clareman Declaration.

[4]    Article 27 of the Mexican Constitution states that all petroleum products are the "inalienable" property of the Mexican Nation. Mex. Const. Art. 27.

[5]    Dkt. 213-5 at 46 (Form S-1 Registration Statement for Opes Acquisition Corp., an affiliate of Axis).

### 3.    The Pemex Contracts and Bareboat Charters

Oro Negro's revenue was generated by five lease agreements between Perforadora and Pemex (the "Pemex Contracts"), pursuant to which Perforadora granted Pemex the right to use the Rigs in the Gulf of Mexico for a fixed daily rate per Rig (the "Day Rate"). (Compl. ¶ 140; Clareman Decl. Ex. 1-T (Decus-Pemex Contract), at Cl. 7.1.)[6] The contracts are governed by Mexican law and are subject to the exclusive jurisdiction of the courts of Mexico. (*See, e.g.*, Clareman Decl. Ex. 1-T (Decus-Pemex Contract), at Cl. 33.) Under the original terms of the Pemex Contracts, the Day Rate was approximately $160,000 per day for four Rigs and $130,000 per day for the fifth Rig. (Compl. ¶¶ 142–43.)

The termination provisions in the Pemex Contracts provide that Pemex may unilaterally terminate the Contracts under certain circumstances, such as "if Perforadora breaches them, for *force majeure*, or for 'duly justified reasons'" or "when so determined by [Pemex]." (*Id*. ¶ 144; *accord* Clareman Decl. Ex 1-T (Decus-Pemex Contract), at Cl. 18.)[7] Pemex also had the right to rescind or terminate the Pemex Contracts in the event of Perforadora's insolvency.[8]

Perforadora did not own the Rigs; it leased them from the Singapore Rig Owners through five agreements called bareboat charters (the "Bareboat Charters"), governed by U.S.

---

[6]    Copies of the Pemex Contracts and translations are attached as Exhibits 1 to 5 of the Clareman Declaration. The Pemex Contracts for Decus, Fortius, Laurus, and Primus Rigs similar in all material respects. The Impetus-Pemex Contract differs in some respects, and is addressed separately where relevant.

[7]    *See also id.* Ex. 3-T (Laurus-Pemex Contract), at Cl. 18; *id.* Ex. 4-T (Primus-Pemex Contract, at Cl. 18; *id* Ex. 2-T (Fortius-Pemex Contract), at Cl. 18.) The Impetus Pemex Contract does not contain this language.

[8]    For example, the Decus, Laurus, Primus, and Fortius Contracts each provide that Pemex can "administratively rescind the Contract at any time" if, among other things, Perforadora "is subject to commercial insolvency, bankruptcy or suspension of payments." (*See* Clareman Decl. Ex. 1-T (Decus-Pemex Contract), at Cl. 28; *id.* Ex. 3-T (Laurus-Pemex Contract), at Cl. 17; *id.* Ex. 4-T (Primus-Pemex Contract, at Cl. 17; *id* Ex. 2-T (Fortius-Pemex Contract), at Cl. 17.) Similarly, the Impetus-Pemex Contract provides that Pemex may terminate if Perforadora files a voluntary petition for bankruptcy. (*See id.* Ex. 5-T (Impetus-Pemex Contract), Cl. 30.3.2.3.)

maritime law. (Compl. ¶¶ 124–26.)[9]  Each Bareboat Charter corresponded to a specific Pemex

Contract and required that Perforadora pay each Singapore Rig Owner rent ("Charter Hire"

under the contracts) based on a formula tied to the Day Rate in the corresponding Pemex

Contract. (*See e.g.*, Clareman Decl. Ex. 6 (Primus Bareboat Charter), at §§ 3.2, 7.1, 11.1.)  Each

of the Bareboat Charters states that if the corresponding Pemex Contract is terminated "in

accordance with [the Pemex Contract's] terms or for any other reason prior to the Termination

Date . . . such termination will also be applicable for this Charter." (*Id.*).[10]

### 4.    The Oro Negro Drilling Bond Agreement and Mexican Trust Agreement

The Singapore Rig Owners financed the purchase of the Rigs in part through

approximately $900 million in bonds issued by Oro Negro Drilling (the "Bonds"). (Compl.

¶¶ 106–07, 109.)  The bond agreement ("Bond Agreement") is governed by Norwegian law,

subject to the exclusive jurisdiction of Norwegian courts, and names Nordic Trustee AS ("Nordic

Trustee"), a Norwegian company, as Bond Trustee.[11] (Clareman Decl. Ex. 11 (Bond

Agreement), at Clause 19.7.)[12]

The Bonds are secured by substantially all of Oro Negro's assets.  The security

package includes the Rigs, as well as rights to obtain all of Integradora's shares of Oro Negro

Drilling, all of the shares of Perforadora, and all of Oro Negro Drilling's shares of the Singapore

---

[9]     Copies of the Bareboat Charters are attached as Exhibits 6 to 10 of the Clareman Declaration.

[10]    *See also* Clareman Decl. Ex. 7 (Decus Bareboat Charter), at §§ 3.2, 7.1, 8.1.1, 11.1; *id.* Ex. 8 (Fortius
        Bareboat Charter), at §§ 3.2, 7.1, 8.1.1, 11.1; *id.* Ex. 9 (Laurus Bareboat Charter), at §§ 3.2, 7.1, 8.1.1, 11.1;
        Impetus Bareboat Charter §§ 3(b), 7.1, 8.1.1, 11.1.

[11]    Nordic Trustee was named as a defendant in a mirror-image complaint filed in a separate adversary
        proceeding. (*See* Complaint, *In re Perforadora Oro Negro, S. De R.L. de C.V.*, No. 19-01301 (June 24,
        2019).)

[12]    A copy of the Bond Agreement, as amended and restated on November 9, 2016, is attached as Exhibit 11 to
        the Clareman Declaration.

Rig Owners (collectively, the "Share Charges").[13]   The Share Charges also permitted Nordic

Trustee to replace all of the directors of Oro Negro Drilling and the Singapore Rig Owners in the

event of a default under the Bond Agreement. (*See* Compl. ¶¶ 113–114.)  Under the Bond

Agreement, events of default included failure by Perforadora or Integradora to make any

payment when due, and commencement of insolvency proceedings in any jurisdiction.

(Clareman Decl. Ex. 11 (Bond Agreement), Cl. 15(a)–(k) (listing events of default).)

       The Bonds were set to mature in January 2019.  (*See id.*, at Cl. 10.1.1(a).)  To

ensure payment, the Bond Agreement required all payments to Perforadora by Pemex to be made

to a trust account at Deutsche Mexico, a Mexican entity (the "Mexican Trust," governed by

Mexican law), with Nordic Trustee named as the primary beneficiary and the Singapore Rig

Owners as secondary beneficiaries.  (Compl. ¶ 160.)

       Under the "waterfall" in the Bond Agreement and Mexican Trust Agreement,

Perforadora was a pass-through vehicle intended only to receive enough funds to pay taxes and

operating costs; the remainder of the funds paid by Pemex to the Mexican Trust were required to

be paid to the Rig Owners as Charter Hire under the Bareboat Charters.  (Compl. ¶ 160; *see also*

Clareman Decl. Ex. 11 (Bond Agreement), at Cl. 13.4(b); *id.* Ex. 19-T (Mexican Trust

Agreement), at Cl. 9(a); *id.* Ex. 20-T (Third Amendment to Mexican Trust Agreement), at 5.)

The waterfall ensured that all proceeds from the Pemex Contracts flowed through the Mexican

Trust, and then to specific accounts controlled by the Bond Trustee as security for Oro Negro's

obligations under the Bond Agreement.  (*See id.*)

---

[13]     Copies of the Singapore Rig Owner Share Charges and Oro Negro Share Charges and translations are
        attached as Exhibit 11 to 18 of the Clareman Declaration.

### 5.    The Ad Hoc Group of Oro Negro Bondholders

Plaintiffs named as defendants various entities that owned or managed Oro Negro Bonds (the "Ad Hoc Group"). (Compl. ¶¶ 1, 19.) The Ad Hoc Group is alleged to have been formed in May 2017, and to have owned 60% of the Bonds. (*See* Compl. ¶¶ 109, 118.) The Ad Hoc Group consists of international investors, only one of which, Alterna, was incorporated in the United States when the Ad Hoc Group was formed. (Compl. ¶ 20.) The remaining original Ad Hoc Group members were located in Hong Kong (ARCM), London (CQS), Cyprus (GHL), and Bermuda (MFC and SFIL).[14] (*See* Compl. ¶¶ 29, 35, 37, 45, 50, 57.)[15] AMA, headquartered in New York, is only the financial advisor to the Ad Hoc Group. (Compl. ¶¶ 24, 25.)[16]

### B.    Pemex's Demand to Amend the Oro Negro Contracts

### 1.    Pemex's Threats to Breach the Agreements

Although the Pemex Contracts required payments of approximately $160,000 and $130,000 per day per Rig, Pemex did not actually pay those rates. In 2015 and 2016, citing "budget cuts caused by the decline of the price of oil, Pemex forced a 'temporary' alteration of the terms of the [Pemex] Contracts" by suspending all payments and operations for two Rigs until mid-2017, and reducing the Day Rate for three Rigs by approximately 27%. (Compl.

---

[14]    Kristan Bodden, the CEO of MFC, also resides in the United States; MFC is a Bermudan limited company. (Compl. ¶¶ 55–56.)

[15]    The composition of the Ad Hoc Group changed over time. MFC left the Ad Hoc Group in December 2018. (Compl. ¶ 166.) In October 2017, Contrarian Capital Partners, LLP also joined the Group. Contrarian has been named as a defendant in a separately filed, parallel complaint. (*See* Complaint, *In re Perforadora Oro Negro, S. De R.L. de C.V.*, No. 19-01301 (June 24, 2019).)

[16]    For ease of reference, this Motion refers to the Ad Hoc Group, AMA, and AMA CEO Paul Leand collectively as the "Ad Hoc Defendants." Plaintiffs use the term "Ad-Hoc Group Defendants" to refer to the Ad Hoc Defendants along with the Mexican law firm that represented the Singapore Rig Owners in Mexican criminal proceedings (Garcia Gonzalez y Barradas Abogados, S.C. ("GGB")); a Mexican national and resident who Plaintiffs allege is a "lobbyist" for the Ad Hoc Group (Andres Antonius-Gonzalez); and a London-based shipping magnate that Plaintiffs allege "led" the Ad Hoc Group (John Fredriksen)—an allegation which is wholly unsupported by the pleadings, which allege no specific actions by Fredricksen. (Compl. ¶¶ 7, 27–28, 43–44, 67, 186.)

¶ 145.)  The Complaint does not dispute that budget cuts occurred or that oil prices declined, but intimates those reasons were pretextual, alleging that "[f]rom 2012–2017, agents of the Mexican government solicited bribes from Oro Negro and its principals, which they refused to pay. Mexico retaliated against Oro Negro by imposing the drastic 2015 and 2016 Amendments and ultimately purporting to cancel the [Pemex] contracts . . . ."  (Compl. ¶ 158; *see also id.* ¶¶ 13, 159, 222.)

The Pemex Contracts were scheduled to revert to their original terms in October 2017, but, in March 2017, Pemex again sought to renegotiate.  (Compl. ¶¶ 146, 162.)  At that time, Pemex told Perforadora "that the [Pemex] Contracts would not revert to their original terms, and demand[ed]" that the contracts be permanently amended to reflect the 2016 amendments.  (*Id.* ¶¶ 162, 194, 398.)  Plaintiffs do not allege that any defendant encouraged, supported, *or even knew about* Pemex's demands to Oro Negro in March 2017, or played any role whatsoever in inducing those demands.

Neither Pemex's request nor its timing was coincidental.  On March 1, 2017, Pemex's Board of Directors issued a resolution directing Pemex to renegotiate its existing contracts—including those with Oro Negro—to bring them in line with Pemex's reduced budget and the broader oil market.  The resolution stated:

> Pursuant to Article 13, Section I, IV and XXIX of the Petróleos Mexicanos Law, the Board of Directors:
>
> **One.- Authorizes** the Management to negotiate and agree to modification of contracts, suspensions and early terminations, including those regarding terms for which prior authorization of this Board may be required, on the terms of the applicable provisions. . . .
>
> **Two.- Instructs** the Management so that, through the Operating Directorate of Procurement and Supply, it reports every six months to this Board . . . on the contractual modifications which have been agreed to, as well as the contracts in relation to which their suspension or early termination has been determined.

(Clareman Decl. Ex. 21 (Pemex Board of Directors Decision CA-016/2017), at 24.)  Pemex cited

this instruction from its Board to Oro Negro during negotiations in the spring and summer of

2017 as a basis for demanding amendments to the Pemex Contracts.  (*See* Clareman Decl. Ex. 22

(July 6, 2017 Letter), at 157).)[17]  Plaintiffs allege that during subsequent discussions between

Pemex and Oro Negro from April until September 2017, Pemex "repeatedly threaten[ed] to

terminate the [Pemex] Contracts."  (Compl. ¶¶ 164, 183.)

        The first alleged contact between the Ad Hoc Defendants and Pemex occurred in

April 2017, when principals of "MFC and ARCM met with Pemex to discuss Oro Negro," in

meetings allegedly "brokered" by defendant Andreas Antonius, a Mexican national living in

Mexico.  (*Id.*  ¶¶ 184, 403.)  Plaintiffs do not allege that these meetings occurred without Oro

Negro's knowledge and consent, and there is no allegation that Pemex's conduct changed as a

result of these meetings.

        The Ad Hoc Group formed in May 2017—two months after Pemex first

demanded the contract amendments and allegedly began threatening to terminate the Pemex

Contracts.  (*See Id.* ¶ 166.)  Plaintiffs do not allege any change in Pemex's posture toward the

company after the Ad Hoc Group formed or retained advisors.

        ### 2.        Negotiations with Pemex After the Formation of the Ad Hoc Group

        The threat by Pemex to terminate the Pemex Contracts was not only adverse to

Oro Negro's interests.  It was also adverse to the economic interests of its Bondholders.  The

Bonds were due to mature in January 2019, and had an aggregate face amount of approximately

---

[17]        At that time, Pemex told Oro Negro that Oro Negro's demands "exceed[ed] the budget allocated to Pemex
for the year 2017" and "d[id] not comply with the profitability and viability of the Projects . . . making it
legally impossible to accept them."  (Clareman Decl. Ex. 22, at 157.)

$900 million.  (Compl. ¶¶ 107–108.)  If the Pemex Contracts were terminated, Oro Negro would generate no revenue and default.

Plaintiffs allege virtually no contact between the Ad Hoc Group and Pemex or Oro Negro during the summer of 2017.[18]  Oro Negro, on the other hand, negotiated with Pemex extensively during the spring and summer of 2017 concerning potential amendments to the Pemex Contracts.  In connection with these negotiations, Oro Negro "reached out to the Ad-Hoc Group to discuss amending the Bonds."  (Compl. ¶ 188.)[19]  This "out-reach" by Oro Negro was little more than an effort to shift the pain of the Pemex amendments from Oro Negro to the Bondholders, for the benefit of Oro Negro's equity holders.  Oro Negro's only proposal, on August 28, 2017, would have reduced the face amount of the Bonds from approximately $900 million to approximately $300 million in conjunction with a debt-to-equity swap, paid the Bondholders $30 million outright, and provided the bondholders with one of the Rigs.  (Compl. ¶ 188.)  In this proposal, the existing equity took essentially no loss and would have kept approximately 90% of the equity in the new capital structure.  (*See* Clareman Decl. Ex. 23 (August 28, 2017 Press Release), at 3.)  The Bondholders rejected the offer.  (Compl. ¶ 189.)

Plaintiffs' remaining allegations regarding August 2017 are internally inconsistent and suggest no wrongdoing by the Ad Hoc Group.  For example, the Complaint alleges that in response to Oro Negro's August 28, 2017 proposal, the Ad Hoc Group "sent three letters to Oro

---

[18]    The Complaint alleges that in "telephone conferences in August 2017, Leand represented to a Bondholder that Pemex's priority was to protect the interests of the creditors of Pemex's vendors and that Pemex would determine what daily rates to pay its vendors based on the needs and preferences of the vendor's creditors." (Compl. ¶ 190.  The Complaint suggests that Mr. Leand "knew that Pemex's priority was to further the interests of holders of the Bonds."  (*Id.*)  According to the Complaint, on September 8, 2017, Mr. Ercil stated that he "was meeting with Pemex to discuss Oro Negro."  (*Id.*  ¶ 187).

[19]    According to correspondence filed by Oro Negro's former foreign representative, Pemex and Oro Negro met at least seven times from March through June 2017.  (*See* Clareman Decl. Ex. 22 (July 6, 2017 Letter), at 157.)

Negro demanding that Perforadora yield to Pemex and accept the 2017 Proposed Pemex

Amendments"—a better outcome for the Bondholders as compared to Oro Negro's proposal.

(Compl. ¶ 189.)  The Complaint also alleges that Oro Negro "informed Pemex that it would

accept the 2017 Proposed Pemex Amendments" on August 11, 2017, and that "Pemex failed to

execute the 2017 Pemex Amendments."  (Compl. ¶¶ 192–93.)  The Complaint does not explain

how the Bondholders' "demand" for Oro Negro to do what it already agreed to do harmed Oro

Negro, nor is there an allegation that the Ad Hoc Group prevented Pemex from signing the

amendments.

Moreover, the letters from the Bondholders show clearly that the Bondholders

made concrete counterproposals to Oro Negro that would have provided the company with debt

relief, accepted the Pemex amendments, avoided termination of the Pemex Contracts, and

allowed Oro Negro to continue as a going concern.  On September 12, 2017, the Ad Hoc Group

issued a binding resolution that, subject to Oro Negro's acceptance, amended the Bond

Agreement to consent to Oro Negro's acceptance of the 2017 Pemex Amendments.  (*See*

Clareman Decl. Ex. 24 (the "September 12 Resolution")．)  The September 12 Resolution also

restructured the Bonds by relieving Oro Negro of a $23 million payment due to the Bondholders

on October 1, 2017.  The proposal included a management incentive plan, would have

maintained full employment at Oro Negro, and required no capital contribution from equity

holders.  Oro Negro rejected this proposal the next day.  (*See* Clareman Decl. Ex. 25 (September

13, 2017 Letter).)

Taken as a whole, the allegations in the Complaint and documents it incorporates

by reference tell a story in which Pemex sought permanently to amend the Pemex Contracts in a

way that would impact the company, the Bondholders, and the equity.  Those groups negotiated

to preserve their own contractual rights and advance their economic interests.  But nothing in the

Complaint credibly pleads that the Ad Hoc Group caused Pemex to renegotiate the contracts or

later threaten to terminate them.  (*See* Compl. ¶ 10.)

### C.    Perforadora's and Integradora's *Concurso* Proceedings

On September 11, 2017, Perforadora filed for bankruptcy in Mexico

(commencing a proceeding called a *concurso mercantil*); Integradora filed on September 29,

2017.  (Compl. ¶¶ 195, 198, 252.)  Perforadora did not make its filing public and did not inform

Pemex or the Bondholders.  (*Id.* ¶ 252.)  Perforadora's *concurso* filing was first reported in the

press on September 21, 2017.  (Clareman Decl. Ex. 26 (Press Release).)

In its *concurso* filing, Perforadora sought numerous injunctive measures designed

to undermine the Bondholders' rights under the Bond Agreement.  For example, it sought to

enjoin Nordic Trustee from (i) declaring an event of default, (ii) terminating the Bareboat

Charters, or (iii) exercising the Share Charges.  (*See* Clareman Decl. Ex. 27 (the "October 5

Order").)  Perforadora also sought orders (i) requiring Pemex to pay money directly to it, rather

than to the Mexican Trust Account, (ii) enjoining termination of the Pemex Contracts, and (iii)

compelling Pemex to pay the original Day Rates under the contracts.  (*See id.*)

Perforadora's *concurso* filing set off a chain of contentious events, all of which

are subject to active and on-going litigation in Mexico.

**Termination of Pemex Contracts and Bareboat Charters.**  On October 3,

2017, Pemex made good on its months-long threat to terminate the Pemex Contracts and

delivered termination notices to Perforadora.  (*See* Compl. ¶ 214.)[20]  Although the Complaint

claims that "Pemex initially had no plans to terminate the [Pemex] Contracts as a result of

---

[20]      Copies of the Pemex termination notices are attached as Exhibits 28 to 32.

Perforadora's *concurso* filing," (*id.* ¶ 231), that allegation is flatly contradicted by the numerous

allegations that Pemex had repeatedly threatened to terminate the contracts for months as part of

a broader plan to "retaliate" against Oro Negro.  (*See id.* ¶¶ 164, 183, 188, 408).[21]



; the *Concurso* Court accepted Perforadora's filing on October 5,

2017, and although Pemex terminated Oro Negro's contracts, it did not "give new contracts" to

the Ad Hoc Group.[22]

**Exercise of Rights Under the Bond Agreement.**  Between September 21 and

October 5, 2017, the Ad Hoc Group directed Nordic Trustee to enforce several of the

Bondholders' rights under the Bond Agreement:

- On September 25, 2017, Nordic Trustee declared an event of default under the Bond
  Agreement.  (*Id.* ¶¶ 236, 252, 415.)

---

[21]    The Complaint attempts to ground this allegation in a text message, in which one Ad Hoc Group member
stated, told AMA that Pemex "[didn't] seem concerned about the news," and would "focus on next steps in
a week or so." (Compl. ¶ 231.)  Lack of concern with Perforadora's filing does not reasonably imply
Pemex had no intention of terminating the contracts, and the October 3, 2017 termination notices were sent
to Perforadora in a timeframe consistent with the statement that Pemex would focus on next steps "in about
a week or so."  *Id.*

[22]    The Complaint alleges repeatedly that the Bondholders induced termination of the Pemex Contracts in
order to award new contracts to Seamex.  (*See Id.* ¶¶ 10, 450, 474.)  However, the first alleged meeting or
discussion of any kind with Fintech Advisory, Inc. or Seadrill Limited (together, the "Seamex Defendants")
occurred on September 29, 2017, weeks after Oro Negro filed for *concurso*. (*Id.* ¶ 239.)  There is no
allegation that Seamex, Seadrill, or Fintech did anything to set in motion the events that began in March
2017 with Pemex's threat to breach or terminate contracts with Oro Negro.  (*Id.* ¶¶ 389–411.)  And, in all
events, there was never a final agreement between the Ad Hoc Defendants and the Seamex Defendants
regarding operation of the Rigs.  The parties "negotiated," according to the Complaint, solely in response to
the *concurso* filing and Pemex's threats to terminate, and not before.  (*Id.* ¶ 240.)

16

- On September 25, 2017, two directors of Oro Negro Drilling and the Singapore Rig Owners were replaced with new directors. (*Id.* ¶¶ 236, 255.) On October 3, 2017, the Share Charge on Oro Negro Drilling's shares was executed, thereby removing Integradora from its position of control over the company. (*Id.* ¶¶ 255, 346.)

- On October 5, 2017, the Singapore Rig Owners sent notices to Perforadora confirming the terminations of the Bareboat Charters due to the termination of the Pemex Contracts two days earlier. (*Id.* ¶ 237.)

Notwithstanding the allegation that these actions collectively constituted a "violent" response to the *concurso* filing, there is no allegation that any exercise of these rights was contrary to the Bond Agreement. (*See* Compl. ¶ 412.)

***Concurso* Court Orders and Related Litigation in Mexico.** The Complaint contains pages upon pages of allegations that defendants and Pemex "collude[d] to ignore *Concurso* court orders." (Compl. Part III. Section I.D.2.) Absent from the litany of alleged wrongs in Mexico is any finding by the *Concurso* Court that any of its orders had been violated. To the contrary, although Oro Negro has litigated all of the actions taken in response to the *concurso* filing extensively in Mexico there is no alleged ruling that the defendants failed to comply with any Court order in Mexico.

Plaintiffs' claims focus on two *Concurso* court orders, the first of which is dated October 5, 2017, and accepted Perforadora's *concurso* petition and granted certain injunctive relief. (*Id.* ¶ 200.) According to Plaintiffs, the October 5 Order enjoined Pemex from terminating its contracts and prevented Nordic Trustee from terminating the Bareboat Charters. (*Id.*) The *Concurso* Court also enjoined Deutsche Mexico—the trustee of the Mexican Trust—from distributing any funds in the Trust to any party. (*Id.*) On October 11, 2017, the *Concurso* Court issued a second order confirming the substance of the October 5 Order. (*See* Clareman Decl. Ex. 33 (the "October 11 Order"); Compl. ¶ 202.)

17

The scope of the October 5 and 11 Orders is the subject of on-going and unresolved litigation in Mexico, specifically regarding their retroactivity to the Pemex terminations. According to the Complaint, the *Concurso* Court, in a subsequent order, "stated that the October 5 and 11 Orders applied retroactively and as such, [] Pemex's purported terminations of the [Pemex Contracts] 'were not valid' . . . and that the [Pemex] Contracts were valid and enforceable" (the "December 29 Order"). (*Id.* ¶ 203; *see also* Clareman Decl. Ex. 34-T (December 29 Order).) However, Pemex appealed the December 29 Order to a constitutional appellate court—called an *amparo* court—in January 2018. (*See Compl* ¶ 203 at n.10.) The *amparo* court stayed the December 29 Order, and is yet to issue a final ruling. (*See id.*) Similarly unresolved in the Mexican courts, according to the complaint, is the allegation that Nordic Trustee's declaration of an event of default under the Bond Agreement and exercise of the Share Charges were invalid. (Compl. ¶ 208–10.)

Plaintiffs allege that Deutsche Mexico improperly wired $23 million from the Mexican Trust to Nordic Trustee in violation of the October 5 and 11 Orders. (*See* Compl. ¶ 257.) Yet that claim has been explicitly rejected by the *Concurso* Court. On August 17, 2018, the *Concurso* Court ruled that the $23 million disbursement complied with the Mexican Trust Agreement and did not violate prior orders—a fact Oro Negro's former Foreign Representative admitted to this Court.[23] (*See* Clareman Decl. Ex. 35 (August 17, 2018 Order).) The court reaffirmed that holding on October 11, 2018. (*See* Clareman Decl. Ex. 41 (October 11, 2018 *Concurso* Court Order).) Although Plaintiffs have appealed, no court in Mexico has found that the $23 million distribution violated any court order.

---

[23]    On September 13, 2018, former Foreign Representative Alonso Del Val informed this Court that "[o]n August 17, 2018, the *Concurso* Court ruled that Deutsche Mexico's disbursement of the $23 million from the Mexican Trust to Nordic Trustee did not violate the October 5 Order." (Dkt. 94 at 3–4.)

**D.      Allegations Regarding Pemex in January 2018**

Following hundreds of paragraphs in the complaint alleging that Pemex wanted to

"retaliate" against and "destroy Oro Negro," Plaintiffs allege—with scant detail—an about-face

by Pemex in January 2018, at which time plaintiffs claim that, "Pemex was set to have

negotiations with Perforadora to reactivate the [Pemex] Contracts."  (Compl. ¶ 272.)  Pemex

canceled the meeting, and did not reactivate the contracts.  (*Id*. ¶¶ 276–277.)  Plaintiffs blame

their inability to negotiate with Pemex on the Ad Hoc Group's Mexican counsel and a consultant

in Mexico, who allegedly dissuaded Pemex from meeting with Oro Negro.  (*Id*. ¶¶ 274–75.)

The Complaint contains no allegations regarding what Pemex offered to do other

than "negotiat[e]."  (*Id*. ¶ 272.)  No actual offer to "reactivate" the contracts was allegedly made.

All that is alleged is that Pemex agreed to meet with Oro Negro to discuss the Pemex Contracts,

and subsequently did not.  (*Id. ¶¶* 272, 276.)

**E.      Criminal Investigations Concerning Oro Negro and Its Former Management**

In addition to the alleged interference with the Pemex Contracts, Plaintiffs allege

that "in 2018, the Ad Hoc Group and Mexico[] initiated criminal cases seeking to seize Oro

Negro's cash and the Rigs and to imprison Oro Negro's management." (Compl. ¶ 11.)

Implicated in this alleged conspiracy—which is devoid of any specific allegations of misconduct,

and utterly lacking in any allegations that would show Oro Negro's innocence—are the *Servicio*

*de Administración Tributaria* (the "SAT," Mexico's tax authority), Mexico's Finance Minister,

the *Procuraduría General de la Republica* (the "PGR," Mexico's federal prosecutor's office),

the *Procuraduría General de Justicia de la Ciudad de México* (the Mexico City District

Attorney), and at least one criminal court judge supervising the criminal case from which two

contested court orders have issued.  (Compl. ¶¶ 335–338, 341, 343, 349, 352, 354–356, 368, 371,

378.)  All of the criminal investigations remain on-going; none has resulted in any finding of

innocence on the part of Oro Negro or its management, nor has any court found misconduct by government entities prosecuting them.  Every material event alleged in the complaint related to the criminal investigations has been the subject of judicial review by at least one Mexican court.

### 1.   Investigation into Fraudulent Administration of the Mexican Trust Account

In October 2017, AMA discovered that at least $16 million was missing from the Mexican Trust by comparing Perforadora's operating costs to the amount Perforadora collected from Pemex net of taxes, based on monthly financial reports Oro Negro made under the Bond Agreement.  (*See* Compl. ¶¶  327, 328, 329; Clareman Decl. Ex. 11 (Bond Agreement), Cl. 13.4(b)(i)(a); Clareman Decl. Ex. 19 (Mexican Trust Agreement), at Cl. 9(a)(iv)).  According to Perforadora's own financial information, it collected $138 million from Pemex in 2017 and incurred $33 million in operating expenses and administrative costs for the same period.  (*See* Compl. ¶¶ 327–28.)  The Singapore Rig Owners should have been paid the difference of $105 million.  But they were paid $89 million, leaving $16 million unaccounted for.  (*See id.* ¶ 328.) The Complaint meekly contests the conclusion that money was missing from the Mexican Trust by arguing that AMA should have "review[ed] the invoices that Pemex paid in 2017 . . . because the payments that Pemex made in 2017 were likely from 2016 invoices."  But this allegation does not explain why more money would leave the Trust than could be justified by Perforadora's reported expenses.  The Complaint is devoid of any attempt to proffer a "corrected" accounting showing that no money is missing, and does not attach any information from which a conclusion contrary to AMA's could be drawn.  (*See id.* ¶ 329.)

Following the discovery of the missing $16 million, the Singapore Rig Owners filed a criminal complaint with the PGR, alleging Perforadora had committed the crime of fraudulent administration of corporate assets.  (*Id.* ¶ 352.)  As part of its investigation, the PGR

obtained a copy of Perforadora's tax filings from the SAT, which, under Mexican law, included invoices for all payments to or from Perforadora (called "<u>DIOTS</u>").  (Compl. ¶¶ 336, 363.)

The official tax records show that, between 2014 and 2017, Perforadora paid $500,000 to 16 "sham" companies that were "blacklisted by the Mexican government because they facilitate tax evasion."  (*Id.* ¶¶ 339, 358).  Plaintiffs do not deny that the SAT's official records in fact reflect payments by Perforadora to these "sham" companies.  Rather, they blame the records on unidentified Mexican government officials whom they allege "were bribed to [] convince the SAT to fabricate or deliver to the PGR fabricated evidence."  (*See id.* ¶¶ 340–41, 391.)  This scurrilous allegation is not supported by any specific facts, and is based solely on the allegation that Perforadora did not itself record criminal transactions in its own tax filings.  (*Id.* ¶¶ 363–64.)  This allegation is hardly conclusive proof of Oro Negro's innocence.

### 2.    Investigation into Payments to Sham Companies

Based on the SAT's records of Perforadora's payments to "sham" companies, on September 14, 2018, the Singapore Rig Owners filed a *querella* with the Mexico City prosecutor's office (the "<u>Sham Company *Querella*</u>").  (Compl. ¶ 352.)  The Sham Company *Querella* alleged that Perforadora's payments to the "sham" companies constituted the crime of fraudulent administration of company assets.  (*See id.*)

Plaintiffs allege that the Singapore Rig Owners' counsel "knew or should have known that the evidence on the SAT's disc was false" because the disc allegedly contained conflicting information among the "hundreds of tax filings."  (Compl. ¶¶ 337, 365.)  However, a Mexico City prosecutor and a Mexican criminal judge have found the evidence sufficiently compelling to freeze the Mexican Trust and order the Rigs placed under the Rig Owners' control during the pendency of the criminal investigations.

Specifically, on September 25, 2018, "the Mexico City DA . . . sought and obtained an order from [a Mexico City criminal judge] seizing all the bank accounts of the Mexican Trust and of Perforadora (the 'Seizure Order')." (*Id.* ¶ 368)  The court found that the prosecutor had presented sufficient evidence that Perforadora had committed the crime of fraudulent administration to justify freezing the Mexican Trust Account.  (Clareman Decl. Ex. 45 (Sept. 25 Order) at 5–6.)[24]  Oro Negro has challenged the Seizure Order in Mexico, but it has been upheld by five separate courts, including a unanimous decision by the Supreme Court of Mexico on July 4, 2019.  (*See id.* Ex. 39 (July 4, 2019 Sup. Ct. Order); *see also* Clareman Decl. Ex. 40 (June 7, 2019 Amparo Court Order).)

On October 18, 2018, after a two-day hearing, the Singapore Rig Owners sought and obtained an order from the Mexico City criminal court granting them provisional restitution of the Rigs (the "Restitution Order").  (Compl. ¶ 372.)  The Mexican criminal judge not only ordered the restitution of the Rigs, but "to ensure the Singapore Rig Owners would have all possible assistance from the Mexican government" the court ordered the *Agencia de Investigación Criminal*, the PGR's police force, and the *Fuerzas Armadas*, the Mexican army, to "provide all possible assistance to the Singapore Rig Owners in taking over the rigs."  (Compl. ¶ 378.)

On October 21, 2018, the Singapore Rig Owners and government officials sought to execute the order, and three people boarded one of the rigs—an attorney for the Singapore Rig

---

[24]    Plaintiffs note that a different judge had denied a similar request made by the authorities in the PGR investigation into the Fraudulent Administration *Querella* (*see* Compl. ¶ 369), and misleadingly state that the "federal judge concluded that the allegations of mismanagement of the Mexican Trust were completely baseless and that the PGR had no evidence demonstrating that the Mexican Trust was in any way related to any criminal conduct." (Compl. ¶ 334.)  This is plainly a mischaracterization of the decision; the federal investigation is ongoing, which it would not be if a court had actually concluded the claims were "baseless."  The federal judge denied the requested relief without prejudice because the prosecutor merely provided the judge with a disc containing all of Oro Negro's tax filings from the SAT without explaining their importance.

Owners, a federal police officer, and a private security guard.  (*Id.* ¶¶ 381–82.)  Plaintiffs'

employees, however, refused to comply with the Restitution Order and turn over possession of

the Rigs.  On November 15, 2018, AMA, Alterna, and the Singapore Rig Owners stipulated to a

temporary restraining order and agreed not to take further actions to execute the Restitution

Order.[25]  (*In re Perforadora Oro Negro, S. de R.L. de C.V.*, Adv. Proc. No. 18-01693, Dkt. 25)

### F.        The Chapter 15 Proceeding

On April 20, 2018, former Foreign Representative Alonso Del Val sought

recognition of the Mexican *concurso* proceeding as a foreign main proceeding pursuant to

Chapter 15 of title 11.  (Compl. ¶ 292.)  On May 17, 2018, this Court granted recognition to

foreign main proceeding (the "Recognition Order"), and also granted Oro Negro stay relief

pursuant to 11 U.S.C. § 1520 against any "act to obtain possession of property of the estate or

property from the estate or to exercise control over property of the estate" within the territorial

jurisdiction of the United States.  (*See* Compl. ¶ 555; 11 U.S.C. § 362 (made applicable through

11 U.S.C. § 1520(a)).)

On July 11, 2018, the Court entered an order granting comity to the October 5,

October 11, and December 29 Orders "in accordance with their terms . . . solely with respect to

persons or property over whom/which this Court ha[d] jurisdiction."  (*See* Compl. ¶ 293;

Clareman Decl. Ex. 43 (the "Comity Order").)  When granting comity, the Court observed it

"cannot be underscored enough the extent to which the parties disagree[d] as to the interpretation

of various aspects of the Mexican court orders."  (Clareman Decl. Ex. 44 (the "Comity Hr'ng

---

[25]        Plaintiffs allege that the Singapore Rig Owners filed two additional criminal complaints:  (1) a complaint
against Alonso Del Val, for authorizing an attorney to file concurso petitions on behalf of Integradora and
its subsidiaries when Del Val lacked the authority to do so, and (2) a complaint against Perforadora and its
employees for being in contempt of the Restitution Order.  (Compl. ¶¶ 343–48, 394–97.)  Other than the
fact of these filings, Plaintiffs allege no separate harm from these investigations.

Tr.") at 204:9–11.)  Further, the Court made clear that it did not resolve the parties' dispute as to

the meaning or scope of the October 5, October 11, or December 29 Orders, because "it would

not be appropriate for [the Court] to interpret the orders of the Mexican court."  (*Id.* at 204:11–

16.)[26]

Notwithstanding the ambiguity as to what the Mexican *concurso* orders

proscribed, Plaintiffs allege that the Ad Hoc Defendants, collectively, willfully violated the

Comity and Stay Orders when the Singapore Rig Owners attempted to execute the Restitution

Order issued by the Mexican criminal court.  (*See* Compl. ¶¶ 553, 556–59, 563.)

G.    **The Adversary Proceeding**

On June 13, 2019, the *Concurso* Court ordered the liquidation of Oro Negro.  (*See*

Dkt. 214.)  The court-appointed liquidator, Fernando Perez-Correa, was subsequently designated

as the foreign representative, replacing Mr. Gil.  (*See* Dkt. 238).  This Adversary Proceeding was

commenced by Mr. Gil, the former foreign representative, on the eve of liquidation, on June 6,

2019.  Although Mr. Perez-Correa  is the current foreign representative he has not yet appeared

as a party to the Adversary Proceeding or substituted himself as Plaintiff for Mr. Gil.

Plaintiffs allege 21 causes of action, including 19 tort claims arising out of the

termination of the Pemex Contracts, related contracts, and conduct in Mexican *concurso* and

criminal courts.  Plaintiffs allege that the Defendants conspired with the Mexican government to

tortiously interfere with Oro Negro's contracts and relationships with Pemex and the Singapore

Rig Owners.  (Counts 1, 2, 3, 4, 5, 6, 12, 13, 14, 15, 16, 19, 20, 21.)  Plaintiffs also allege a

conspiracy to "sabotage" Oro Negro's efforts to reorganize (Counts 7, 8), and a further

---

[26]    The Court explained that "it was pretty clear [during the hearing] that [the Court] was struggling at times
and continue[d] to struggle to understand exactly what the Mexican court meant in issuing its rulings.  But
that's for the Mexican court to determine."  (Clareman Decl. Ex. 44 (Comity Hr'ng Tr.), at 204:17–20.)

conspiracy to abuse the legal process in Mexico by pursuing the criminal investigations (Counts 9, 10, 11). The remaining non-tort claims allege that the Defendants violated the stay and the Comity Order by enforcing the Restitution Order (Count 18), and that the Singapore Rig Owners breached the Bareboat Charters with Oro Negro (Count 17). All claims but 4 have been asserted against the Ad Hoc Defendants (Counts 2, 4, 12, 17). For the reasons described below, all of these claims against the Ad Hoc Defendants should be dismissed.

<u>**ARGUMENT**</u>

To survive a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Fed. Deposit Ins. Corp.* v. *Bank of New York Mellon*, 369 F. Supp. 3d 547, 552 (S.D.N.Y. 2019) (citing *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)). While reasonable inferences may be drawn in plaintiff's favor, "pleadings that . . . are no more than conclusions[] are not entitled to the presumption of truth." *Iqbal*, 556 U.S. at 679. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" and "formulaic recitation of the elements of a cause of action" are not sufficient to withstand a motion to dismiss. *Id.* at 678, 681 (citing *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). Dismissal is appropriate where the plaintiff fails to "'raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc.* v. *Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief." *Id.* (same).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), a Court may consider documents that are incorporated by reference in the complaint, documents that the

plaintiffs relied on in bringing suit and that are either in plaintiffs' possession or that plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. *See Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)), *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Although the Court generally accepts plaintiffs' allegations as true, the Court "need not accept as true an allegation that is contradicted by documents on which the complaint relies." *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 231 (S.D.N.Y. 2015) (citing *In re Bristol–Myers Squibb Sec. Litig.,* 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004)).

To withstand a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), "the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists." *Leon* v. *Rockland Psychiatric Center*, 232 F. Supp. 3d 420, 426 (S.D.N.Y. 2017); *see also Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."). In considering whether plaintiff has met this burden, the Court accepts as true the facts alleged in the Complaint, but need not draw "argumentative inferences" from the complaint in plaintiff's favor. *Buday* v. *New York Yankees Partnership*, 486 F. App'x 894, 895 (2d Cir. 2012). In addition to the facts alleged in the complaint, in resolving a motion to dismiss pursuant to Rule 12(b)(1), courts may consider evidence outside the pleadings, including affidavits and other materials submitted by the parties. *Fed. Deposit Ins. Corp.* v. *Bank of New York Mellon*, 369 F. Supp. 3d 547, 552 (S.D.N.Y. 2019); *Makarova*, 201 F.3d at 113.

## I.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED ON FORUM NON CONVENIENS GROUNDS

This action does not belong in a United States Court.  Perforadora and Integradora are Mexican companies; Mr. Gil, Integradora's former CEO, is a Mexican citizen; almost all events alleged in the Complaint occurred in Mexico, including an alleged conspiracy with "Mexico"; the evidence is mostly in Mexico; and Mexico has the greater interest in adjudicating these claims.  Indeed, many of the issues raised by the complaint, including the validity of the termination of the Pemex Contracts and whether the exercise of the Share Charges can be annulled, are already being litigated in Mexico.  (Compl. ¶¶ 210.)  Accordingly, the Complaint should be dismissed on forum non conveniens grounds so that it may be heard, if at all, in the appropriate forum, Mexico.

The doctrine of forum non conveniens allows a court to decline jurisdiction if, after weighing private and public interest factors, it decides the case should be heard in a more convenient forum.  *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 257 (1981); *see, e.g.*, *In re Bancredit Cayman Ltd.*, 2008 WL 5396618, at *9 (Bankr. S.D.N.Y. Nov. 25, 2008) (dismissing a Chapter 15 adversary proceeding complaint on forum non conveniens).  When evaluating a forum non conveniens challenge, courts in this Circuit employ a three-step inquiry.  *Iragorri* v. *United Techs. Corp.*, 274 F.3d 65, 73–74 (2d Cir. 2001) (*en banc*); *see Abullahi* v. *Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009).  At the first step, a court determines the degree of deference properly afforded to a plaintiff's choice of forum.  At step two, it considers whether the alternative forum proposed by defendants is adequate to adjudicate the dispute.  Finally, at step three, a court must balance the private and public interests implicated in the choice of forum.  *Norex Petrol. Ltd.* v. *Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005).

Here, no deference is owed to Plaintiffs' choice of forum, and even if deference were owed, it would be outweighed by public and private interest factors, which strongly favor adjudicating these claims in Mexico.

### A.    Plaintiffs' Choice of Forum Deserves No Deference

At the first step of the inquiry, "a court should compare the lawsuit's bona fide connection to the forum against any indicia that the plaintiff was motivated by forum shopping." *Erausquin*, 806 F. Supp. 2d at 724. The "degree of deference owed to a plaintiff's choice of forum [is measured] on a sliding scale; the more it appears that the plaintiff's choice of a United States forum was motivated by forum shopping reasons, the less deference the plaintiff's choice commands." *In re Nat'l Bank of Anguilla*, 580 B.R. 64, 85 (Bankr. S.D.N.Y. 2018). "[A] foreign plaintiff's choice of forum deserves less deference than the same choice by a domestic plaintiff," *Turedi* v. *Coca-Cola Co.*, 343 F. App'x 623, 625 (2d Cir. 2009), and when the connections to the chosen forum are very limited, that choice is entitled to "minimal[] deference." *Wilson* v. *ImageSat Int'l N.V.*, No. 07 Civ. 6176 (DLC), 2008 WL 2851511, at *4 (S.D.N.Y. July 22, 2008), *as amended* (July 30, 2008), *aff'd sub nom. Wilson* v. *EcIkhaus*, 349 F. App'x 649 (2d Cir. 2009).

This action is brought on behalf of two Mexican companies, with no operations in the United States, that are being liquidated in a Mexican bankruptcy proceeding. (Compl. ¶¶ 18, 195, 198.) Mr. Gil is Oro Negro's former CEO and a Mexican citizen.[27] Neither Plaintiffs nor

---

[27]    Mr. Gil is allegedly a resident of Miami, Florida, (Compl. ¶ 17), but, as discussed *infra*, there is no jurisdiction in this Court for his individual claims. Moreover, his state of residence does not weigh against dismissal in favor of Mexico. He has no alleged connection to New York. Each of his claims relate to investments and business ventures in Mexico, and regardless "[w]here an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon [residence] as a talisman against forum non conveniens dismissal is diminished." *Base Metal Trading SA* v. *Russian Aluminum*, 253 F. Supp. 2d 681, 696 (S.D.N.Y. 2003) (internal quotation marks omitted). Additionally, mere residence in the United States "is not in and of itself

the lawsuit have a significant "bona fide connection" to New York. *Iragorri*, 274 F.3d at 71–72;

*cf. Pollux Holding Ltd.* v. *Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003)  ("[T]he

appropriate level of deference depend[s] on the plaintiffs' relationship with the Southern District

of New York.").  These facts alone create "a plausible likelihood" that "the [forum] selection

was made for forum-shopping reasons" rather than convenience. *In re Nat'l Bank of Anguilla*,

580 B.R. at 85 (citing *Iragorri*, 274 F.3d at 71).  In fact, Plaintiffs allege *no* connections between

Oro Negro and the United States other than (1) that the Bareboat Charters were governed by U.S.

maritime law, and (2) seven of the 24 named defendants are (or have been) based in the United

States—only *three* of them in New York.[28]  These minimal connections, weighed against the

inconvenience of litigating in New York, lay bare that Plaintiffs are forum shopping.

     *First*, Mexico is presumptively the more convenient forum because the events

underlying Plaintiffs' claims occurred in Mexico and most relevant evidence and witnesses are

there. *See Niv* v. *Hilton Hotels Corp.*, 710 F. Supp. 2d 328, 332 (S.D.N.Y. 2008) (finding this

factor weighed in favor of dismissal when "none of the significant events occurred in this

jurisdiction").  Pemex's alleged conduct to "retaliate" against Oro Negro took place in Mexico

(Compl. ¶¶ 145–46, 158); Oro Negro's *concurso* proceedings are ongoing in Mexico (*see id.* ¶¶

195, 198, 210); conduct related to the seizure of the Mexican Trust Account occurred in Mexico

(*see id.* ¶¶ 349–354); the criminal proceedings against Oro Negro and its former management are

pending in Mexico (*see id.* ¶¶ 324, 343, 348, 352, 394); and any alleged efforts to seize the Rigs

occurred in Mexico (*see id.* ¶¶ 372–374, 380–84).  There are in fact several cases in Mexican

---

sufficient to bar a district court from dismissing a case on the ground of forum non conveniens." *Cheng* v. *Boeing Co.*, 708 F.2d 1406, 1411 (9th Cir. 1983).

[28]    The Second Circuit has explained that "a plaintiff's choice to initiate suit in the defendant's home forum . . . only merits heightened deference to the extent that the plaintiff and the case possess *bona fide* connections to, and convenience factors favor, that forum." *Pollux*, 329 F.3d at 74; *accord Piper Aircraft*, 454 U.S. at 251–52.

courts turning on issues implicated in the Complaint, such as the lawsuit Oro Negro filed against

Pemex alleging that Pemex unlawfully terminated the Pemex Contracts.  (*See Id.* ¶ 209.)

The crucial evidence is there, not here.  Mexico is a signatory of the Hague

Convention on the Taking of Evidence Abroad, but the Hague process for pretrial discovery is

laborious.  Further, the Hague Convention in this case would only allow for the taking of

evidence in accordance with "the methods and procedures to be followed" in Mexico.

Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, art. 9, March 18,

1970, 23 U.S.T. 2555.  Accessing evidence in Mexico through the Hague Convention would be

burdensome for the parties and this Court, and would not result in any greater evidentiary record

than would be available if the proceeding itself took place in Mexico.  By contrast, Plaintiffs

already obtained any New York evidence through Oro Negro's Chapter 15 proceeding and Rule

2004 subpoenas.  It is implausible that New York would be more convenient now.[29]

*Second*, Oro Negro seeks tactical advantage by bringing its claims (eight under

Mexican law) in a U.S. court.  This further supports an inference of forum shopping.  *See*

*Iragorri*, 274 F.3d at 71 (noting that when foreign plaintiff chooses a U.S. forum, "a plausible

likelihood exists that the selection was made for forum-shopping reasons, such as the perception

that United States courts award higher damages than are common in other countries").  Pretrial

discovery in Mexico is much narrower than in the U.S. and, in contrast with wide-ranging

deposition questions permitted under U.S. law, testimonial discovery is limited to yes-or-no

---

[29]    The foreign representative's motion seeking approval of its proposed litigation interest agreement (the "LIA Motion") (Dkt. 205) laid bare the forum shopping motives animating plaintiffs in this case.  They sought to avail themselves of rules here that were more "plaintiff friendly" than what they would encounter in Mexico, and attempted to conceal the proposed sale agreement from the *Concurso* Court.  The Foreign Representative, Mr. Perez-Correa, explained to this Court that "the first reason [for filing the LIA Motion in this forum instead of in Mexico] is if the company files [it] in Mexico, it has to become public"—an explanation that was rightly rejected by this Court.  (Adjournment of the Sale Motion Hr'ng Tr. 20:17–20, Aug. 15, 2019.)  Plaintiffs are similarly forum shopping here.

questions and is supervised by the court.  (*See* Declaration of Rodrigo Zamora ¶ 86 ("Zamora Decl.").)  Plaintiffs also purport to seek punitive damages—and the settlement pressure that their availability creates—which are very limited under Mexican law.[30]

      *Finally*, Oro Negro's decision to litigate in a forum where only a minority of defendants are amenable to suit rather than in its home forum smacks of "tactical harassment of an adversary" rather than convenience.  *See Norex*, 416 F.3d at 155–156.  Only seven of the 24 defendants, and four of the thirteen Ad Hoc Defendants, are alleged to be U.S. persons or businesses.[31]  (*See* Compl. ¶¶ 19–67.)  These non-U.S. defendants have substantial objections to personal jurisdiction in the United States and contest the ability of this Court to assert jurisdiction, as explained in the Foreign Defendants' Motion To Dismiss The Complaint For Lack Of Personal Jurisdiction filed contemporaneously herewith.

      Accordingly, Plaintiffs' choice of forum warrants no deference.

      **B.**    **Mexico Is an Adequate Alternative Forum**

      Courts determining the adequacy of a non-U.S. forum examine two principal questions:  first, whether defendants can be served in the foreign forum; and second, whether that forum provides an adequate remedy.  *See In re Arbitration Between Monegasque De Reassurances S.A.M.* v. *Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002).  Here, the answer to both questions demonstrates that Mexico is adequate.

      As to the first question, Mexican courts are competent to hear cases against multiple defendants, including defendants located abroad, if they are parties to contracts to be

---

[30]    In fact, punitive damages were unknown to the Mexican legal system until 2014, and they are still only allowed as part of the compensation for the so-called moral damages (non-monetary).  (Zamora Decl. ¶ 32 n.26.)

[31]    *See* Foreign Defendants' Motion To Dismiss The Complaint For Lack Of Personal Jurisdiction for further discussion of the lack of jurisdiction over non-U.S. Ad Hoc Defendants.

performed in Mexico or are alleged to have committed torts in Mexico.  (*See* Zamora Decl. ¶ 74–79.)  Here, each of Plaintiffs' claims against the Ad Hoc Defendants includes Mexican defendants and alleges breaches of contract or torts in Mexico.  (Compl. ¶¶ 446–53, 458–65, 477–514, 521–46, 551–79.)  Moreover, each of the Ad Hoc Defendants resides in a country that is party to the Hague Convention on Service of Process and is therefore subject to service. *Firebird Republics Fund, Ltd.* v. *Moore Capital Management LLC*, No. 09 Civ. 303, 2009 WL 2043885 (S.D.N.Y July 14, 2009) (finding Ukraine and the U.K. adequate alternate forums because the Hague Convention permits service and both forums permit litigation of the asserted claims); *Leetsch* v. *Freedman,* 260 F.3d 1100, 1103 (9th Cir. 2001) (noting that amenability to service is "not in question" because "[s]ervice would be possible … under procedures set forth in the Hague Convention").

When evaluating the adequacy of a foreign forum's remedy, "the relevant inquiry concerns the capability of the foreign court to litigate the 'essential subject matter' of the dispute."  *Palacios*, 757 F. Supp. 2d at 357.  The remedy provided by the alternative jurisdiction is sufficient so long as it is not "so clearly inadequate or unsatisfactory that it is no remedy at all."  *See Ranza*, 793 F.3d at 1077; *Strategic Value Master Fund, Ltd.* v. *Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 756 (S.D.N.Y. 2006).  Indeed, "only on rare occasions will the 'alternative forum . . . be so unsatisfactory that the forum is inadequate.'"  *Navarrete De Pedrero* v. *Schweizer Aircraft Corp.*, 635 F. Supp. 2d 251, 261 (W.D.N.Y. 2009) (quoting *DiRienzo* v. *Philip Servs. Corp.*, 232 F.3d 49, 57 (2d Cir. 2000)).  The mere fact that the law of the alternative forum is less favorable on the merits, or that the forum has less favorable discovery procedures, does not weigh against dismissal.  *See Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 255 (1981).

Here, Mexico offers Oro Negro remedies that easily meet this threshold, and numerous courts in this Circuit have found Mexican courts to be an adequate forum for tort claims.[32] Plaintiffs themselves allege that Mexico recognizes claims for intentional torts and negligence—indeed, eight of their claims *are pled under Mexican law*. (*See* Compl. ¶¶ 471, 478, 485, 491, 502, 509, 536, and 542.) *See also Becker*, 1995 WL 267025 at *2 ("Mexican law recognizes the concept of negligence."). As explained in Section III, *infra*, the fact that Plaintiffs' allegations are insufficient to state intentional tort or negligence claims under Mexican law does not militate against dismissal here. "The Second Circuit has made it abundantly clear that '[t]he availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum.'" *LaSala* v. *Bank of Cyprus Pub. Co*., 510 F.Supp.2d 246, 255 (S.D.N.Y. 2007) (quoting *PT United Can Co.* v. *Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998)). In *LaSala*, the district court dismissed for forum non conveniens in favor of Cyprus despite the fact that two of plaintiffs' five claims were not recognized by Cypriot courts. *See also Palacios*, 757 F. Supp. 2d at 357 (finding Guatemala an adequate forum because it "recognizes substantially equivalent claims" for some of the alleged causes of action). Here, Plaintiffs' claims are deficient under Mexican law, but not because Mexico does not recognize tort claims or is not amenable to litigating the "essential subject matter of the dispute." *Id*. (internal quotation omitted). If this complaint is dismissed, Plaintiffs will be free to bring claims in Mexico and fashion their pleadings accordingly. (*See* Zamora Decl. ¶¶ 74–79; Section III, *infra*.)

---

[32]    *See, e.g.*, *Osuna* v. *Citigroup Inc.*, No. 17 Civ. 1434 (RJS), 2018 WL 6547205, at *8 (S.D.N.Y. Sept. 28, 2018) (malicious prosecution, tortious interference with business relationships, and fraud); *Langsam* v. *Vallarta Gardens*, No. 08 CIV. 2222 WCC, 2009 WL 8631353, at *6–7 (S.D.N.Y. June 15, 2009) (conversion, fraud, and wire fraud); *Becker* v. *Club Las Velas*, No. 94 CIV. 2412 (JFK), 1995 WL 267025, at *2 (S.D.N.Y. May 8, 1995) (negligence); *Navarrete De Pedrero* v. *Schweizer Aircraft Corp.*, 635 F. Supp. 2d 251, 261 (W.D.N.Y. 2009) (product liability and negligence).

33

### C.    Private and Public Interest Factors Favor Dismissal

The balance of private and public interests implicated in the choice of forum here weighs decisively in favor of Mexico.

#### 1.    Private Factors Weigh in Favor of Dismissal

The private interest factors strongly favor dismissal on forum non conveniens grounds.  When weighing the private interests, courts consider "(a) the ease of access to evidence; (b) the availability of compulsory process; (c) the cost for cooperative witnesses to attend trial; (d) the enforceability of a judgment; and (e) all other practical matters that might shorten any trial or make it less expensive."  *Do Rosario Veiga* v. *World Meteorological Organisation*, 486 F. Supp. 2d 297, 306 (S.D.N.Y. 2007) (citing *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508–09 (1947)); *accord Aguinda* v. *Texaco, Inc.*, 303 F.3d 470, 479 (2d Cir. 2002) (citation omitted).  Each factor favors Mexico.

*First*, as discussed above, much of the evidence, including documents held by of Oro Negro, Pemex, the Mexican tax authority and other government authorities, and the three Mexican defendants (over whom there is no basis apparent in the Complaint for jurisdiction here) are in Mexico.  This "concentration of evidence in [Mexico] weighs heavily in favor of dismissal." *Palacios*, 757 F. Supp. 2d at 361; *see also Becker*, 1995 WL 267025, at *3 (private factors weighed in favor of Mexico where, among other things, "the official records concerning the incident . . . are all located in Mexico").  Moreover, given that many of the relevant documents are in Spanish and relate to Mexican law—in particular, records of Mexican proceedings, Mexican court orders, Mexican tax records, and Spanish-language communications—the cost and delay of translation and interpretation expenses, and of the need for expert witnesses on Mexican law, weighs in favor of dismissal. *See In re Bancredit*, 2008

WL 5396618, at *6 (citing cases); *Blanco* v. *Banco Indus, de Venez.*, S.A., 997 F.2d 974, 982 (2d Cir. 1993).

*Second*, most key witnesses are in Mexico.  For example, necessary witnesses include Oro Negro and Deutsche Bank Mexico, S.A. employees, the Mexican prosecutors, representatives of the Mexican tax agency, and former Pemex officials, many of whom are not subject to the Court's compulsory process.  This, too, weighs toward dismissal.  *See Becker* v. *Club Las Velas*, 1995 WL 267025, at *3–4 (S.D.N.Y. May 8, 1995) (finding that compulsory process for unwilling witnesses favors Mexico where several "non-party witnesses" are located in Mexico); *Strategic Value Master Fund, Ltd.* v. *Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 768–69 (S.D.N.Y. 2006) ("The fact that defendant's nonparty witnesses are not subject to the Court's compulsory process weighs heavily in favor of dismissal.").

Plaintiffs may argue that Defendants can compel evidence from Mexican witnesses through the Hague Convention, but the Convention does not provide for live testimony at trial.  *Mastafa* v. *Australian Wheat Bd. Ltd.*, No. 07 Civ. 7955, 2008 WL 4378443 at *8 (S.D.N.Y. Sept. 25, 2008).  *See also Urban Global* v. *Dibbsbarker*, No. 10-12615, 2011 WL 2802904 at *6 (E.D. Mich. July 18, 2011).  When the only means to obtain testimony from key witnesses is through the Hague Convention, courts have found that this factor weighs in favor of dismissal.  *Cf. Gulf Oil*, 330 U.S. at 511 ("Certainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants."); *Strategic Value Master Fund*, 421 F. Supp. 2d at 769 (dismissing under forum non conveniens in part because discovery under Hague Convention is "time-consuming" and conflicts with preference for live testimony).

*Finally*, Mexican judgments may be enforceable through Mexican procedures for enforcing judgments against non-resident litigants.  *See Loya* v. *Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656 (9th Cir. 2009) (upholding dismissal, in part, where district court found that the fact that a Mexican judgment would be enforceable in the United States weighed in favor of dismissal).

### 2.    Public Factors Weigh in Favor of Dismissal

The relevant public interest factors also strongly weigh in favor of dismissal. When weighing the balance of the public interest, courts consider "(a) administrative difficulties relating to court congestion; (b) imposing jury duty on citizens of the forum; (c) having local disputes settled locally; and (d) avoiding problems associated with the application of foreign law." *Do Rosario Veiga*, 486 F. Supp. 2d at 307 (citing *Gilbert*, 330 U.S. at 508–09).  Each factor weighs in favor of Mexico.

*First*, "[t]his dispute is, at bottom, a controversy centered in Mexico," and "the substantial connection to Mexico far outweighs any interest New York has."  *Osuna*, 2018 WL 6547205, at *11.  Indeed, this litigation involves conduct in Mexico, relating to the Mexican government and a state-owned company that manages a natural resource that, as Oro Negro states, is "by far" the Mexican government's largest source of revenue.  (Compl. ¶ 5.)  By contrast, Plaintiffs fail to allege *any* interest of the United States in this case.  *See In re Air Crash Near Peixoto De Azeveda, Brazil, on Sept. 29, 2006*, 574 F. Supp. 2d 272, 288 (E.D.N.Y. 2008), *aff'd sub nom. Lleras* v. *Excelaire Servs. Inc.*, 354 F. App'x 585 (2d Cir. 2009) (holding that in cases so unrelated to the United States, "it would be unfair to burden its citizens, in the districts in which these cases were commenced"); *In re Bancredit*, 2008 WL 5396618, at *8 (explaining that a Chapter 15 recognition order did not "alter the fact that this is a local Dominican dispute").

Accordingly, there is no reason to impose the burden of this expansive litigation on this Court's busy docket.

*Second*, this case requires analysis of many Mexican law issues, including eight counts under Mexican law, many of which implicate the conduct of Mexican officials. Numerous claims under U.S. law call for analysis of Mexican court orders, such that Mexican law pervades the Complaint. For instance, Plaintiffs' allegations that the Ad Hoc Defendants "sabotag[ed]" the *concurso* proceedings put this Court in the absurd position of determining whether a Mexican bankruptcy proceeding has been impaired under Mexican law. (*See* Compl. ¶¶ 487(b), 493(b).) Plaintiffs also allege abuse of criminal procedures in Mexico, and challenge in this Court orders and decisions that have been upheld by numerous courts in Mexico, including the Supreme Court. Plaintiffs' tortious interference claim regarding the Pemex Contracts addresses contracts governed by Mexican law; "breach" is a necessary element of Plaintiffs' claim and will require interpretation of Mexican law. Plaintiffs claim that the conspiracy included actions to violate numerous orders of the *Concurso* Court—claims which will of course require examination of the orders, as well as related litigation and appeals in Mexico addressing these same issues.

"Courts have a legitimate interest in avoiding the difficulty with questions of conflicts of law and the application of foreign law." *See Monegasque de Reassurances S.A.M.* v. *NAK Naftogaz of Ukraine and State of Ukraine*, 158 F.Supp.2d 377, 387 (S.D.N.Y. 2001); *In re Bancredit*, 2008 WL 5396618, at *8 ("Although the need to apply foreign law . . . alone is not sufficient to warrant dismissal, it may nevertheless be considered as part of the balancing equation" (internal quotations and citations omitted)). Where foreign law remains unsettled and could cause significant difficulty in its interpretation, this should be a "powerful factor weighing

in favor of dismissal." *LaSala*, 510 F. Supp. 2d at 233–34 (dismissing case where legal experts disagreed about critical points of Swiss law).

This concern is especially pertinent here. Plaintiffs' Complaint cites more than 20 different Mexican court orders—and omits many others that Defendants would put before the Court—regarding controversies that are, to varying degrees, unsettled in Mexican courts. The sheer number of orders under Mexican law creates substantial challenges in interpretation. This Court has already had significant experience attempting to resolve the meaning of many of these Mexican court orders and knows firsthand the interpretive difficulties they present.[33] There is no compelling reason to impose that interpretative burden on this Court as opposed to the Mexican courts that issued them. The unsettled and uniquely challenging nature of these questions of foreign law makes the claims in the Complaint unsuited to litigation in this U.S. proceeding.

The balance of public interest factors is not altered because Integradora and Perforadora are Chapter 15 debtors. As this court explained in *In re Bancredit*, "chapter 15 was not designed to encourage forum shopping or hear disputes with no connection to the forum. Suffice it to say, the countervailing policies embodied in the doctrines of forum non conveniens and, more generally, international comity, dictate that the balance of public interests weighs in favor of dismissing the case." 2008 WL 5396618, at *9 (emphasis added); *see also id.* (noting

---

[33]    For example, the Court noted at the time the Comity order was issued that it "cannot be underscored enough the extent to which the parties disagree[d] as to the interpretation of various aspects of the Mexican court orders." (Clareman Decl. Ex.44 (the "Comity Hr'ng Tr.") at 204:9–11.) The Court added: "it was pretty clear [during the hearing] that [the Court] was struggling at times and continue[d] to struggle to understand exactly what the Mexican court meant in issuing its rulings. But that's for the Mexican court to determine." (Comity Hr'ng Tr. at 204:17–20.) These challenges have not abated over time. Two weeks ago, the Court has observed that "every day, every week, something new happens that sheds different light on what happened in the past, appears to contradict it, appears to supersede it. It is very difficult to get an accurate picture . . . of what's happening [in Mexican courts]." Adjournment of the Sale Motion Hr'ng Tr. 9:6–10, August 15, 2019 (Dkt. 259).

that "the United States [] has a strong interest in not assuming the singular burden of collection court to the world").

*Third*, the public interest favors dismissal where, as here, there is "parallel litigation arising out of the same or similar facts already pending in the foreign jurisdiction." *In re Nat'l Bank of Anguilla*, 580 B.R. at 90 (citing *Argus Media Ltd.* v. *Tradition Fin. Servs. Inc.*, No. 09 Civ. 7966 (HB), 2009 WL 5125113, at *6 (S.D.N.Y. Dec. 29, 2009)). As discussed at length below, the crux of Plaintiffs' case concerns Pemex's decision to terminate the Oro Negro contracts. (*See* Section II.A., *infra*.) But Oro Negro and Pemex have engaged, and continue to engage, in litigation in Mexico over that very issue. (*See, e.g.*, Compl ¶¶ 203 n.10, 219– 220.) *See Aquila* v. *Fleetwood, R.V., Inc.*, 2014 WL 1379648, at *4 (E.D.N.Y. Mar. 27, 2014) (courts analyzing public interests give "great weight to the need to avoid multiplicity of litigation from a single transaction"). Plaintiffs have also brought duplicative lawsuits in Mexico against other defendants in this case, individually, against Deutsche Bank Mexico, and against the Singapore Rig Owners and the Singapore Directors. All of the criminal actions remain ongoing in Mexico and are being supervised by Mexican criminal courts. Moreover, Plaintiffs make numerous allegations that the Ad Hoc Defendants and Pemex colluded to manipulate *concurso* proceedings and to violate *Concurso* Court orders—such allegations are a direct reference to ongoing "parallel litigation arising out of the same facts already pending" in Mexico. (Compl. ¶¶ 205, 208, 221, 255, 257; *see also id.* ¶ 487(b).) *Accord In re Nat'l Bank of Anguilla*, 580 B.R. at 90. Plaintiffs should not be allowed additional bites at the apple.[34] *See Otor, S.A.* v. *Credit*

---

[34]    Principles of "adjudicative comity" further support dismissal on grounds of forum non conveniens grounds. Adjudicative comity is a doctrine pursuant to which courts "abstain from exercising jurisdiction in deference to a foreign nation's courts that might be a more appropriate forum for adjudicating the matter." *See In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 101 (2d Cir. 2019). In addition to the NAFTA arbitration, the Complaint describes numerous proceedings in Mexico that pre-date this case and arise from the same operative facts and which remain unresolved in Mexican courts. (*See, e.g.*, Compl. ¶¶ 203 n.10, 208–210, 220, 222, 343–348, 390.) *See Tarazi* v. *Truehope, Inc.*, 958

*Lyonnais, S.A.*, No. 04 Civ. 6978(RO), 2006 WL 2613775, at *5 (S.D.N.Y. Sept. 11, 2006)

(dismissal "would also avoid significant duplication of legal efforts by the Courts and the parties,

as the subject matter of this dispute and related claims has already been presented and

adjudicated in multiple proceedings" in France).

     *Finally*, the public interest especially favors dismissal where the issues to be

litigated are "intimately involved with sovereign prerogatives," and where courts in another

jurisdiction are "the only tribunal[s] empowered to speak definitively" on an issue.  *See*

*Figueiredo Ferraz E Engenharia de Projeto Ltda.* v. *Republic of Peru*, 665 F.3d 384, 392 (2d

Cir. 2011) (where statute limiting payment to satisfy a judgment against instrumentality of

Peruvian government "tip[ped] the FNC balance decisively against the exercise of jurisdiction in

the United States"); *see also id.* ("The rate at which public funds may be disbursed to satisfy

public obligations is surely 'intimately involved with sovereign prerogative' and the Peruvian

courts are 'the only tribunal[s] empowered to speak authoritatively' on the meaning and

operation of the cap statute.").  Here, essentially all claims are "intimately involved with [the]

sovereign prerogative[s]" of Mexico:  they either impugn decisions relating to "supreme state

sovereignty over natural resources," *Int'l Ass'n of Machinists*, 649 F.2d at 1361, or call into

question the validity of Mexico's enforcement of its own criminal laws, *see Yahoo! Inc.*, 433

---

F. Supp. 2d 428, 434–35 (S.D.N.Y. 2013) (staying action in deference to "substantially similar" ongoing
Canadian litigation, where the U.S. action was brought against one defendant who was not a party to the
Canadian litigation); *see also Fed. Treasury Enter. Sojuzplodoimport* v. *Spirits Int'l B.V.*, 809 F.3d 737,
742–43 (2d Cir. 2016) (quoting *Pravin Banker Assoc., Ltd.* v. *Banco Popular Del Peru*, 109 F.3d 850, 854
(2d Cir. 1997)) ("United States courts ordinarily refuse to review acts of foreign governments and defer to
proceedings taking place in foreign countries."). If this Court proceeded to adjudicate Plaintiffs' claims, it
would risk creating conflicts with rulings in Mexico about the same underlying issues.  *Accord Schuler* v.
*Rainforest All., Inc.*, 684 F. App'x 77, 79 (2d Cir. 2017) ("[T]he [plaintiffs] are essentially asking an
American court to overrule the Mexican courts' judgment that the [plaintiffs] failed to prove ownership of
property located in Mexico. We agree with the district court that principles of comity preclude us from
doing so.").  Adjudicative comity is a standalone grounds for dismissal, and here further supports dismissal
for forum non conveniens.

F.3d at 1227–28 (Ferguson, O'Scannlain, and Tashima, JJ., concurring) (U.S. judges have no "authority to pass critical judgment on the[] validity" of foreign criminal laws).  (*See* Section II, *infra*.)  Because Mexican courts are "the only tribunal[s] empowered to speak authoritatively" about the validity of both sets of claims, dismissal is warranted.

*        *        *

For the foregoing reasons, Mexico is the more appropriate forum and all claims should be dismissed on forum non conveniens grounds.[35]

## II.    PLAINTIFFS' CLAIMS ARE BARRED BY THE ACT OF STATE DOCTRINE

All of Plaintiffs' claims against the Ad Hoc Defendants directly challenge sovereign acts of the Mexican government and would require this Court to declare numerous actions by Mexico invalid.  Such claims are barred by the act of state doctrine.

The gravamen of Plaintiffs' complaint is that the Defendants conspired with the Mexican government.  Twelve of the seventeen causes of action against the Ad Hoc Defendants turn on Pemex's decisions and actions regarding the Pemex Contracts (the "Pemex Claims").[36] These claims allege that Pemex wrongfully sought to renegotiate the Pemex Contracts (Counts 1, 3, 5, 6, 19–21); threatened and then wrongfully terminated the Pemex Contracts (Counts 1, 3, 5–

---

[35]    Although Count 18, which alleges a violation of 11 U.S.C. §1520(a)(1)'s automatic stay and this Court's Comity Order, relates directly to topics within this Court's purview, the underlying allegations can and should be heard by a Mexican court.  Plaintiffs allege that Defendants violated the Comity Order by violating the *Concurso* court's orders dated October 5 and 11 Orders.  (Compl. ¶ 558–59.)  Whether the Mexican court's orders were violated is a question best adjudicated by Mexican courts.  Furthermore, whether each of the defendants were involved in any acts that allegedly violated the Comity Order is a factual question that would rely on the same evidence as other claims related to the alleged attempts to foreclose on and seize the Rigs.  As such, they should be determined together with the other claims, in Mexico.

[36]    (*See* Compl. ¶ 449 (Count 1); *id.* ¶ 461 (Count 3); *id.* ¶ 473 (Count 5); *id.* ¶ 480 (Count 6); *id.* ¶ 487(a), (d) (Count 7); *id.* ¶ 493(a), (d) (Count 8); *id.* ¶ 524 (Count 13); *id.* ¶ 538 (Count 15); *id.* ¶ 544 (Count 16); *id.* ¶ 567(a), (b), (e) (Count 19); *id.* ¶ 572(a), (b) (Count 20); *id.* ¶ 577(a), (b), (e) (Count 21).)

8, 13, 15, 16, 19–21); and later refused to "reactivate" and "perform" the Pemex Contracts (Counts 1, 3, 5–8, 19–21).

The remaining causes of action against the Ad Hoc Defendants are premised on allegations of conspiracy with, and wrongdoing by, Mexico's criminal justice system, including misconduct by prosecutors, judges, the SAT, and Mexico's Ministry of Finance to pursue criminal investigations regarding Oro Negro and its management (the "Criminal Claims").[37] The Criminal Claims allege that Mexico conspired with the defendants and wrongfully pursued criminal investigations into management of Oro Negro, by Mr. Gil and others, based on misinterpreted financial data and false tax records (Counts 9–11, 14–16, 19–21), which later resulted in a Mexican criminal court order granting the Seizure and Restitution Orders (Counts 7, 8, 14–16, 18–21).

The act of state doctrine precludes a U.S. court from "inquir[ing] into the legality, validity, and propriety of the acts . . . of foreign sovereigns acting in their governmental roles within their own boundaries." *See Braka* v. *Bancomer, S.N.C.*, 762 F.2d 222, 225 (2d Cir. 1985). "The touchstone of the doctrine is the principle of comity between nations," *Bandes* v. *Harlow & Jones, Inc.*, 852 F.2d 661, 666 (2d Cir. 1988), and it stands for the principle that "[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Banco Nacional de Cuba* v. *Sabbatino*, 376 U.S. 398, 416 (1964). It arises as a "consequence of domestic separation of powers, reflecting 'the strong sense of the

---

[37] (*See* Compl. ¶ 487(f) (Count 7); *id.* ¶ 493(f) (Count 8); *id.* ¶ 499 (Count 9); *id.* ¶ 506 (Count 10); *id.* ¶ 513 (Count 11); *id.* ¶ 531(a–c) (Count 14); *id.* ¶ 538(a–c) (Count 15); *id.* ¶ 544(a–c) (Count 16); *id.* ¶ 557 (Count 18); *id.* ¶ 567(d), (g), (h) (Count 19); *id.* ¶ 572(d–f) (Count 20); *id.* ¶ 577(d), (g), (h) (Count 21).) Certain of the Pemex Claims and Criminal Claims overlap, as ultimately both theories arise from the same underlying alleged conspiracy with the Mexican government.

Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs," which is the province of the Executive Branch. *W.S. Kirkpatrick & Co.* v. *Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (quoting *Sabbatino*, 376 U.S. at 423). "[T]he act of state doctrine 'is not some vague doctrine of abstention but a principle of decision binding on federal and state courts alike'; 'the act within its own boundaries of one sovereign State . . . becomes . . . a rule of decision for the courts of this country.'" *See Fed. Treasury Enter. Sojuzplodoimport, OAO* v. *Spirits Int'l B.V.*, 809 F.3d 737, 743 (2d Cir. 2016) (quoting *W.S. Kirkpatrick*, 493 U.S. at 406).

      The doctrine applies even where, as here, the foreign sovereign is not a defendant, but is alleged to be a "co-conspirator" whose sovereign acts are "at the heart of the [plaintiff's] claim[s]." *Hunt* v. *Mobil Oil Corp.*, 550 F.2d 68, 76 (2d Cir. 1977). It similarly applies where plaintiffs allege that defendants "catalyz[ed]" government acts, and where "the consequences of defendants' [alleged] manipulative course of action all involve acts of the . . . government." *Hunt* v. *Mobil Oil Corp.*, 410 F. Supp. 10, 24 (S.D.N.Y. 1975), *aff'd*, 550 F.2d 68 (2d Cir. 1977) (quoting *Occidental Petroleum Corp*. v. *Buttes Gas & Oil Co*., 331 F. Supp. 92, 108 (C.D. Cal. 1971)). The doctrine applies even where the foreign sovereign has allegedly violated its own laws. *Konowaloff*, 702 F.3d 140, 145–46 (2d Cir. 2012); *see also Sabbatino*, 376 U.S. at 415 n.17 ("The courts below properly declined to determine if the issuance of [Cuba's] expropriation decree complied with the formal requisites of Cuban law.")

      The doctrine is properly invoked "where '(1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act." *Sea Breeze Salt Inc.* v. *Mitsubishi Corp.*, 899 F.3d 1064, 1069 (9th

Cir. 2018) (citation omitted).  The Supreme Court has also "suggest[ed] . . . that the policies

underlying act of state doctrine"—namely, "international comity, respect for the sovereignty of

foreign nations in their own territory, and the avoidance of embarrassment to the Executive

Branch in its conduct of foreign relations"—"should be considered in deciding whether, despite

the doctrine's technical availability, it should nonetheless not be invoked."  *W.S. Kirkpatrick*,

493 U.S. at 408–09; *see Bigio* v. *Coca-Cola Co.*, 239 F.3d 440, 452 (2d Cir. 2000), *cert. denied*,

133 S. Ct. 952 (2013).[38]

### A.     The Pemex Claims Are Barred by the Act of State Doctrine

The Pemex Claims flow from Plaintiffs' theory that Pemex allegedly "colluded"

with the Ad Hoc Defendants wrongfully to terminate its contracts and business relations with

Oro Negro so that the Ad Hoc Group could take over the Rigs and enter into new contracts with

Pemex through a different operator.  (*See, e.g.*, *id.* ¶¶ 9, 10, 13, 14, 449.)  Pemex's decisions

whether, and on what terms, to contract with Perforadora fall squarely within the act of state

doctrine, and claims stemming from these decisions cannot be overturned by a U.S. court.

### 1.     Pemex's Termination of the Pemex Contracts and Decisions Concerning Its Business Relations With Oro Negro Were Sovereign Acts

Pemex's conduct as alleged in the Complaint are acts of a foreign sovereign in its

own territory.  Plaintiffs acknowledge that Pemex is "part of" the Mexican government.  (Compl.

¶ 5.)  Its sole function is uniquely sovereign:  to exploit Mexico's most valuable natural resource,

which the Mexican constitution declares to be property of the state.  *See* Mex. Const., Art. 27.

---

[38]     For example, United States courts do not recognize or deem valid "atrocities such as genocide, mass rape, [or] ethnic cleansing" pursuant to the act of state doctrine, even if they are pursued by a sovereign government.  *Kashef* v. *BNP Paribas S.A.*, 925 F.3d 53, 61-62 (2d Cir. 2019).  Extreme facts such as these are not present here.

Pemex's decisions concerning which companies it will contract with and on what terms—including renegotiation, termination, or abstention from doing business with Oro Negro—were "official acts" of Mexico within its territory.  As evidenced by Oro Negro's correspondence with Pemex in July 2017, the acts taken by Pemex against Oro Negro were consistent with a broader policy of renegotiating and terminating contracts passed by Pemex's board of directors in a resolution dated March 1, 2017.

Courts have repeatedly held that "a nation's decisions about the exploitation of its own natural resources," including oil, "are quintessentially sovereign in nature" and satisfy the act of state doctrine's "sovereign act" requirement.  *Sea Breeze Salt*, 899 F.3d at 1069–70 (citing "a long line of decisions by [the Ninth Circuit] and other courts of appeals").  Moreover, the doctrine applies to state-owned corporations such as Pemex.  *See id.* (applying doctrine to claims against salt company that was 51 percent owned by Mexico); *World Wide Minerals Ltd.* v. *Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002) (applying doctrine to claims against state-owned uranium venture); *Spectrum Stores, Inc.* v. *Citgo Petroleum Corp.,* 632 F.3d 938, 942 (5th Cir. 2011) (affirming dismissal under doctrine as to "oil production companies (most of which are owned in whole or in part by OPEC member nations)") (parenthetical in original).

*Sea Breeze Salt* is directly on point.  In that case, the Ninth Circuit held that the act of state doctrine applied to decisions by ESSA—a sea salt producer in Mexico, like Pemex, controlled by the Mexican government—concerning the counterparties with which it would do business in the production and distribution of salt.  899 F.3d at 1069–70.  The *Sea Breeze Salt* plaintiffs were two private salt companies who alleged a conspiracy between ESSA and Mitsubishi, and claimed that Mitsubishi induced ESSA to terminate its distribution contract with

the plaintiffs and "refuse[] to honor multiple purchase orders . . . under the distribution contract" with plaintiffs. 899 F.3d at 1067, 1069–71. In affirming the district court's dismissal of all of plaintiffs' claims against Mitsubishi—including claims for tortious interference with contract and business relations—the Ninth Circuit reasoned that because "Mexico's salt is a sovereign natural resource," its exploitation by a state-controlled corporation, including decisions about sales and distribution of the natural resource, were "sovereign acts." *Id.* at 1069–70.

Similarly, in *Spectrum Stores*, the Fifth Circuit dismissed plaintiffs' price-fixing conspiracy claims against various state-run oil companies of OPEC nations on act of state grounds, because the alleged price-fixing agreements implicated "decisions about how much of [each country's] oil to extract." 632 F.3d 938, 954–55 & n.18 (5th Cir. 2011); *accord Int'l Ass'n of Machinists & Aerospace Workers* v. *OPEC*, 649 F.2d 1354, 1360 (9th Cir. 1981) (affirming dismissal of claims because "OPEC's 'price-fixing' activity has a significant sovereign component," and where "the granting of any relief would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources"); *see also Nnaka* v. *Fed. Republic of Nigeria*, 756 F. App'x 16, 18 (D.C. Cir. 2019) (mem.) (explaining that the "official act" requirement involves "conduct that is by nature distinctly sovereign, i.e., conduct that cannot be undertaken by a private individual or entity" (quoting *McKesson Corp.* v. *Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012)). The Second Circuit has also applied the act of state doctrine to state-owned oil companies; in *Hunt*, the court concluded that Libya's decisions regarding oil exportation were inherently sovereign acts due to the OPEC nations' policies of "controlling the spigot" for oil production. 632 F.3d at 944, 954–55.

Here, as in *Sea Breeze Salt* and *Spectrum Stores*, Pemex's actions,
notwithstanding the alleged conspiracy with defendants, are sovereign acts because each reflects
a decision by the Mexican government about the exploitation of oil.  (Compl. ¶ 5.)  Those
sovereign decisions fall squarely within the "official act" prong of the act of state doctrine.[39]

### 2.    Plaintiffs' Claims Would Require the Court to Invalidate Pemex's Official Acts

On their face, the Pemex Claims ask this Court to declare invalid three official
acts of Pemex:  (1) Pemex's efforts to renegotiate the Pemex Contracts starting in March 2017,
which Plaintiffs allege "was a breach of the [Pemex] Contracts" (Compl. ¶ 449(a)); (2) Pemex's
termination of the Pemex Contracts in October 2017, which they allege was "unlawful" and also
a breach of contract (*id.* ¶ 449(b)); and (3) Pemex's alleged "fail[ure] to perform under the
[Pemex] contracts in January 2018" (*id.* ¶ 449(c)).[40]

---

[39]    Some district courts in this Circuit recognize a "commercial activity" exception to the act of state doctrine similar to that in the Foreign Sovereign Immunity Act.  *See In re Air Cargo Shipping Servs. Antitrust Litig.*, Nos. 06-MDL-1775, 10-CV-639 (JG) (VVP), 2010 WL 10947344, at *32–33 (E.D.N.Y. Sept. 22, 2010); *Lyondell-Citgo Ref., LP* v. *Petroleos de Venezuela, S.A.*, No. 02 CIV. 0795 (CBM), 2003 WL 21878798, at *8–9 (S.D.N.Y. Aug. 8, 2003).  The Second Circuit has made clear that "neither the Supreme Court nor [the Second] Circuit . . . has ever concluded that there is a commercial exception to the doctrine of act of state."  *Fed. Treasury Enter. Sojuzplodoimport, OAO* v. *Spirits Int'l B.V.*, 809 F.3d 737, 744 (2d Cir. 2016) (declining to rule on the existence of such an exception).  Moreover, the exception has been expressly rejected by both the Fifth and Eleventh Circuits.  *Spectrum Stores*, 632 F.3d at 955 n.16; *Honduras Aircraft Registry, Ltd.* v. *Gov't of Honduras*, 129 F.3d 543, 550 (11th Cir. 1997).  The Court need not address that question, however, as decisions regarding management and of oil production and distribution have been repeatedly found to be sovereign, not commercial, acts.  *Cf. Sea Breeze Salt*, 899 F.3d at 1075 n.4 (noting that "it appears possible that any commercial exception is in fact subsumed within the prima facie requirement that the challenged conduct constitute an 'official act of a foreign sovereign.'" (citation omitted)).

[40]    It is immaterial that a trial court in Mexico has ruled that Pemex's termination of the contracts constituted a breach—a ruling that the Mexican government disputes in a yet-unresolved appeal.  (*See* Compl. ¶ 220.)  First, the act of state doctrine bars inquiry into the validity of a foreign sovereign's actions by a U.S. court even if the complaint alleges a violation of the foreign state's own domestic laws.  *Konowaloff*, 702 F.3d at 145–46.  Second, as Plaintiffs state, the decision in question is not final and is currently subject to review by an appellate court in Mexico.  (Compl. ¶ 220.)  Notably, at an earlier stage of the same proceeding, that appellate court reversed the lower court's decision to enjoin Pemex from terminating the contracts, in part because Pemex's reasons for terminating the contracts were potentially valid.  (Clareman Decl. Ex. 48 (April 10, 2018 *amparo* court order).)

There is no dispute that plaintiffs' case takes direct aim at the validity of Pemex's

actions towards Oro Negro.  Plaintiffs allege that "the core of this case involves the efforts by the

Ad-Hoc Group . . . and Pemex[] to purport to terminate the [Pemex] Contracts so that the Ad-

Hoc Group could take over the Rigs . . . .  These efforts began with Pemex demanding to

dramatically amend the [Pemex] Contracts, including by reducing its payments to Oro Negro

. . . ."  (*Id.* ¶ 9.)  The purported illegitimacy of these acts is the foundation for plaintiffs' tort

theories under U.S. and Mexican law seeking to hold the Ad Hoc Defendants liable for Pemex's

efforts to renegotiate the Pemex Contracts starting in March 2017, and eventually terminating

them and refusing to "reactivate" them.  (*See* Compl. ¶ 449(a) (Count 1); ¶ 461(a) (Count 3);

¶ 473(a) (Count 5); ¶ 480(a) (Count 6); ¶ 567(a) (Count 19); ¶ 572(a) (Count 20); and

¶ 577(a) (Count 21).)

The alleged illegitimacy of Pemex's termination of the Pemex Contracts is also

central to Plaintiffs' claims concerning the termination of the Bareboat Charters.  Those tortious

interference claims allege that the Ad Hoc Defendants "caused" the Singapore Rig Owners "to

unlawfully terminate the Bareboat Charters *based solely on Pemex's unlawful termination* of the

[Pemex] contracts."  (*Id.* ¶ 524 (Count 13), ¶ 538(a) (Count 15), ¶ 544(a) (Count 16).)  Those

claims—like all of the Pemex Claims—rest on the validity of the Pemex terminations.

Questioning the legality of a foreign sovereign's action—including by ruling the

act breached some domestic obligation—is precisely what the act of state doctrine is intended to

prevent.  *World Wide Minerals Ltd.* v. *Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir.

2002); *see also W.S. Kirkpatrick*, 493 U.S. at 409 ("[T]he acts of foreign sovereigns taken within

their own jurisdictions shall be deemed valid."); *accord AdvanFort Co.* v. *Cartner*, No. 1:15 Civ.

220, 2015 WL 12516240, at *6 (E.D. Va. Oct. 30, 2015) (dismissing tortious interference with

business expectancy claim where plaintiff asserted defendant induced Marshall Islands government to suspend plaintiff's permits, because "[s]quarely at issue" was "the country's public act of revoking a company's permit").

Here again, *Sea Breeze Salt* is on point.  899 F.3d 1064 (9th Cir. 2018).  In affirming dismissal on act of state grounds, the Ninth Circuit observed that "[e]ach of the five causes of action brought by plaintiffs has at its core ESSA's alleged decision to repudiate all of its distribution contracts with other entities and return to distributing salt exclusively through Mitsubishi."  *Id.* at 1071.  "Because each count is premised on ESSA's alleged decision to repudiate all other contracts and distribute salt exclusively through Mitsubishi, each count would require a court to pass on the validity of Mexico's sovereign decisions about how to exploit and profit from its natural resources."  *Id.* at 1072.  The court held that doing so would violate the act of state doctrine.

Each claim relies on the proposition that the Ad Hoc Defendants conspired "with[] Pemex" to "cause Pemex" to take an allegedly unlawful action against Oro Negro (*see, e.g.*, Compl. ¶ 449), which would "require [this] court to pass judgment on the validity of Mexico's sovereign decisions about how to exploit and profit from its natural resources."  *Sea Breeze Salt*, 899 F.3d at 1072.  Accordingly, Plaintiffs' allegations in Counts 1, 3, 5–8, 13, 15, 16, and 19–21 that implicate Pemex's allegedly unlawful conduct should be dismissed pursuant to the act of state doctrine.

**B.      The Act of State Doctrine Bars Plaintiffs' Claims Stemming From the
Criminal Proceedings, Including the Seizure and Restitution Orders**

The Criminal Claims also stem from an alleged conspiracy involving the highest

reaches of the Mexican government[41] and seek to invalidate Mexico's sovereign acts concerning

the enforcement of its criminal laws by prosecutors and criminal judges in Mexico.  Accordingly,

those claims should be dismissed pursuant to the act of state doctrine.

### 1.      Administration of Criminal Justice Is a Sovereign Act

Mexico's administration of its criminal justice system is a quintessentially

sovereign activity.  "The decision of a foreign sovereign to exercise its police power through the

enforcement of its criminal laws plainly qualifies as an act of state."  *Nocula* v. *UGS Corp.*, 520

F.3d 719, 728 (7th Cir. 2008).  The Supreme Court has made clear that "a foreign state's exercise

of [it's police] power" is "peculiarly sovereign in nature," *Saudi Arabia* v. *Nelson*, 507 U.S. 349,

350 (1993), and that a foreign state unquestionably has "a sovereign right to prosecute

[individuals] for crimes committed on [its own] soil," *Munaf* v. *Geren*, 553 U.S. 674, 694–95

(2008) (listing cases).  *See also Nnaka*, 756 F. App'x at *18 (act of state doctrine was properly

invoked in a "decision to conduct a criminal investigation, which ranks 'foremost among the

prerogatives of sovereignty'" (citation and internal alteration omitted)).

The act of state doctrine applies to each alleged act by Mexican law enforcement

and the Mexican criminal court cited in the Complaint.  *Saudi Arabia*, 507 U.S. at 350.

### 2.      Plaintiffs' Claims Would Require this Court to Invalidate Mexico's
Sovereign Acts to Enforce Its Criminal Laws

---

[41]      The alleged conspiracy was far-reaching.  It purportedly included the former Minister of Finance of
Mexico, Emilio Lozoya (Pemex's CEO from 2012 to 2016), other "current and former senior Pemex
officials," unnamed "officials at the highest levels of the Mexican political establishment, including a
former Minister of Energy," Judge Enrique Cedillo-Garcia, unnamed local judges in México City, other
"Mexican prosecutors and judges" allegedly involved in the seizure of the Mexican Trust, México's federal
prosecutors' office, México's tax agency, México City's local prosecutors' office, and the police force of
the PGR.  (*See* Compl. ¶¶ 159, 185, 264, 270, 341, 368, 378, 397.)

The Criminal Claims are predicated on the validity of Mexico's criminal investigations of Oro Negro and its former managers, and the Seizure Order and Restitution Order that were granted as part of those investigations. Those criminal investigations remain ongoing, and none has resulted in any findings that would support Plaintiffs' sensational claims. To the contrary, the Seizure Order has been upheld numerous times by Mexican courts, including by a unanimous decision of Mexico's Supreme Court. (*See* Clareman Decl. Ex. 40 (June 7, 2019 Amaparo Court Order). The relief Plaintiffs seek would thus require this Court to inquire into the legality, validity, and propriety of Mexico's own prosecution of its criminal laws and the orders of its criminal and appellate courts. Dismissal of these claims under the act of state doctrine is therefore warranted.[42]

*Nocula* v. *UGS Corp.* contained similar allegations and supports dismissal here. 520 F.3d 719, 721 (7th Cir. 2008). In that case, plaintiff alleged that a Polish corporation intentionally disrupted its business by improperly lodging a criminal complaint in Poland for theft of intellectual property, which resulted in the Polish police's seizure of plaintiff's computers. *Id.* In particular, plaintiff claimed defendant "maliciously instituted the Polish criminal prosecution and used it as leverage to force the transfer of a license." *Id.* In affirming dismissal of the case, the Seventh Circuit "ha[d] no trouble" finding that the prosecution was an act of state and that "[t]he seizure of the property was obviously part and parcel of the criminal prosecution." *Id.* at 728. Accordingly, "[t]o the extent the subsequent loss of [property] was wrongful (i.e., negligent), the loss is attributable to the Polish government," so any personal

---

[42] *See Nocula*, 520 F.3d at 728 (affirming dismissal of intentional and negligent torts stemming from defendant's criminal complaint to Polish authorities, which caused the Polish government's seizure of plaintiff's assets); *Duchow* v. *United States*, No. CIV.A. 95-2121, 1995 WL 425037, at *4 (E.D. La. July 19, 1995), *aff'd*, 114 F.3d 1181 (5th Cir. 1997) (finding it would be "inappropriate and improper" under the act of state doctrine to "intervene in, interfere with, and inhibit" the prosecution by a sovereign country of a person who allegedly violated its laws).

51

claim by plaintiff seeking to hold defendant liable for the wrongful loss "would necessarily call

for an inquiry into the acts of a foreign sovereign and is barred by the act-of-state doctrine." *Id.*

Similarly, in *Du Daobin* v. *Cisco Sys., Inc.*, 2 F. Supp. 3d 717, 720 (D. Md. 2014),

Chinese dissidents sued Cisco Systems on the theory that it assisted China in creating a

surveillance program that would ostensibly be used for law enforcement, but that Cisco allegedly

knew would also be used to identify and torture dissidents. *Id.* at 720. In dismissing the case,

the court stated that "[p]laintiffs are effectively asking the Court to decide that the Chinese

government, with substantial assistance from Cisco, has engaged in multiple violations of

international law . . . . Adjudication of these claims would require judging official actions of the

Chinese government and its officials in enforcing Chinese law against Chinese citizens in

China." *Id.* at 726.

Here, Plaintiffs similarly attempt to hold the Ad Hoc Defendants liable based on

criminal proceedings instituted in a foreign country. Like *Nocula*, Plaintiffs challenge conduct

by foreign officials that were "part and parcel of the criminal prosecution" with claims that

"would necessarily call for an inquiry into the acts of a foreign sovereign." 520 F.3d at 728.

And, similar to *Du Daobin*, adjudicating these claims would require judging official actions of

the Mexican government and its officials in enforcing Mexico's law against Mexican citizens.

*See* 2 F. Supp. 3d at 726. These claims are barred by the act of state doctrine.

\*          \*          \*

None of the policies underlying the act of state doctrine weighs against dismissal

of this action. This case has potentially significant implications for foreign relations with

Mexico, as Mexico continues to fight Oro Negro's claims that it breached the Pemex Contracts

and has continued to prosecute the criminal actions.  Principles of international comity plainly

weigh in favor of dismissal.

For the reasons set forth above, the Pemex Claims and the Criminal Claims

should be dismissed pursuant to the act of state doctrine.

## III.   MEXICAN LAW GOVERNS PLAINTIFFS' TORT CLAIMS, AND PLAINTIFFS FAIL TO STATE A CLAIM UNDER MEXICAN LAW

Plaintiffs allege 11 causes of action against the Ad Hoc Defendants alternatively

under New York and Mexican law for (1) tortious interference with Oro Negro's contracts and

business relations with Pemex (Counts 1, 3, 5, 6); (2) tortious interference with the Bareboat

Charters and Oro Negro's business relations with the Singapore Rig Owners (Counts 13–16);

and (3) abuse of process arising from criminal investigations in Mexico (Counts 9–11).  Two

additional causes of action—intentional and negligent torts in connection with Oro Negro's

"reorganization efforts"—are pled exclusively under Mexican law (Counts 7 and 8).  All of the

Mexican law counts are pled under the same statutory provisions in Mexico's civil code—Article

1910 of the Federal Civil Code of Mexico and Mexico City Civil Code ("Article 1910").[43]

Each New York law claim should be dismissed because under New York choice

of law rules, Mexican law governs.  *See In re Hellas Telecomm. (Luxembourg) II SCA*, 524 B.R.

488, 521–29 (Bankr. S.D.N.Y. 2015) (dismissing fraudulent conveyance claim pled under New

York law because foreign law controlled). The claims under Mexican law should also be

dismissed because, as explained by the Ad Hoc Defendants' expert on Mexican Civil Law,

Rodrigo Zamora, Plaintiffs fail to state a claim on which relief may be granted.

---

[43]   Article 1910 of the Federal Civil Code and the Mexico City Civil Code are identical, and interpreted consistent with one another.  (Zamora Decl. ¶ 15.)  We treat both together and do not distinguish between the two.

## A.    Plaintiffs' Tort Claims Are Governed by Mexican Law and Therefore the New York Law Claims Should be Dismissed

Choice of law rules in this Court are supplied by the law of the forum state. *Norte* v. *Worldbusiness Capital, Inc.*, No. 14 Civ. 10143(CM), 2015 WL 7730980, at *10–11 (S.D.N.Y. Nov. 24, 2015), *aff'd Maricultura Del Norte, S. de R.L. de C.V.* v. *Umami Sustainable Seafood, Inc.*, 769 F. App'x 44, 54 (2d Cir. 2019). Under New York choice of law rules, "the first step . . . is to determine whether there is an actual conflict of laws between the jurisdictions involved." *GlobalNet Financial.Com, Inc.* v. *Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006) (citation omitted). New York tort law and Mexican law are in conflict here; the elements of a claim under Article 1910 differ from those applicable to the New York law torts alleged in the Complaint. *See Elmaliach* v. *Bank of China Ltd.*, 110 A.D.3d 192, 200–01 (1st Dep't 2013); (Zamora Decl. ¶¶ 6–33.)

Where a conflict exists, the law of the jurisdiction with the greatest interest in the litigation governs. *Cooney* v. *Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993). The "interest analysis" is "intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Fin. One Pub. Co.* v. *Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 337 (2d Cir. 2005) (quoting *Cooney*, 81 N.Y.2d at 72); see *Geller* v. *Delta Airlines*, 717 F. Supp. 213, 216 (S.D.N.Y. 1989). New York courts follow the Restatement (Second) of Conflicts of Laws and consider the place where the injury occurred, the place where the conduct causing the injury occurred, and the citizenship of the parties to evaluate which jurisdiction has the greatest interest in having its law apply. See *Schultz* v. *Boy Scouts of Am.*, 65 N.Y.2d 189, 198 (1985) (citing Restatement (Second) of Conflict of Laws § 145 (1971)); *First Hill Partners, LLC* v. *BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 635–36 (S.D.N.Y. 2014). New York

courts also consider public policy factors including the "the relevant policies of the forum," the

"protection of justified expectations," and "certainty, predictability and uniformity of result."

*Davis* v. *Costa-Gavras*, 580 F. Supp. 1082, 1091–92 (S.D.N.Y. 1984) (quoting Restatement

(Second) of Conflict of Laws § 6 (1971)).

        For tort claims, "the law of the jurisdiction where the tort occurred will generally

apply because that jurisdiction has the greatest interest in regulating behavior within its borders."

*Cooney*, 81 N.Y.2d at 72; *First Hill Partners*, 52 F. Supp. 3d at 635–36.  A tort is deemed to

occur "in the place where the injury was inflicted, which is generally where the plaintiffs are

located."  *2002 Lawrence R. Buchalter Alaska Trust* v. *Phila. Fin. Life Assur. Co.*, 96 F. Supp.

3d 182, 217 (S.D.N.Y. 2015) (citation omitted); see also *In re Thelen LLP*, 736 F.3d 213, 220

(2d Cir. 2013); *Am. Lecithin Co.* v. *Rebmann*, No. 12 Civ. 929(VSB), 2017 WL 4402535, at

\*22–23 (S.D.N.Y. Sept. 30, 2017) (holding that the law of the state where plaintiffs were injured

applied to tortious interference claim); *Norte*, 2015 WL 7730980, at \*10–11 (same).

### 1.      Mexican Law Governs Plaintiffs' Tortious Interference Claims

        All of the choice of law factors considered by New York courts support the

application of Mexican law to Plaintiffs' claims arising from tortious interference with contract

and business relations.

        **The torts occurred in Mexico.**  The tortious interference claims are brought by

two Mexican companies with no operations or presence in the United States.  *See Norte,* 2015

WL 7730980, at \*11.  They are located in Mexico, and could only have been injured there.  As a

result, the alleged injuries were inflicted in Mexico and the torts occurred there.  *2002 Lawrence*

*R. Buchalter Alaska Trust*, 96 F. Supp. 3d at 217.  This is the most important factor under New

York's choice of law analysis for tort claims, and it points clearly to Mexico.  *See Norte*, 2015

WL 7730980, at \*10–11; *Cooney*, 81 N.Y.2d at 72.

**The conduct occurred in Mexico.** All of the principal actions which allegedly give rise to the torts occurred in Mexico, and involved Mexican citizens acting in concert with the Mexican government. Pemex's decisions to repudiate and, later, to terminate the Pemex Contracts—which are governed by Mexican law—and discontinue its business relationship with Plaintiffs occurred in Mexico, where both Pemex and Oro Negro exclusively operate. (Compl. ¶¶ 1, 5, 18.) The termination of the Bareboat Charters—which are governed by U.S. maritime law, not New York law—was entirely based on the termination of the corresponding Pemex Contracts. (*Id.* ¶¶ 126, 430–31.) Any performance (or non-performance) related to the Pemex Contracts and the Bareboat Charters occurred in Mexico. (*Id.* ¶ 127); *see Norte*, 2015 WL 7730980, at *11. To the extent Plaintiffs' claim for tortious interference with business relations is based on the commencement of the Mexican criminal investigations, those criminal investigations were initiated by Defendant Garcia Gonzalez y Barradas ("GGB") *in Mexico*, and allegedly involved a conspiracy with Mexican government officials, prosecutors, and judges to harm Oro Negro. (*Id.* ¶¶ 306–97, 499). Any tortious acts regarding Deutsche Mexico relate to an alleged failure by a Mexican bank to make payments associated with a Mexican Trust Account in Mexico. (*Id.* ¶¶ 257–71, 487.) Actions that occurred in New York are comparatively incidental as all of the alleged acts were directed at people and entities in Mexico. This factor also strongly militates in favor of the application of Mexican law. *See Norte*, 2015 WL 7730980, at *11; *Abogados* v. *AT&T, Inc.*, 223 F.3d 932, 935–36 (9th Cir. 2000) (applying Mexican law despite the "decisions . . . and meetings" that the plaintiffs pointed to taking place outside of Mexico because "the complained-of conduct in this case took place primarily, if not entirely, in [Mexico]").

**The citizenship of the parties favors Mexican law.** The most significant acts alleged were taken by Mexican domiciliaries. Perforadora and Integradora are Mexican companies with their principal places of business in Mexico. (Compl. ¶ 18.) Pemex is a Mexican state-owned company and "part of" the Mexican government, as are the numerous government officials in Mexico who are alleged to have taken actions to harm Oro Negro. Two alleged Ad Hoc Group advisors (and named Defendants), GGB, and Andres Constantin Antonius-Gonzalez ("Antonius"), are domiciled in Mexico. By contrast, the Ad Hoc Defendants are domiciled all over the world; five in countries other than the United States and Mexico—specifically, Bermuda, Cyprus, Hong Kong, and the United Kingdom. The Ad Hoc Defendants based in the United States are located in Delaware, New York, and Florida. Mexico is home to the greatest number of parties and relevant third parties at issue, and the remaining defendants are highly dispersed—these facts also favor the application of Mexican law. *See Norte*, 2015 WL 7730980, at *11.

**Public policy supports the application of Mexican law.** Public policy factors also favor the application of Mexican law. Applying Mexican law would protect the parties' "justified expectations" that their conduct would be judged by the laws of Mexico, where the activities that form the basis of Plaintiffs' allegations occurred, and would also serve the interest in certainty, predictability and uniformity of result. *See Davis*, 580 F. Supp. at 1092; *In re Citigroup Inc. Sec. Litig.*, 987 F. Supp. 2d 377, 390 (S.D.N.Y. 2013). It cannot seriously be doubted that Mexico has a stronger interest in having its law apply to an alleged conspiracy centered around Pemex's conduct regarding oil contracts with Mexican companies, or the administration of its criminal justice system, than New York, Florida, or any of the myriad other jurisdictions in which defendants happen to reside.

57

*Norte* is particularly instructive.  In *Norte*, plaintiff, a Mexican fishing company that fished Bluefin tuna off the coast of Mexico, brought a tortious interference claim, purportedly under New York law, against its lender arising out of the lender's foreclosure on mortgages on plaintiff's fishing vessels at a time when plaintiff was attempting to consummate a joint venture with its co-plaintiff, another Mexican fishing company.  2015 WL 7730980, at *10. The court concluded based on New York choice of law rules that Mexican law applied to tortious interference claims where "Plaintiffs are Mexican companies," the locus of the tort was in Mexico, and the contracts that were allegedly interfered with were "between two Mexican corporations concerning a Mexican joint venture."  *Norte*, 2015 WL 7730980, at *11.

The same reasoning applies to the claims here.  All of the factors New York courts consider strongly support the conclusion that Mexican law applies to Plaintiffs' tortious interference with contract and business relations claims.

### 2.  Mexican Law Governs Plaintiffs' Abuse of Process Claims

Plaintiffs' abuse of process claims are also governed by Mexican law.  All of the factors compel that result.  The alleged injury occurred in Mexico, where the criminal investigations are located.  Plaintiffs are Mexican companies and a Mexican citizen and were allegedly damaged by actions taken by a Mexican law firm, Mexican prosecutors, and a Mexican criminal court.  The injuries occurred in Mexico where Oro Negro, its Rigs and its accounts were located.  Mexico also has the greatest interest in having its laws apply to alleged injuries caused by its own criminal justice system, and the integrity of the lawyers and judges responsible for administering criminal laws in that country.

New York courts apply foreign law to claims for abuse of a foreign jurisdiction's legal process.  According to the New York Court of Appeals, in cases in which "plaintiff is claiming that defendant used [a foreign forum's] legal machinery maliciously . . . it would be

58

almost unthinkable to seek the applicable rule in the law of some other place." *Heany* v. *Purdy*, 29 N.Y.2d 157, 159 (1971). In *Heany*, plaintiff trespassed on the beach in front of defendant's property, which was located in Ontario, Canada. *Id.* at 158. Defendant had plaintiff arrested in Canada. *Id.* Plaintiff brought suit in New York for false arrest, false imprisonment, and malicious prosecution among other torts. *Id.* The New York Court of Appeals ruled that it is "appropriate to look to the law of the place of the tort so as to give effect to that jurisdiction's interest in regulating conduct within its borders." *Id.* at 159 (quoting *Babcock* v. *Jackson*, 12 N.Y.2d 473 (1963)). The Eastern District of New York followed this reasoning when analyzing an abuse of process claim, and applied the law of the forum where the defendant allegedly abused process. *McNamee* v. *Clemens*, 762 F. Supp. 2d 584, 610–11 (E.D.N.Y. 2011).

Similarly here, Plaintiffs assert that the Singapore Rig Owners filed criminal complaints in Mexico, which resulted in the initiation of criminal investigations and judgments concerning people and property in Mexico. (Compl. ¶¶ 306–10.) Under these circumstances, Mexican law applies to Plaintiffs' abuse of process claims.[44]

\*       \*       \*

---

[44]    The Second Circuit's decision in *Weiss* v. *Hunna* does not compel a contrary result. 312 F.2d 711 (2d Cir. 1963). In that case, defendants allegedly abused legal process in Austria by filing a lawsuit in Austria in an attempt to prevent plaintiff from selling shares of stock to a fellow New York resident. *Id.* at 715. The Second Circuit explained that the alleged misuse of process "was to frustrate a contract made in New York between residents of New York [involving] a transaction  entered into and carried out in New York; and the harm—the diminution of the price of the shares—was suffered in New York." *Id.* at 717. *Weiss* does not apply for three reasons. First, it has been overruled, as a matter of New York law, by the New York Court of Appeals' decisions in *Babcock* and *Heany*. *See Dinesol Bldg. Prod., Ltd.* v. *Tapco Int'l Corp.,* No. 06 Civ. 2919, 2008 WL 11483087, at \*6 (N.D. Ohio 2008) (recognizing the conflict between *Weiss* and the Second Restatement, which New York subsequently adopted in *Babcock*). Second, the significant New York interests involved in *Weiss* do not apply where, as here, Plaintiffs are Mexican nationals, the claims arise under foreign law and Defendants are overwhelmingly non-U.S. residents. Third, in that case, Austria did not provide a remedy for abuse of process, however Mexican law allows a party to obtain recourse if they can prove that Defendants provided false evidence in filing criminal complaints. (*See* Zamora Decl. ¶ 65.)

Because Mexican law applies to all claims pled alternatively under New York and Mexican law, the New York tort claims should be dismissed.  *See Norte*, 2015 WL 7730980, at *10–12 (conducting New York choice of law analysis to find that "Mexican law governs the tort claim" and dismissing the claim because Plaintiffs failed to state a claim under Mexican law); *Heany*, 29 N.Y.2d at 159 (dismissing a claim for malicious prosecution where Canadian law, rather than New York law, applied); *In re Hellas*, 524 B.R. at 521–29 (conducting New York choice of law analysis and dismissing New York state law claim, because the court determined that foreign law applied).

### B.    Plaintiffs' Claims Under Mexican Law Fail to State a Claim on Which Relief May Be Granted

Eight claims in Plaintiffs' complaint are pled as torts under Mexican law, and allege liability for interference with contract and business relations with Pemex (Counts 5 and 6); interference with Oro Negro's reorganization efforts (Counts 7 and 8); filing criminal complaints that led to the criminal investigations (Counts 10 and 11); and interference with the Bareboat Charters and business relations with the Singapore Rig Owners (Counts 15 and 16).[45]  Each claim is brought under Article 1910, and each claim is pled as an intentional and negligent tort. All of these claims fail as a matter of Mexican law and should therefore be dismissed.

#### 1.    Mexican Tort Law

Mexico is a civil law jurisdiction, meaning the sources of law in Mexico are the Constitution, statutes, and other codified statutory law, including the Civil Code.  Although Mexico does not generally adhere to *stare decisis*, when interpreting the Mexican Federal Civil Code, courts are bound by certain precedents from the Mexican Supreme Court and Mexican

---

[45]    Mexican law does not recognize independent claims for negligent as opposed to intentional torts.  (*See* Zamora Decl. ¶ 29.)  Rather, the degree of willfulness is considered at the damages stage.  Therefore, Plaintiffs' eight separate counts are really just four claims under Mexican law.

appellate courts, called *jurisprudencia*, or binding precedents.  (*See* Zamora Decl. ¶ 16.) [46]

Mexican courts treat other decisions as non-binding, called *tesis aisladas*.  They may be

persuasive when interpreting the Federal Civil Code, but need not be followed.  (*See id.*)

       Article 1910 of the Federal Civil Code and Mexico City Civil Code is, as a

general matter, a statutory basis for non-contractual civil wrongs (akin to tort liability) under

Mexican law.  *See Curley* v. *AMR Corp.*, 153 F.3d 5, 14 (2d Cir. 1998); (*see also* Zamora Decl.

¶ 27.)  Article 1910 is found in the Federal Civil Code chapter governing "Liabilities from Illicit

Acts" and in the sub-chapter concerning "Obligations."  It states:

> He who acting illegally or against good custom causes damage to another, is
> obliged to repair it, unless he proves that the damage occurred as a consequence
> of the fault or inexcusable negligence of the victim.

(Zamora Decl. ¶ 27.)  Article 1910 is not a plenary liability statute encompassing all conduct that

may give rise to liability.  The statute's reference to "acting illegally or against good customs "

provides for civil liability for conduct that otherwise violates Mexican statutory law.  (*See*

Zamora Decl. ¶¶ 31–32.)  In other words, Article 1910 does not supply a cause of action for any

and all wrongs; a cause of action requires plaintiff to plead that defendants' conduct violated a

specific statutory prohibition under Mexican law.

       In addition, Article 1910 imposes a strict causation requirement between the

conduct alleged and the injury suffered.  To establish liability, plaintiff must not only allege that

---

[46]    Rule 44.1 of the Federal Rules of Civil Procedure provide that "[i]n determing foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1  Mr. Zamora is a practicing attorney in Mexico and an adjunct professor of Mexican law.  Therefore, the Court may consider Mr. Zamora's declaration.  *See In re: Lyondell Chem. Co.*, 543 B.R. 428, 444 (Bankr. S.D.N.Y. 2016) (considering declaration of Luxembourg attorney in connection with defendant's motion to dismiss adversary complaint based on Luxembourg law).

it suffered damages, but also that its damages were the "immediate and direct consequence" of

defendant's actions.  (*See id.* ¶¶ 30, 32.)

> ## 2. Plaintiffs' Claims Related to Pemex Fail Because Mexican Law Does Not Recognize Tortious Interference With Contract or Business Relations

Plaintiffs' fifth and sixth causes of action are pled as alternatives to their claims

for tortious interference with the Pemex Contracts (Count 1) and Oro Negro's business

relationship with Pemex (Count 3).  The Mexican Law Counts allege that the Ad Hoc

Defendants should be liable under Article 1910 for allegedly "arranging or participating . . . in

meetings and telephone conferences with [Pemex] to cause Pemex to: (a) force Perforadora to

yield to the 2017 Proposed Pemex Amendments . . . ; (b) unlawfully terminate the Oro Negro

Contracts; and (c) fail to perform under the Oro Negro Contracts in January 2018. . . ."

(*Compare* Compl. ¶¶ 473, 480, *with id.* ¶¶ 449, 461.)  These claims thus purport to allege

tortious interference with contract and with business relations under Mexican law.

Mexican law, however, does not recognize liability under Article 1910 for

tortious interference with contract or business relations.  As explained in further detail by Mr.

Zamora and previously recognized by the Second and Ninth Circuits, "Mexican law has not

embraced the concept of imposing liability for interfering with a contract or contractual relations

between other parties, as described in Counts 5 and 6 of the Adversary Complaint."  (Zamora

Decl. ¶ 38); *see also Maricultura Del Norte, S. de R.L. de C.V.* v. *Umami Sustainable Seafood,*

*Inc.*, 769 F. App'x 44, 54 (2d Cir. 2019) ("Mexican law does not recognize a claim for tortious

interference with contract.") ("*Maricultura*"); *Desarrolladora Farallon S. de R.L. de C.V.* v.

*Cargill Fin. Servs. Int'l, Inc.*, 666 F. App'x 17, 25 (2d Cir. 2016) ("[A] tortious interference

claim is not cognizable under the law of Mexico. . . ."); *see also Coufal Abogados* v. *AT&T, Inc.,*

223 F.3d 932, 935 (9th Cir. 2000) ("New York recognizes a claim for tortious interference, whereas Mexico does not.").

As Mr. Zamora explains, there are neither *jurisprudencia*, binding precedents, nor *tesis aisladas,* persuasive precedents, which would support the existence of such a claim under Mexican law. (*See* Zamora Decl. ¶ 37); *see also Maricultura*, 769 F. App'x at 54 (observing that Plaintiffs could not cite any binding *jurisprudencia* that recognizes a claim for tortious interference). To the contrary, under Mexican law, only parties to a contract can be liable for breach, and not a third party, even if the third party induces the breach. (*See* Zamora Decl. ¶¶ 23–25.) None of the Ad Hoc Defendants are parties to any contract that was allegedly breached.

Because Mexican law does not recognize liability for alleged interference with contract or prospective business relations and plaintiffs do not otherwise allege any independent violation of statutory law by Defendants, Counts 5 and 6 of the Complaint fail to state a claim and should be dismissed.[47]

### 3.    Plaintiffs' Claims for Allegedly "Sabotaging" Oro Negro's Reorganization Efforts Fails

Plaintiffs' seventh and eighth causes of action—alleging intentional and negligent interference with Oro Negro's reorganization efforts under Article 1910—similarly fail to allege a cognizable claim under Mexican law. Plaintiffs seek to hold the Ad Hoc Defendants liable for

---

[47]    Plaintiffs' claims related to the Pemex Contracts and Plaintiffs' business relationship with Pemex (Counts 5 and 6) also fail because, by their own allegations, Pemex took these actions not because of anything the Ad Hoc Defendants did, but out of a desire to "retaliate" against Oro Negro for refusing to pay bribes. (*See* Compl. ¶¶ 13, 158, 159.) Pemex demanded the contract amendments, and threatened to terminate the Pemex Contracts if Oro Negro did not agree, before any member of the Ad Hoc Group even engaged in any discussion with Pemex. (*Compare id.* ¶ 162, *with id.* ¶ 184.) In fact, Pemex's board resolved to terminate contracts on March 1, 2017, months before the Ad Hoc Group formed or is even alleged to have conspired with Pemex. (*Compare* Clareman Decl. Ex. I.12, *with* Compl. ¶ 162.) Thus, taking the allegations in the complaint as true and with reference to the Pemex Board Resolution from March 1, 2017, there is no reasonable inference that would suggest that Pemex's termination was the "immediate and direct" consequence of the Ad Hoc Defendants' action.

allegedly "sabotaging [Oro Negro's] efforts to reorganize" (Compl. ¶¶ 487, 493), by "(a) colluding with Pemex to cause Pemex to terminate the Oro Negro Contracts after Perforadora filed for *concurso*; (b) colluding with Pemex to cause the *Concurso* Court to reject Perforadora's *concurso* filing; (c) entering into agreements to manage the Rigs after the Ad-Hoc Group prevailed in unlawfully taking over them; (d) preventing Pemex from performing the Oro Negro Contracts in January 2018; (e) causing Deutsche Mexico to fail to make almost any payments to Perforadora during the *concurso*; and (f) improperly causing the seizure of all of the funds in the Mexican trust." (*Id.*)

There is no recognized tort under Mexican law for tortious interference with reorganization. (*See* Zamora Decl. ¶ 40.) Moreover, Plaintiffs' allegations regarding the Pemex Contracts and related actions, (a), (c) and (d) above, simply repackage their tortious interference with contract claims and fail for the same reasons. Plaintiffs' remaining allegations (b, e, and f, above) fail because they do not plead the *sine qua non* of an Article 1910 violation: a separate statute prohibiting the alleged conduct which was violated by Defendants. (*See* Zamora Decl. ¶¶ 31–32, 39–48.)[48] Here, Plaintiffs have failed to allege any violation of any statute prohibiting what Defendants allegedly did. (*See id.* ¶ 35–36.) Accordingly, Counts 7 and 8 should be dismissed.

### 4.    Plaintiffs' Fail to State a Claim for Abuse of Process Under Mexican Law

Plaintiffs' claims for abuse of process under Mexican Law (Counts 10 and 11) also fail to plead a cognizable claim under Article 1910. Counts 10 and 11 allege that the Ad Hoc Defendants are liable under Article 1910 for allegedly "causing, or conspiring to cause,

---

[48]    In addition, Plaintiffs have failed to allege any damages from allegedly colluding with Pemex to cause the *Concurso* Court to reject Perforadora's *concurso* filing because the *concurso* filing was ultimately accepted. (*See* Compl. ¶¶ 198, 204.)

Mexico to open four criminal investigations against [Oro Negro and its employees]." (*See* Compl. ¶¶ 504, 511.) Under Mexican law, filing a criminal complaint in relation to a potential crime and providing evidence to support that complaint are protected rights under the Mexican Constitution. (*See* Zamora Decl. ¶ 61.) Accordingly, these claims fail to plead that Defendants have "act[ed] illegally or against the good customs" as would be required to state a claim under Article 1910. (*See id.* ¶ 30) Moreover, under Mexican law, once a party files a criminal complaint, the decision to pursue an investigation or prosecution rests solely with the prosecutor's office. (*See id.* ¶ 62.) Actions taken thereafter by the prosecutors are not, as a matter of law, the "immediate and direct" cause of Plaintiffs' injuries as required by Article 1910. (*See id.*)

Plaintiffs claim that the Sham Company *Querella* was filed based on knowingly false or fabricated evidence (specifically, the SAT tax records, not documents created by Defendants themselves), yet such an argument does not rescue their claim.[49] First, a plaintiff may only bring a claim based on fraudulent conduct in a criminal proceeding once the criminal action has terminated in her favor. (*See* Zamora Decl. ¶ 67.) That has not happened here. Second, under Mexican law, a party is "entitled to rely on documents provided by the government" and such "public or official documents (*documentos publicos*) . . . are accorded full evidentiary weight." (Zamora Decl. ¶ 68.) Plaintiffs make vague and conclusory allegations that

---

[49]    The Complaint includes a conclusory suggestion that Defendants have succeeded in Mexican court "potentially by paying bribes. . . ." (*See, e.g.*, Compl. ¶ 505.) These allegations raise, at best, a "sheer possibility" of unlawful action. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*). The Court can ignore such speculation, "devoid" of any "factual enhancement" on a motion to dismiss. *Id.* at 681. Moreover, these allegations should not be credited under Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires averments of fraud, including allegations of fabricated evidence, to be stated with "particularity." *See Majors* v. *Crawley*, No. 88 CIV. 6064 (MGC), 1991 WL 41587, at *3 (S.D.N.Y. Mar. 15, 1991). Specifically, these allegations fails to sufficiently plead the "content of the alleged misrepresentation." *Luce* v. *Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986). In the case of allegedly fabricated evidence, Plaintiffs must plead the "basis for believing that these documents are not genuine." *Majors*, 1991 WL 41587, at *3. Plaintiffs Complaint does not. Therefore, these allegations should not be credited.

bribery lead to the creation of false tax records but do not allege with any specificity how the Ad

Hoc Defendants or counsel in Mexico supposedly "knew" that to be the case.

Because Plaintiffs have failed to state a claim to relief under Mexican law for

abuse of process, their tenth and eleventh causes of action should be dismissed.

### 5. Plaintiffs' Claims for Tortious Interference with Contract and Business Relations Related to the Bareboat Charters and Singapore Rig Owners Fail to State a Claim Under Mexican Law

Counts 15 and 16 seek to hold the Ad Hoc Defendants liable under Article 1910

for (1) "interfering or conspiring to interfere [with] the Bareboat Charters by causing the

Singapore Rig Owners to unlawfully terminate the Bareboat Charters;" (2) "causing the

Singapore Rig Owners to initiate four criminal investigations"; (3) "causing the Singapore Rig

Owners to fail to pay Reimbursement Costs to Perforadora" under the Bareboat Charters; and (4)

"making it impossible for Perforadora to pay past due Charter Hire" as a result of the Seizure

Order.  (Compl. ¶¶ 538, 544.)  As explained above, Mexican Law does not recognize claims for

interfering with a contract or business relations.  (*See* Section III.B.2, *supra*; Zamora Decl.

¶¶ 23–26, 38.)  Therefore, Counts 15 and 16 should be dismissed.[50]

## IV. SHOULD THE COURT APPLY NEW YORK LAW, PLAINTIFFS FAIL TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED

Although Plaintiffs' tort claims are governed by Mexican law, they nevertheless

should be dismissed for failure to state a claim even if New York law applied.

---

[50]    Plaintiffs fail to state a claim against the Ad Hoc Defendants related to the termination of the Bareboat Charters or the Singapore Rig Owners' failure to pay Reimbursement Costs because the Ad Hoc Defendants' actions were not the direct or immediate cause of Perforadora's injuries.  As to the termination of the Bareboat Charters, those agreements provided that they would terminate automatically with the termination of the Pemex Contracts.  (See Compl. ¶ 126.)  Similarly, the Ad Hoc Defendants actions cannot be the "direct and immediate" cause of the Singapore Rig Owners' failure to pay allegedly incurred Reimbursement Costs because, as the Complaint states, those costs were incurred "[b]efore the illegal seizure of control over the Singapore Rig Owners. . . ."  (Compl. ¶ 131.)

### A.    Perforadora Fails to State a Claim for Tortious Interference with the Pemex or Bareboat Contracts (Counts One and Thirteen)

The Complaint alleges tortious interference with contract under New York law arising from terminations of the Pemex Contracts and Bareboat Charters.  Both of these claims fail.

To establish a claim for tortious interference with contract, plaintiff must allege: (1) the existence of a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of the third party's breach without justification; (4) breach of the contract; and (5) damages resulting from the breach. *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006).  To defeat a motion to dismiss, plaintiffs must show that "there would not have been a breach but for the activities of defendants."  *Sharma* v. *Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990) (affirming dismissal of a tortious interference claim where plaintiff failed to allege that defendant's actions were "but for" cause of breach).  Perforadora's claims fail because the Complaint does not plausibly allege but-for causation or, with respect to the Bareboat Charters, lack of justification.[51]

### 1.    Perforadora Fails to State a Claim for Tortious Interference With the Pemex Contracts

The Ad Hoc Defendants were not the but-for cause of any alleged breach of contract committed by Pemex against Perforadora.  According to the Complaint, Pemex repudiated the contacts in March 2017, "repeatedly threatened" to terminate the contracts

---

[51]    Plaintiffs' tortious interference with contract claims were brought on behalf of both Integradora and Perforadora (Compl. ¶¶ 453, 527), however, only Perforadora was party to contracts with Pemex and the Singapore Rig Owners (*id.* ¶¶ 447, 552).  Integradora therefore has no claim for tortious interference with contract.  *See Restis* v. *Am. Coalition Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 727 (S.D.N.Y. 2014) (holding that tortious interference with contract claim "must be dismissed because . . . the named Plaintiffs were not parties to the contracts at issue").

between April and September 2017, terminated the contracts in October 2017, and decided not to

"reactivate" the contracts in January 2018.  (Compl. ¶¶ 164, 277, 408, 419, 572.)  This course of

conduct allegedly followed a similar pattern in 2015 and 2016, and was motivated by Pemex's

desire to "retaliate" against Oro Negro for reasons unrelated to the Ad Hoc Group.

       Pemex's actions beginning in March 2017 occurred months before the Ad Hoc

Group was formed in May 2017, and before any individual defendant is alleged to have any been

in contact with Pemex.  (Compl. ¶ 162.)  Moreover, Pemex's repudiation of the Pemex contracts

in March 2017 followed a resolution by its board specifically instructing its management to

renegotiate and terminate existing contracts—including those with Oro Negro.  (*See* Clareman

Decl. Ex. 21.)  Whatever communications individual bondholders had with Pemex "[s]tarting in"

April 2017, no change in Pemex's behavior is alleged.  (*See* Compl. ¶ 184.)  Accordingly, these

allegations fail to allege that the Ad Hoc Defendants were the "but-for" cause of Pemex's

terminations.

       "When a complaint alleges that '[the breaching party] exhibited a predisposition

toward breaching the Agreement independent of the alleged involvement of the Defendants,

Plaintiffs cannot establish 'but for' causation,'" and a tortious interference claim cannot be

sustained.  *N. Shipping Funds I, L.L.C.* v. *Icon Capital Corp.*, No. 12 Civ. 3584(JCF), 2013 WL

1500333, at *6 (S.D.N.Y. Apr. 12, 2013) (quoting *RSM Prod. Corp.* v. *Fridman*, 643 F. Supp. 2d

382, 410 (S.D.N.Y. 2009) (alteration in original) (dismissing plaintiff's claim for tortious

interference with contract).  Accepting Plaintiffs' allegations as true, Pemex clearly exhibited a

"predisposition toward breaching"—Pemex allegedly announced it would breach in March 2017

and did so due to motives independent of the Ad Hoc Group.  *N. Shipping Funds*, 2013 WL

1500333, at *6.  In addition, Perforadora's *concurso* filing would only have strengthened

Pemex's intention to breach; the filing attempted to impose on Pemex a court-ordered obligation to pay Oro Negro the contractual Day Rates Pemex rejected repeatedly, and which they have successfully argued in Mexican courts "threaten[ed] Pemex's financial survival."  (Compl. ¶ 203 n.10.)

Nor does the Complaint support any plausible inference that the Ad Hoc Group wanted Pemex to terminate the contracts pre-bankruptcy.  The Ad Hoc Group sent Oro Negro three letters in August and September 2017 urging Perforadora to accept Pemex's amended terms—actions which would have prevented termination.  (*Id.* ¶ 189.)  The Bondholders' wanted the Pemex Contracts in place because, as Plaintiffs allege, Pemex's payments were Oro Negro's only source of revenue and thus the only way to service the Bonds.  (*Id.* ¶¶ 451, 456, 463, 468.)  To this end, the Bondholders voluntarily passed a resolution binding them to allow Oro Negro to accept Pemex's proposed amendments, to help Oro Negro avoid default.

Plaintiffs seek to establish the necessary causation by alleging that on September 28, 2017, ███████████████████████████████████████████████████████████ ███████████████████████████████ (Compl. ¶ 232.)  This allegation is too slender a reed to support Plaintiffs' claims, and it is belied by the documentary evidence quoted by Plaintiffs in support of this allegation. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████.[52] ████████████████████████████

---

[52] ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████  This allegation does not properly allege any fraudulent misrepresentation to support Plaintiffs' tortious interference claim because it "fails to plead the alleged misrepresentation with particularity," as required by Fed. R. Civ. P. 9(b).  *Wolff* v. *Rare Medium, Inc.*, 210 F. Supp. 2d 490, 500 (S.D.N.Y. 2002), *aff'd,* 65 F. App'x 736 (2d Cir. 2003).

███████████████████████████████████████████████████

██████████████████. Neither Plaintiffs' allegations nor the document on which it is based

is sufficient to overcome dismissal of this claim, particularly when considered in light of the

extensive allegations of repudiation and threats by Pemex. *See Sharma* v. *Skaarup Ship Mgmt.*

*Corp.*, 699 F. Supp. 440, 447 (S.D.N.Y. 1988) (dismissing a tortious interference claim because

the allegation that defendants acted in concert with a party to the contract at issue implied that

that party "would have breached its obligations even without the involvement of the . . .

defendants").[53]

> **2.    Plaintiffs Fail to State a Claim for Tortious Interference With the Bareboat Charters**

Plaintiffs' claim for tortious interference with the Bareboat Charters fails for

similar reasons.  To begin with, it relies entirely on the allegation that the Bareboat Charters were

terminated "based solely on" Pemex's termination of the Pemex Contracts.  (Compl. ¶ 524.)

This claim is simply derivative of the Pemex termination claim and fails for the same reasons

discussed above.

In addition, the Bareboat Charters terminated by their terms upon termination of

the Pemex Contracts.  (*See* Statement of Facts Section A.3, *supra*; Compl. ¶ 524; *see also*

Clareman Decl. Ex. 8-T (Primus Bareboat Charter) §§ 3.2, 7.1, 11.1.)  The termination provision

states that if the Pemex Contracts are terminated "in accordance with their terms ***or for any other***

***reason*** prior to the Termination Date . . . such termination will also be applicable for this

Charter."  Thus, even if Pemex breached by terminating the Pemex Contracts, the Bareboat

---

[53]    To the extent Plaintiffs allege tortious interference with the Pemex Contracts in January 2018, that claim
fails because there was no contract at that time—Pemex had terminated them.  The tortious interference
with contract claim therefore cannot be sustained—there was not valid and binding contract.

Charters are not also breached by termination; the Bareboat Charters terminate once Pemex terminates its Oro Negro contracts "in accordance with their terms or for any other reason." Plaintiffs cannot state a claim for tortious interference if there is no underlying breach. *Kirschner* v. *CIHLP LLC*, No. 15-CV-8189 (RA), 2016 WL 5720782, at *5 (S.D.N.Y. Sept. 30, 2016) ("[A]a tortious interference with contract claim cannot survive where there is no properly alleged claim for an underlying breach.").

Plaintiffs' tortious interference claim arising from the Bareboat Charters fails for yet another reason:  under New York law, tortious interference with contract claims against defendants with an "economic interest" in the breaching party's business are subject to a heightened pleading standard.  *In re Bernard L. Madoff Inv. Sec. LLC*, 440 B.R. 282, 294 (Bankr. S.D.N.Y. 2010).  "[W]hen a complaint supports a defendant's economic interest in the breaching party's business, it is insufficient for a complaint merely to allege the elements of tortious interference; rather, the plaintiff must also adequately allege that the defendant acted maliciously, fraudulently, or illegally."  *Benihana of Tokyo, LLC* v. *Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 29–30 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018).

The Complaint establishes on its face that the Ad Hoc Defendants had an economic interest in the Singapore Rig Owners.  They were Bondholders in Oro Negro Drilling, and after the Share Charges were executed, Nordic Trustee owned all of the equity in both Oro Negro Drilling and the Singapore Rig Owners.  This form of economic interest is sufficient under New York law.  *See Foster* v. *Churchill*, 87 N.Y.2d 744, 747 (1996) (defendants with a 75 percent equity ownership stake in the company established a defense of economic justification when they "acted to preserve the financial health" of the company).  Likewise, the termination of the bareboat charters was necessary to preserve the "health" of Oro Negro

Drilling.  Therefore, the economic justification doctrine requires that Plaintiffs' claim fails.

*Benihana of Tokyo*, 259 F. Supp. 3d 16, 29 (a showing of economic justification "bars an action

for tortious interference with contract"); *see also Solmetex, LLC* v. *Dental Recycling of N. Am.,*

*Inc.*, No. 17 Civ. 860 (JSR), 2017 WL 2840282, at \*5 n.10 (S.D.N.Y. June 26, 2017) (dismissing

claim of tortious interference where "the pleadings . . . recount[ed] that" the defendant acted in

its economic self-interest).  Plaintiffs do not plausibly plead that the Ad Hoc Defendants acted

out of malice, fraud, or illegality in connection with the Bareboat Charter terminations, as they

would have to do to overcome the economic justification defense.  *IMG Fragrance Brands LLC*

v. *Houbigant, Inc.*, 679 F. Supp. 2d 395, 406 (S.D.N.Y. 2009).  Thus, the claim fails.

### B.    Plaintiffs Fail to State a Claim for Tortious Interference With Business Relations With Pemex or the Singapore Rig Owners

A claim for tortious interference with business relations "must allege that '(1)

[plaintiff] had a business relationship with a third party; (2) the defendant knew of that

relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or

used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to

the relationship.'" [54]  *Ace Arts, LLC* v. *Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 452

(S.D.N.Y. 2014) (quoting *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)).

The first element requires plaintiff to "specify some particular, existing business

relationship through which plaintiff would have done business but for the allegedly tortious

behavior." *Kramer* v. *Pollack-Krasner Found.*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995).  There

must be "reasonable certainty" of future contractual relations between plaintiff and a third party,

---

[54]    "Tortious interference with prospective economic advantage" is an "alternative name" for tortious interference with business relations. *Catskill Dev., L.L.C.* v. *Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).  They are the sam e cause of action under New York law.  *Valley Lane Indus. Co.* v. *Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 105 (2d Cir. 2012).

*Union Carbide Corp.* v. *Montell N.V.*, No. 95 Civ. 0134(SAS), 1998 WL 474207, at *2

(S.D.N.Y. Aug. 12, 1998); merely alleging that the plaintiff and the third party had done business

in the past is insufficient.  *Connolly* v. *Wood-Smith*, No. 11 Civ. 8801 (DAB)(JCF), 2012 WL

7809099, at *11 (S.D.N.Y. May 14, 2012).

   The requirement to show malice or dishonest, unfair, or improper means is "a

particularly high hurdle" for plaintiffs alleging tortious interference with business relations.  *Id.*

To meet it, plaintiff must show that defendant acted *solely* to inflict harm on plaintiff, or "that the

defendant committed a crime or an independent tort such as fraud."  *Confido Advisors, LLC* v.

*USAA Real Estate Co.*, No. 17 Civ. 5632, 2018 WL 4265900, at *9 (S.D.N.Y. Sept. 6, 2018)

(internal quotation marks and alterations omitted).  This type of claim is "very difficult to

sustain."  *Kramer*, 890 F. Supp. at 258.[55]

   **1.**  **Plaintiffs Fail to State A Claim for Tortious Interference With Their
Business Relationship With Pemex**

   Plaintiffs' claim that the Ad Hoc Defendants "caused" Pemex to end its business

relationship with Oro Negro merely repackages the same allegations Plaintiffs' advanced in

support of their tortious interference with contract claim, and fails for the same reasons.  *See*

*Wolff* v. *Rare Medium, Inc.*, 210 F. Supp. 2d 490, 500 (S.D.N.Y.2002), *aff'd*, 65 F. App'x 736

(2d Cir. 2003) (dismissing the plaintiffs' claims for both tortious interference with contract and

tortious interference with business relations).  Tortious interference with business relations

requires "more culpable conduct on the part of the defendant" than tortious interference with

---

[55]  Like their tortious interference with contract claims, Plaintiffs brought tortious interference with business relations claims on behalf of both Perforadora and Integradora.  (Compl. ¶¶ 465, 534.)  Plaintiffs do not even attempt to allege any business relationship between Integradora and either Pemex or the Singapore Rig Owners.  (*See id.* ¶¶ 459, 529) (alleging the existence of business relationships between Perforadora and the Singapore Rig Owners).  Accordingly, Integradora's claims should be dismissed.  Perforadora's allegations fail to state a claim for tortious interference with business relations.

contract, and therefore, if the tortious interference with contract claim fails, the business relations

claim necessarily follows. *Id.* (quoting *Wolff* v. *Rare Medium, Inc.*, 171 F. Supp. 2d 354, 361

(S.D.N.Y. 2001)). Here, Plaintiffs make no attempt to meet the more stringent requirement for

the business relations tort. Given that plaintiffs fail to state a tortious interference with contract

claim, their tortious interference with business relations claim should also be dismissed.

Plaintiffs' allegation that the Ad Hoc Defendants interfered with Plaintiffs'

business relations with Pemex in January 2018 also fails because at that time, there was no

"particular, existing" business relationship between Perforadora and Pemex. *Kramer*, 890 F.

Supp. at 258 (S.D.N.Y. 1995). The parties had a history of doing business, but that is

insufficient to sustain a claim. *See Connolly* v. *Wood-Smith*, 2012 WL 7809099, at *11

(S.D.N.Y. May 14, 2012).

The Complaint also does not plead that a "reasonable certainty" of future

contractual relations with Pemex existed in January 2018, when agents for Bondholders

allegedly caused Pemex to cancel a meeting with Perforadora to discuss Oro Negro. *See Union

Carbide Corp.*, 1998 WL 474207, at *2. Plaintiffs merely allege that "Pemex was set to have

negotiations with Perforadora to reactivate the Oro Negro Contracts." (Compl. ¶ 272.)

Allegations about "potential contracts" "completely fail" as a matter of law. *See Kramer*, 890 F.

Supp. at 258. Plaintiffs' claim concerning the alleged interference with a meeting between Oro

Negro and Pemex cannot sustain a tortious interference with business relations claim. *Kramer*,

890 F. Supp. 2d at 258 (dismissing a claim for tortious interference with business relationships

where plaintiff referred generally to "potential contracts" that third parties would have been

willing to enter but for defendants' conduct). *Kramer*, 890 F. Supp. at 258.

This claim also fails because the conduct that allegedly gave rise to the claim was not criminal, independently tortious, or taken for the sole purpose of inflicting harm on Plaintiffs. *See Confido Advisors, LLC*, 2018 WL 4265900, at *9. The Complaint alleges that upon learning that Pemex intended to reopen negotiations with Oro Negro "[Andres] Antonius and [Santiago] Garcia . . . met with Pemex." (Compl. ¶ 275.) Plaintiffs do not even attempt to claim that anyone "committed a crime or an independent tort such as fraud, or acted for the sole purpose of inflicting intentional harm on the plaintiff" during that meeting. *Confido Advisors, LLC* v. *USAA Real Estate Co.*, No. 17 Civ. 5632, 2018 WL 4265900, at *9 (S.D.N.Y. Sept. 6, 2018) (internal quotation marks and alterations omitted). No tortious interference with Plaintiffs' business relationship with Pemex can be sustained based on this pleading.

## 2. Plaintiffs Fail to State a Claim for Tortious Interference With a Business Relationship With the Singapore Rig Owners

Plaintiffs' claim for tortious interference with their business relationship with the Singapore Rig Owners also cannot stand.

*First*, each of the acts asserted as support for this claim is duplicative of allegations underlying claims for other torts arising from the Pemex and Bareboat Charter terminations. They fail for the same reasons. *See* Section IV.A & B, *infra*.

*Second*, Plaintiffs do not set forth facts sufficient to allege a "particular, existing" relationship with the Singapore Rig Owners through which they would have done business but-for the conduct of the Ad Hoc Defendants. Any relationship between Plaintiffs and the Singapore Rig Owners terminated as soon as the Bareboat Charters terminated. None of the alleged acts supporting this claim—allegedly pursuing illegitimate criminal actions, and interfering with payment of Charter Hire and Reimbursement Costs—is alleged to have wrongfully interfered with any reasonably certain future business relationship. As to the

Reimbursement Costs, the Complaint makes clear that the Singapore Rig Owners incurred but did not pay those costs more than a year before the Ad Hoc Defendants exercised the Share Charge; those alleged costs were unpaid since May 2016, at a time when the Singapore Rig Owners were under the control of Integradora.  (*See* Compl. ¶¶ 131, 138 (stating that the Singapore Rig Owners failed to pay Reimbursement Costs long before the Ad Hoc Group exercised the Share Charges).  Even if Reimbursement Costs from May 2016 were owed, it is implausible to claim any breach was *caused* by the Ad Hoc Defendants as opposed to Integradora, which itself refused to pay those amounts.  In any case, the Complaint is devoid of any reference to a continuing relationship with the Singapore Rig Owners after the Bareboat Charters were terminated, and the tortious interference with business relationship therefore should be dismissed.

### C.    Plaintiffs Fail to State a Claim for Conspiracy to Commit Tortious Interference

Plaintiffs' claims for conspiracy to commit tortious interference with contract and business relations should be dismissed because they have failed adequately to plead any underlying torts.  *See In re LightSquared, Inc.*, 504 B.R. 321, 356 (Bankr. S.D.N.Y. 2013) (SCC); *Kilkenny* v. *Greenberg Traurig, LLP*, No. 05 Civ. 6578(NRB), 2006 WL 1096830, at *5 (S.D.N.Y. Apr. 26, 2006) ("A claim of conspiracy therefore should be dismissed if the underlying independent tort has not been adequately pleaded.").

Even if Plaintiffs' claims for tortious interference are permitted to proceed, Plaintiffs have failed to sufficiently plead the elements of civil conspiracy.  "To state a claim for civil conspiracy under New York law, a plaintiff, in addition to alleging an underlying tort, must plead facts sufficient to support an inference of the following elements:  (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties'

intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or

injury." *Bigio*, 675 F.3d at 176 (internal citation omitted); *In re Operations NY LLC*, 490 B.R.

84, 103 (Bankr. S.D.N.Y. 2013). "In addition, 'complaints containing only conclusory, vague, or

general allegations that the defendants have engaged in a conspiracy . . . are properly dismissed;

diffuse and expansive allegations are insufficient, unless amplified by specific instances of

misconduct.'" *Kilkenny*, 2006 WL 1096830, at *5 (quoting *Ciambriello* v. *Cnty. of Nassau*, 292

F.3d 307, 325 (2d Cir. 2002)).

The Complaint does not support a conspiracy involving all of the Ad Hoc

Defendants. Plaintiffs do not allege that Alterna, CQS, GHL, or SFIL did anything other than

join the Ad Hoc Group. Plaintiffs make various allegations about ARCM, AMA, and Messrs.

Bodden, Ercil, and Leand, but with few exceptions do not identify which of the generalized

allegations about the Ad Hoc Group, if any, apply to whom. *See In re TransCare Corp.*, 592

B.R. 272, 288 (Bankr. S.D.N.Y. 2018) (dismissing claims against grouped defendants even

where plaintiff alleged the entities "operated in concert with each other as an integrated whole,

and operated through the same narrow cast of human beings"); *In re LightSquared Inc.*, 504 B.R.

at 356; *see also Toumazou* v. *Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014)

(dismissing claims against group of defendants that included parent and subsidiary where

plaintiff failed plausibly to allege alter ego liability). The conspiracy allegations are therefore

insufficient to state a claim encompassing all of the Defendants.

### D.        Plaintiffs Fail to State a Claim for Abuse of Process Under New York Law

The Complaint alleges that the Ad Hoc Defendants instituted four criminal

actions against Oro Negro and its employees and used "fabricated evidence and false allegations

and arguments, and potentially [bribed] Mexican government officials," and that this conduct is

actionable under New York law. (Compl. ¶¶ 497–500.) It is not. For the reasons discussed in

Section III.A.1, *supra*, as a matter of law, an abuse of process claim under New York law cannot be based on an alleged abuse of foreign country's criminal process.  Count 9 should thus be dismissed.

> **E.    Plaintiffs Fail to State a Claim for Prima Facie Tort**

Plaintiffs' claim for prima facie tort fails for two independent reasons: (1) the claim merely repackages the allegations underlying other claims, which cannot be sustained; and (2) on its face, the Complaint establishes that the Ad Hoc Defendants' alleged conduct was motivated by economic reasons, which negates the element of "disinterested malevolence" required to state a claim for prima facie tort.

> **1.    Plaintiffs' Prima Facie Tort Claim Should Be Dismissed, Because it Merely Recycles Other Claims**

Under New York law, a cause of action for prima facie tort is a gap-filler doctrine that "is designed to provide a remedy for intentional and malicious actions that cause harm and for which no traditional tort provides a remedy."  *Curiano* v. *Suozzi*, 63 N.Y.2d 113, 118 (1984).  It is thus a legal theory that "by definition [applies to] an act that does not fall within the categories of the traditional torts."  *Belsky* v. *Lowenthal*, 62 A.D.2d 319, 322 (1st Dep't 1978).  Where, as here, a prima facie tort claim is duplicative of Plaintiffs' other claims, it should be dismissed.  *See Garrison* v. *Toshiba Bus. Sols. (USA) Inc.*, 907 F. Supp. 2d 301, 308 (E.D.N.Y. 2012) (dismissing all tort claims in the complaint and noting that "[w]here plaintiff pleads a traditional tort, there is no cause of action for prima facie tort"); *Gertler* v. *Goodgold*, 107 A.D.2d 481, 490 (1st Dep't 1985) (dismissing prima facie tort claim because it was simply a restatement of plaintiff's breach of contract and intentional tort claims).  Plaintiffs' claim for prima facie tort—which on its face recycles the same allegations plead in other of their tort claims—therefore fails to state a claim.

Each of the eight allegedly tortious acts in Count 19 simply replicates Plaintiffs' claims tortious interference claims (Counts 1, 3, 13, 14), alleged "sabotage" of Oro Negro's efforts to reorganize (Counts 7 and 8), and abuse of process (Count 9).  (*Compare* Compl. ¶ 567(a), (c), (d), and (f) *with id.* ¶¶ 449, 461, 487, 493, 497, 504.)  Plaintiffs cannot simply plead a prima facie tort claim as "a 'catch-all' alternative for every cause of action which cannot stand on its legs."  *Belsky*, 405 N.Y.S.2d at 65.  These allegations fail to state a claim under New York law, and should be dismissed.

### 2.    Plaintiffs' Allegations That the Ad Hoc Defendants Had Economic Motivations Is Fatal to Their Prima Facie Tort Claim

Plaintiffs' allegations demonstrate that the Ad Hoc Defendants were motivated by their own economic interests, which is also fatal to their prima facie tort claim.  (*See* Compl. ¶¶ 2, 12, 175.)  Under New York law, to state a claim for a prima facie tort, plaintiff must allege: (1) intentional infliction of harm, (2) resulting in special damages, (3) without excuse or justification, (4) by an act that would otherwise be lawful.  *See, e.g.*, *U.S. for Use & Benefit of Evergreen Pipeline Constr. Co., Inc.* v. *Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996).  As the New York Court of Appeals has explained, "there is no recovery in prima facie tort unless *malevolence is the sole motive*" for defendant's conduct, "or, in Justice Holmes' characteristically colorful language, unless defendant acts from 'disinterested malevolence.'" *Burns Jackson Miller Summit & Spitzer* v. *Lindner*, 59 N.Y.2d 314, 333 (1983).  Accordingly, courts construe the third element—"without excuse or justification"—strictly, and in order to satisfy it, plaintiff must plausibly allege that defendant's sole motivation was to cause injury to plaintiff.  *See Pisarri* v. *Town Sports Int'l, LLC*, No. 18 Civ. 1737, 2019 WL 1245485, at *5 (S.D.N.Y. March 4, 2019); *Wilson* v. *Tarricone*, No. 12 Civ. 5337, 2013 WL 12084504, at *5 (S.D.N.Y. Sept. 26, 2013).  "[M]otives other than disinterested malevolence, such as profit, self-

interest, or business advantage will defeat a prima facie tort claim." *Pisarri*, 2019 WL 1245485, at *5 (quoting *Twin Laboratories Inc.* v. *Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990)).

Here, Plaintiffs have expressly alleged that the Ad Hoc Defendants' intention was economic in nature and that the Ad Hoc Defendants "stood to substantially profit simply by taking over the Rigs." (*See e.g.*, Compl. ¶ 12.) The presence of any business-related or self-interested motivation, like those alleged in the Complaint, defeats a prima facie tort claim. *See, e.g.*, *Procter & Gamble Co.* v. *Quality King Distributors, Inc.*, 974 F. Supp. 190, 198 (E.D.N.Y. 1997) (dismissing a claim for prima facie tort where plaintiff alleged that defendants acted out of "business animus"). Accordingly, Plaintiffs' prima facie tort claim fails as a matter of law.

### F. Plaintiffs Fail to State a Claim for Negligence

Plaintiffs' negligence claim also fails because Plaintiffs have failed to allege the breach of any duty. In order to state a claim for negligence, plaintiffs must plausibly allege: (1) a duty owed by the Ad Hoc Defendants to them; (2) a breach thereof; and (3) injury proximately resulting therefrom. *See Pasternack* v. *Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 825 (2016). It is elementary that "[i]n the absence of a duty, as a matter of law, there can be no liability" for negligence. *Id.*

Here, Plaintiffs allege, in an entirely conclusory fashion, that the Ad Hoc Defendants "owe a duty of reasonable care to Integradora and Perforadora in the collection of the Bonds and the Charter Hire." (Compl. ¶ 572.) The Ad Hoc Defendants owe no such duty. It is well established that creditors do not owe any duty to debtors. *See AJW Partners LLC* v. *Itronics Inc.*, 892 N.Y.S.2d 46, 48 (1st Dep't 2009) (creditors have no fiduciary duties to debtors in the absence of contrary provisions in the indenture); *River Glen Assocs., Ltd.* v. *Merrill Lynch Credit Corp.*, 743 N.Y.S.2d 870, 871 (1st Dep't 2002) ("[A]n arm's length borrower-lender relationship

is not of a confidential or fiduciary nature and therefore does not support a cause of action" for

negligence).  Furthermore, Plaintiffs make no effort to connect any acts by the Ad Hoc

Defendants to such a contractual duty, or otherwise explain the legal basis for any duty that was

supposedly breached.  (Compl. ¶¶ 571, 572(a)–(f).)

Plaintiffs fail to state a claim for negligence because they fail to allege that the Ad

Hoc Defendants committed any act or omission in breach of any duty.  *Pasternack*, 27 N.Y.3d at

825 (citing *Lauer* v. *City of New York*, 95 N.Y.2d 95, 100 (2000) ("[W]ithout a duty running

directly to the injured person there can be no liability in damages.").

### G.    Plaintiffs Fail to State a Claim for Unjust Enrichment

Plaintiffs also fail to allege a plausible claim for unjust enrichment.  Plaintiffs

allege—based the same litany of allegedly tortious acts as Plaintiffs' other tort claims—that the

Ad Hoc Defendants were unjustly enriched by taking over the Rigs without "justification," and

that it is "against equity and good conscious" for the Singapore Rig Owners to retain the benefits

of possessing the Rigs.  (Compl. ¶¶ 577–78.)  Plaintiffs' claim should be dismissed because it is

duplicative of its other claims, and because the Ad Hoc Defendants did have justification to take

over the Rigs; in May 2019, the *Concurso* Court ordered Perforadora to return possession of the

Rigs to the Singapore Rig Owners.  (Clareman Decl. Ex. 36-T (May 15, 2019 *Concurso*

Decision) at 23.)

In order to state a claim for unjust enrichment, a plaintiff must plausibly allege

that: (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) equity

and good conscience require restitution.  *See Bourbia* v. *S.C. Johnson & Son, Inc.*, 375 F. Supp.

3d 454, 466 (S.D.N.Y. 2019).  The Court of Appeals has made clear that "unjust enrichment is

not a catchall cause of action to be used when others fail."  *Corsello* v. *Verizon New York, Inc.*,

18 N.Y.3d 777, 790 (2012).  Rather, the Court of Appeals has limited this claim to "unusual

situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.* "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id.* Where, as here, an unjust enrichment claim is "duplicative" of other tort claims, unjust enrichment "cannot remedy the defects" of other "defective" claims. *Id.* at 791.

Plaintiffs' unjust enrichment claim merely duplicates their other (inadequately pled) tort claims. Accordingly, it should be dismissed. *See id.*; *see also Ramiro Aviles* v. *S & P Global, Inc.*, 380 F. Supp. 3d 221, 305 (S.D.N.Y. 2019) (dismissing duplicative unjust enrichment claim that "almost exactly mirror[ed] Plaintiffs' fraudulent conveyance claim and breach-of-contract claim") (internal citation omitted); *Plumbing Supply, LLC* v. *ExxonMobil Oil Corp.*, No. 14 Civ. 3674 (VB), 2016 WL 1249611, at *10 (Mar. 29, 2016) (finding the "case [did] not present the 'unusual' circumstances needed to state an unjust enrichment claim" and dismissing plaintiffs' unjust enrichment claim because it "simply duplicate[d]" plaintiffs' other, inadequately plead claims under statutory law).

Even if the duplicative nature of Plaintiffs' unjust enrichment claim were not fatal, Plaintiffs fail to state a claim for unjust enrichment. The Singapore Rig Owners are the legal owners of the Rigs, and they retook possession pursuant to a lawful order of the *Concurso* Court. Accordingly, Plaintiffs cannot argue that it is "against equity and good conscious" for the Singapore Rig Owners to retain the benefits of possessing the Rigs. Likewise, it cannot be "against equity and good conscious" for the Ad Hoc Defendants to derive benefits from the Singapore Rig Owners' lawful possession. The Court should decline Plaintiffs' invitation to overrule the *Concurso* Court's order and dismiss the unjust enrichment claim.

82

## V.    PLAINTIFFS FAIL TO STATE A CLAIM FOR A VIOLATION OF 11 U.S.C. § 1520 OR THE "COMITY ORDER"

For the reasons set forth in the Memorandum of Law in Support of the Singapore Rig Owners' Motion to Dismiss the Complaint, Plaintiffs' claim for violations of 11 U.S.C. § 1520(a)(1) and the Comity Order should be dismissed as to the Ad Hoc Defendants.

## VI.    THERE IS NO BANKRUPTCY COURT JURISDICTION FOR GIL'S INDIVIDUAL CLAIMS AND HE LACKS STANDING TO BRING ANY CLAIMS UNDER CHAPTER 15

### A.    No U.S. Bankruptcy Jurisdiction Exists Over Gil's Claims And They Must Be Dismissed

Plaintiff, Mr. Gil, asserts three Claims against the Ad Hoc Defendants and Singapore Rig Owners in his individual capacity, all of which relate to the criminal investigations proceeding in Mexico.  (*See* Counts 9–11 (the "Non-Debtor Claims")); (Compl. ¶¶ 496–514).[56]  This Court lacks jurisdiction to hear these claims; these Non-Debtor Claims have no conceivable effect on the Mexican estates of Integradora and Perforadora, and accordingly, the jurisdictional requirements of 28 U.S.C. § 1334 are unmet.

Section 1334 grants district courts (or bankruptcy courts by referral) "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  A proceeding "arising under" title 11 is one based in a provision of the Bankruptcy Code itself.  *In re Casual Male Corp.*, 317 B.R. 472, 475-76 (Bankr. S.D.N.Y. 2004).  A proceeding "arising in" a case under title 11 is a proceeding that, even if not specifically provided for in the Bankruptcy Code, can take place only in the context of a case under title 11.  This includes various matters affecting administration of a bankruptcy

---

[56]    Mr. Gil also asserts these personal claims in his capacity as the former foreign representative.  As discussed *supra,* Gil and the debtors' other management are no longer in possession, and Mr. Gil is no longer the Foreign Representative.

case.  *See id.*; *Cont'l Nat'l Bank of Miami* v. *Sanchez (In re Toledo)*, 170 F.3d 1340, 1345 (11th

Cir. 1999).

Finally, a proceeding is "related to" a title 11 case if the action's outcome might

have any "conceivable effect" on the bankruptcy estate.  *Parmalat Capital Finance, Ltd.* v. *Bank

of America Corp.*, 639 F.3d 572, 579 (2d. Cir. 2011); *In re Cuyahoga Equip. Corp.*, 980 F.2d

110, 114 (2d Cir. 1992).  Courts have interpreted "conceivable effect" to mean that "[a]n action

is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or

freedom of action (either positively or negatively) and which in any way impacts upon the

handling and administration of the bankrupt estate."  *New 118th*, 396 B.R. at 890 (quoting *Pacor,

Inc.* v. *Higgins (In re Pacor, Inc.),* 743 F.2d 984, 994 (3d Cir. 1984)).

The Non-Debtor Claims do not "arise in" or "under" title 11—they arise under

non-bankruptcy tort law and the Mexican Civil Code, not a provision of the Bankruptcy Code.

*E.g., Cont'l Nat'l Bank of Miami* v. *Sanchez (In re Toledo)*, 170 F.3d 1340, 1345 (11th Cir.

1999) (proceeding "arising under" title 11 is one based in a provision of the Bankruptcy Code

itself).  Moreover, the Non-Debtor Claims exist outside of the bankruptcy and do not affect the

administration of the bankruptcy estate.  *Id.* (proceeding "arising in" a case under title 11 is a

proceeding that, even if not specifically provided for in the Bankruptcy Code, can take place

only in the context of a case under title 11).  Indeed, the Non-Debtor Claims turn entirely on the

legitimacy of Mexican criminal proceedings, wholly unrelated to any title 11 proceeding.

Nor do the Non-Debtor Claims have any conceivable effect on the foreign estates.

Mr. Gil's claims seek nothing more than monetary relief from non-debtors for the benefit of

another non-debtor.  *See* Compl. ¶¶ 496-514; *see In re Parade Place, LLC*, 508 B.R. 863, 872

(Bankr. S.D.N.Y. 2014) (finding that there can be no related-to jurisdiction over a claim between

non-debtors). "A court *of bankruptcy* has no power to entertain collateral disputes between third parties that do not involve the bankrupt or its property, nor may it exercise jurisdiction over a private controversy which does not relate to matters pertaining to bankruptcy." *In re Paso Del Norte Oil Co.,* 755 F.2d 421, 424 (5th Cir. 1985) (citing *In re Shirley Duke Assocs.,* 611 F.2d 15, 18 (2nd Cir. 1979); *First State Bank & Trust Co.,* 528 F.2d at 350, 353–54; and *Associated Elec. Supply Co. v. C.B.S. Elec. Sales Corp.,* 288 F.2d 683, 684 (8th Cir. 1961)). "Even if resolution of the controversy might have a 'chilling effect' on the [disposition of the bankruptcy], or might reduce claims against the debtor's estate, [a bankruptcy court's exercise of] jurisdiction over a collateral controversy is improper where it is 'possible' to administer the estate without resolving the controversy." *Id.* at 425 (citing *In re N.Y. & Worcester Express, Inc.,* 294 F. Supp. 1163, 1165 (S.D.N.Y.1968) and *First State Bank & Trust Co.,* 528 F.2d at 353–54).

Mr. Gil asserts private claims for damages against non-debtor third parties in his individual capacity. *See, e.g.*, *In re Parade Place, LLC,* 508 B.R. 863, 872 (Bankr. S.D.N.Y. 2014) (concluding that the Bankruptcy Court lacked "subject matter jurisdiction under 28 U.S.C. § 1334 to hear a monetary claim by the Church (a non-debtor) against Valley (also a non-debtor), since that claim could not have any conceivable effect on the bankruptcy estates"). No subject matter jurisdiction exists and Gil's claims should be dismissed. *See* 28 U.S.C. § 1334; *see, e.g., In re Shirley Duke Assocs.,* 611 F.2d 15, 18 (2nd Cir. 1979).

**B.      Gil Lacks Standing to Bring Claims Under Chapter 15**

Even if Mr. Gil's claims did fall within this Court's "related to" jurisdiction, which they do not, Chapter 15 expressly precludes Mr. Gil from bringing any claim in these Chapter 15 cases. Section 1509(f) of the Bankruptcy Code governs direct access to U.S. courts in Chapter 15 cases, and is clear that if recognition is granted, "the *foreign representative* has the capacity to sue and be sued in a court in the United States." 11 U.S.C. § 1509(b)(1) (emphasis

85

added).  Only a Chapter 15 "foreign representative" may obtain relief through Chapter 15.  11 U.S.C. § 1504; *see, e.g., U.S.* v. *J.A. Jones Const. Grp., LLC*, 333 B.R. 637, 638–39  (E.D.N.Y. 2005) ("relief under Chapter 15 is available only after a *foreign representative* commences an ancillary proceeding for recognition of a foreign proceeding"); *In re Barclays Bank* v. *Kemsley*, 992 N.Y.S.2d 602, 606 (N.Y. Sup. Ct. 2014) ("the plain language of Chapter 15 applies only to a 'foreign representative'").

Plaintiff, Mr. Gil, is not the "foreign representative," and brought the Non-Debtor Claims in his personal capacity, not in his previous capacity as the Foreign Representative.  He cannot do so in a Chapter 15 case, and his Non-Debtor Claims should be dismissed.  The current foreign representative, Fernando Perez-Correa, has not been substituted as a plaintiff in this case.  Only he has standing to prosecute any claims under Chapter 15 on behalf of the estates.  Absent substitution, all claims should be dismissed for lack of standing under Chapter 15.

## VII.   THIS ADVERSARY PROCEEDING IS INCONSISTENT WITH THE PURPOSE OF CHAPTER 15 AND SHOULD BE DISMISSED

Oro Negro's *concurso* proceeding is now in the liquidation stage.  The *Concurso* Court has entered a liquidation order directing the liquidator—Mr. Perez-Correa, the current foreign representative—to "proceed with the sale of the assets and rights that comprise the bankruptcy estate . . . in order to make payment to the creditors."  (Clareman Decl. Ex. 37-T (June 13, 2019 *Concurso* Order) at 9).  This action—purportedly Oro Negro's most valuable asset—has not been auctioned for sale in either Mexico or the United States.  (*See* Dkt. 246 (Foreign Representative's Motion for Approval of the Litigation Interest Agreement), at ¶ 1.)  Although the Complaint purports to be seeking recoveries for the benefit of the estate, the creditors are the targets of the litigation, and there is no allegation that they can be subordinated under Mexican law.  The purpose of this action is to further an attempt by Mr. Gil, on behalf of

Oro Negro's equity, to salvage some value from a failed investment by Mr. Gil and his investment fund, Axis. This purpose is apparent on the face of the Complaint, which alleges a loss of "hundreds of millions of dollars in equity value" as damages. (Compl. ¶ 437.) The Complaint was filed by Mr. Gil's personal attorneys. The same attorneys represent Oro Negro's shareholders in ongoing NAFTA proceedings against Mexico related to the Pemex terminations and have appeared in the Chapter 15 proceedings on behalf of Oro Negro's shareholders.

This Chapter 15 case is ancillary to the foreign main proceeding in Mexico. Plaintiffs have strenuously tried to avoid the main proceeding's forum, first by attempting to sell a participation interest in this litigation in the U.S. without approval from the *Concurso* Court (an approach this Court rejected), and now by bringing plenary claims here against dozens of defendants, including Mexican citizens, for events that occurred in Mexico and whose effects are felt in Mexico. The causes of action asserted here include claims under Mexican law, including two causes of actions alleging "sabotage" of Oro Negro's reorganization and violating orders issued by the *Concurso* Court. (Compl. ¶¶ 11, 205, 433, 487, 493.) Plaintiffs also allege that the *Concurso* Court's turnover order, which placed the Rigs under the Bondholders' control, constitutes "unjust enrichment" and should be equitably overturned by this Court. (*Id.* ¶¶ 576–78.) These and other claims alleged here are inappropriate claims to bring in an ancillary U.S. court, as opposed to the *Concurso* Court that is overseeing the allegedly "sabotaged" *concurso* proceedings and issued the orders implicated by Plaintiffs claims.

Chapter 15 has a "very narrow" purpose—to provide "assistance" in the United States to a "foreign court or a foreign representative in connection with a foreign proceeding." 11 U.S.C. § 1501; *see, e.g., Trikona Advisors Limited* v. *Chugh*, 846 F.3d 22, 30

(2d Cir. 2017) (characterizing Chapter 15's purpose as "very narrow").[57]  It incorporated the

Model Law on Cross Border Insolvency into U.S. law.  *See U.S.* v. *J.A. Jones Const. Group,*

*LLC*, 333 B.R. 637, 638 (Bankr. E.D.N.Y. 2005) (citing H.R. Rep. No. 109–31 at 105 (2005),

U.S. Code Cong. & Admin. News 2005, 88, 169).  Chapter 15 does not define "assistance," but

the Model Law provides guidance and lists forms of assistance that Congress enacted as the

principal forms of relief available under Chapter 15.  *See* 11 U.S.C. §§ 1519, 1521.  These

include: "staying execution against the debtor's assets," "entrusting the administration . . . of the

debtor's assets . . . to the foreign representative," "suspending the right to transfer, encumber or

otherwise dispose assets of the debtor" and the like.  *See* Model Law on Cross-Border Insolvency

(UN Commission on International Trade Law 2014) at 9–11; 11 U.S.C. §§ 1519, 1521.

　　　　Consistent with that narrow purpose, the provision allowing foreign debtors to

bring claims limits the "capacity to sue and be sued in a court in the United States" to the foreign

representative—former foreign representatives and debtors' executives have no such right, nor is

there any provision for equity holders to bring direct or derivative claims.  *See* 11 U.S.C.

§ 1509(b)(1).  Moreover, even the Foreign Representative's right to sue is not unfettered; it is

"subject to any limitations that the court may impose consistent with the policy of

[Chapter 15]."  11 U.S.C. § 1509(b).  Courts have relied on this provision to restrict claims under

Chapter 15.  *See In re Stanford Int'l Bank, Ltd.*, 2012 WL 13093940 (N.D. Tex. July 30, 2012)

(limiting relief under Chapter 15 in order to promote "reciprocal cooperation between the

Antiguan and U.S. parties and parties in interest . . ."); *In re Bancredit,* 2008 WL 5396618, at *9

---

[57]    Section 1501(b) states when Chapter 15 applies and includes other circumstances not relevant here, such as appearing in or commencing a parallel plenary case under one of the other chapters of the Bankruptcy Code. 11 U.S.C. § 1501(b)(2).

(noting that Chapter 15 "was not designed to encourage forum shopping or [to force a court to] hear disputes with no connection to the forum").

Here, plaintiffs' do not seek any assistance from this Court in aid of the *concurso* proceeding. Plaintiffs are not, for example, using this litigation to ensure that a party cannot "squirrel[] away assets in the United States outside of the reach of the foreign jurisdiction." *In re Fairfield Sentry*, 458 B.R. 665, 676 (S.D.N.Y. 2011); *cf. Parmalat*, 639 F.3d at 576–77 (U.S.-based assets sought by foreign trustee); *In re British Am. Ins. Co., Ltd.*, 488 B.R. 205, 231–32 (Bankr. S.D. Fla. 2013) (real estate investments located in Florida served as basis of foreign trustees claims); *J.A. Jones Const. Group, LLC*, 33 B.R. at 638 (listing relief available in an ancillary proceeding, to include sections 361, 362, 363, 549, and 552 of the Code). Nor does the foreign representative use this litigation to try to recover the estate's assets or their value located in the U.S. *See e.g.*, *In re Condor Ins. Ltd.*, 601 F.3d 319, 320 (5th Cir. 2010) (finding that the bankruptcy court had jurisdiction "to offer avoidance relief under foreign law in a Chapter 15 bankruptcy proceeding"); *In re British Am. Ins. Co. Ltd.*, 2014 WL 793105, at *2 (Bankr. S.D. Fla. Feb. 27, 2014) (exercising jurisdiction over a claim for civil theft to recover assets). The Complaint does not further any recognized purpose of the *Concurso* Court.

The Liquidation Order directs Mr. Perez-Correa "to proceed with the sale of assets and rights that comprise the bankruptcy estate, seeking to obtain the highest possible product for its sale, in order to make payment to the creditors." (Clareman Decl. Ex. 37-T (June 13, 2019 *Concurso* Order) at 9). The Liquidation Order does not direct Mr. Perez-Correa to engage in speculative, protracted litigation that will potentially prolong the wind-up of Oro Negro's estates for years to come. In fact, the *Concurso* Court emphasized in its July 25 Order that the *Concurso* Law requires that the liquidator seek the "shortest resource recovery

timeframes," for the creditors' benefit.  (Dkt. 248-4 (July 24, 2019 *Concurso* Order) at 32.)  The

*Concurso* Court also emphasized its concern with avoiding the "danger" of further "delay" in the

resolution of the liquidation stage.  (Clareman Decl. Ex. 46-T (July 4, 2019 *Concurso* Order) at

6.)  The *Concurso* Court has not seen these pleadings or endorsed any plan to carry on this

litigation against creditors for the benefit of Mr. Gil, Oro Negro's shareholders, and their shared

counsel.

 Should the current foreign representative fail to intervene and continue this action

in his own name, the lawsuit should be dismissed for lack of standing under 11 U.S.C. §

1509(b)(1).  Even if substitution is made, however, the Court should exercise its discretion to

"impose" "limitations" on what can be pursued in this ancillary proceeding and dismiss the

Complaint, on the grounds that pursuing this action in an ancillary court does not further the

purposes of Chapter 15.  *See, e.g., In re Bancredit*, 2008 WL 5396618, at *9 (noting that Chapter

15 "was not designed to encourage forum shopping or [to force a court to] hear disputes with no

connection to the forum."); *see also Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572

U.S. 118 (2014) (recognizing that statutes limit private rights of action to claims within the "zone

of interests" a statute—here, Chapter 15—was intended to protect); *In re Magnesium Corp. of

Am.*, 583 B.R. 637, 655 (Bankr. S.D.N.Y. 2018).

## <u>CONCLUSION</u>

 For the foregoing reasons, the Complaint should be dismissed in its entirety with

prejudice. [58]

---

[58] Asia Research and Capital Management, Ltd., CQS (UK), Alp Ercil, GHL Investments (Europe) Ltd., and Ship Finance Company, Ltd., (together, the "<u>Foreign Defendants</u>") object to personal jurisdiction and have filed a Motion to Dismiss the Complaint under Rule 12(b)(2) of the Federal Rules of Civil Procedure, filed contemporaneously herewith.

Dated: August 26, 2019
New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

/s/ William A. Clareman
Andrew N. Rosenberg
Aidan Synnott
William A. Clareman
Claudia R. Tobler
Christopher Hopkins
Crystal Johnson

1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel for the Ad Hoc Defendants*