**HEARING TIME AND DATE: (TBD)**
**OBJECTION DEADLINE: October 25, 2019**
**REPLY DEADLINE: November 15, 2019**

**WILK AUSLANDER LLP**
1515 Broadway, 43rd Floor
New York, New York 10036
Telephone: (212) 981-2300
Jay S. Auslander
Eric J. Snyder
Natalie Shkolnik
Julie Cilia
Eloy A. Peral
Robert C. Reiland

*Counsel for Seadrill Limited and Fintech Advisory Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| PERFORADORA ORO NEGRO, S. DE R.L. DE C.V., *et al.* | Case No. 18-11094 (SCC) (Jointly Administered) |
| Debtors in a Foreign Proceeding. | |
| GONZALO GIL-WHITE, PERSONALLY AND IN HIS CAPACITY AS FOREIGN REPRESENTATIVE OF PERFORADORA ORO NEGRO, S. DE R.L. DE C.V. AND INTEGRADORA DE SERVICIOS PETROLEROS ORO NEGRO, S.A.P.I. DE C.V. | Adv. Pro. No. 19-01294 |
| Plaintiff, | |
| -against- | |
| ALP ERCIL; ALTERNA CAPITAL PARTNERS, LLC; AMA CAPITAL PARTNERS, LLC; | |

ANDRES CONSTANTIN ANTONIUS-
GONZÁLEZ; ASIA RESEARCH AND
CAPITAL MANAGEMENT LTD.; CQS
(UK) LLP; FINTECH ADVISORY, INC.;
DEUTSCHE BANK MÉXICO, S.A.,
INSTITUCIÓN DE BANCA MÚLTIPLE;
GARCÍA GONZÁLEZ Y BARRADAS
ABOGADOS, S.C.; GHL INVESTMENTS
(EUROPE) LTD.; JOHN FREDRIKSEN;
KRISTAN BODDEN; MARITIME
FINANCE COMPANY LTD.; NOEL BLAIR
HUNTER COCHRANE, JR; ORO NEGRO
PRIMUS PTE., LTD.; ORO NEGRO
LAURUS PTE., LTD.; ORO NEGRO
FORTIUS PTE., LTD.; ORO NEGRO
DECUS PTE., LTD.; ORO NEGRO
IMPETUS PTE., LTD.; PAUL MATISON
LEAND, JR.; ROGER ALAN BARTLETT;
ROGER ARNOLD HANCOCK; SEADRILL
LIMITED; SHIP FINANCE
INTERNATIONAL LTD.; and DOES 1-100

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF SEADRILL LIMITED AND
FINTECH ADVISORY INC.'S JOINT MOTION TO DISMISS THE COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(2) AND (6) AND FED. R. BANKR. P. 7012**

ii

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......................................................................................... 1

   I.     STATEMENT OF ALLEGED FACTS ..................................................... 3

       A. Relevant Parties and Non-Parties............................................................. 4

       B. The Pemex-SeaMex Contracts.................................................................. 5

       C. The "Core" of the Foreign Representative's Case .................................... 5

       D. The Foreign Representative's Minimal Allegations Concerning Seadrill and
          Fintech...................................................................................................... 6

       E. Pre-Complaint Discovery.......................................................................... 8

       F. The Complaint ........................................................................................... 8

ARGUMENT ................................................................................................................... 9

   I.     RULE 12(B)(6) MOTION TO DISMISS STANDARDS ......................... 9

   II.    THE MEXICAN LAW CLAIMS FAIL UNDER MEXICAN LAW ...... 10

       A. Mexican Tort Law: Background.............................................................. 11

       B. Mexican Law Does Not Recognize the Asserted Claims ........................ 12

       C. The Complaint Omits Prerequisites to Liability Under Article 1910 ....... 13

   III.   THE COMMON LAW CLAIMS FAIL UNDER MEXICAN LAW, WHICH
        GOVERNS THEM ................................................................................. 16

       A. Choice of Law Analysis Shows That Mexican Law Applies ................... 16

       B. The Common Law Claims Do Not State a Claim Under Mexican Law .... 20

   IV.   THE COMMON LAW CLAIMS FAIL UNDER NEW YORK LAW ...... 21

       A. The "Tortious Interference and Conspiracy to Tortiously Interfere with the
         Oro Negro Contracts" Claim (Count I) Fails........................................... 21

       B. Claim For "Tortious Interference and Conspiracy to Interfere in the Bareboat
         Charters" (Count 13) Fails ....................................................................... 26

       C. Claim For Tortious Interference and Conspiracy to Tortiously Interfere With
         Perforadora's Business Relationship with Pemex (Count 3) Fails ........... 28

       D. Claims For Aiding and Abetting Tortious Interference (Counts 2 and 4) Fail ........... 33

       E. Prima Facie Tort Claim (Count Nineteen) Fails ..................................... 36

   V.    THE COURT MUST DISMISS SEADRILL FROM THE ADVERSARY
        PROCEEDING FOR LACK OF PERSONAL JURISDICTION.............. 42

       A. General Standards ................................................................................... 42

       B. General Jurisdiction Is Lacking .............................................................. 44

       C. Specific Jurisdiction Is Lacking.............................................................. 48

       D. Exercising Jurisdiction Over Seadrill In This Adversary Proceeding Would Be
        Unreasonable.......................................................................................... 51

VI.      THE ADVERSARY PROCEEDING IS INCONSISTENT WITH CHAPTER 15 ... 52

CONCLUSION ......................................................................................................................... 53

01104277.6

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AllGood Entertainment, Inc. v. Dileo Entertainment and Touring, Inc.*,
   726 F. Supp. 2d 307 (S.D.N.Y. 2010)...............................................................20, 21

*In re Allstate Ins. Co. (Stolarz-N.J. Mfrs. Ins. Co.)*,
   81 N.Y.2d 219 (N.Y. 1993) .........................................................................................19

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
   343 F. Supp. 3d 94 (E.D.N.Y. 2018) ..........................................................................14

*In re Am. Express Co. Shareholder Litig.*,
   39 F.3d 395 (2d Cir.1994).....................................................................................24, 29

*Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*,
   2012 WL 1193353 (SDNY Apr. 10, 2012)...............................................................39

*AREP Fifty-Seventh, LLC v. PMGP Assocs., L.P.*,
   115 A.D.3d 402 (1st Dep't 2014) ..............................................................................41

*Arista Records, Inc. v. Mp3Board, Inc.*,
   2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002).........................................................21

*Armstrong v. McAlpin*,
   699 F.2d 79 (2d Cir. 1983)...........................................................................................37

*Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Calif., Solano Cty.*,
   480 U.S. 102 (1987)......................................................................................................55

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................10, 11

*Atlantic Richfield Co. v. Arco-Globus Int'l Co.*,
   1996 WL 742863 (S.D.N.Y. Dec. 31, 1996) ...........................................................22

*In re B.C.I Finances Pty. Ltd.*,
   583 B.R. 288 (Bankr. S.D.N.Y. 2018).........................................................18, 19, 22

*In re Bancredit Cayman Ltd.*,
   50 Bankr. Ct. Dec. 257 (Bankr. S.D.N.Y. Nov. 25, 2008) ......................................56

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................10, 11

v

*Belsky v. Lowenthal*,
    62 A.D.2d 319 (1st Dep't 1978) .......................................................................44

*Benton v. Kenney-Van Saun Mfg. & Corp.*,
    2 A.D.2d 27 (2d Dep't 1956) ............................................................................41

*In re Bernard L. Madoff Inv. Sec. LLC,*
    440 B.R. 282 (Bankr. S.D.N.Y. 2010) ..............................................................31

*In re Bernard L. Madoff Inv. Sec. LLC,*
    525 B.R. 871 (Bankr. S.D.N.Y. 2015) ..............................................................53

*Black Bear Fuel Oil, Ltd. v. Swan Lake Developers LLC,*
    128 A.D.3d 1191 (3d Dep't 2015) .....................................................................33

*In re Bozel S.A.,*
    434 B.R. 86 (Bankr. S.D.N.Y. 2010) ................................................................50

*Brink's Ltd. v. S. African Airways,*
    93 F.3d 1022 (2d Cir. 1996).............................................................................20

*Bristol-Myers Squibb Co. v. Superior Ct. of Calif., San Francisco County,*
    137 S.Ct. 1773 (2017) .........................................................................46, 47, 52

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)..........................................................................................52

*Burns Jackson Miller Summit & Spitzer v. Lindner,*
    88 A.D.2d 50 (2d Dept.1982), aff'd 59 N.Y.2d 314 (1983) ............................23, 40

*Cartelli v. Lanier Worldwide, Inc.,*
    872 F.Supp. 1253 (S.D.N.Y. 1995).................................................................39, 40

*Carvel Corp. v. Noonan,*
    3 N.Y.3d 182 (2004) ........................................................................................32

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.,*
    217 F. Supp. 2d 423 (S.D.N.Y. 2002), *judgment reinstated*, 345 F.Supp. 2d 360 (S.D.N.Y.
    2004), vacated and remanded sub nom. *Catskill Litig. Tr. V. Park Place Entm't Corp.*, 169
    Fed. Appx. 659 (2d Cir. 2006), and *aff'd* 547 F.3d 115 (2d Cir. 2008), and *judgment
    reinstated sub nom. Debary v. Harrah's Operating Co., Inc.*, 465 F.Supp. 2d 250 (S.D.N.Y.
    2006), and *aff'd*, 547 F.3d 115 (2d Cir. 2008) ............................................ 30-32, 35

*Chemtex, LLC v. St. Anthony Enterprises, Inc.,*
    490 F. Supp. 2d 536 (S.D.N.Y. 2007)...........................................................36, 38

*Christopher Lisa Matthew Policano, Inc. v. North Am. Precis Syndicate, Inc.,*
    129 A.D2d 488 (1st Dep't 1987) ......................................................................42

vi

*Church of Scientology of California v. Siegelman*,
    94 F.R.D. 735 (S.D.N.Y. 1982) ......................................................................44

*In re CIL Ltd.*,
    582 B.R. 46 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, 13-11272-JLG, 2018 WL
    3031094 (Bankr. S.D.N.Y. June 15, 2018) ................................................ *passim*

*Cortlandt St. Recovery Corp. v. Deutsche Bank AG, London Branch*,
    2015 WL 5091170 (S.D.N.Y. Aug. 28, 2015) .........................................................54

*Coufal Abogados v. AT&T, Inc.*,
    223 F.3d 932 (9th Cir. 2000) ..............................................................................13

*Curiano v. Suozzi*,
    63 N.Y.2d 113 (1984) ...............................................................................40, 45

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014).........................................................................47, 49, 50

*Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*,
    568 F. Supp. 2d 329 (S.D.N.Y. 2008).............................................................32, 35

*Davis v. 1568 Broadway Hotel Mgt. LLC DoubleTree Hotel Times Sq.*,
    2018 WL 317849 (S.D.N.Y. Jan. 5, 2018) ............................................26, 28, 30

*DDR Const. Servs., Inc. v. Siemens Indus., Inc.*,
    770 F. Supp. 2d 627 (S.D.N.Y. 2011)..........................................................25, 26

*Desarrolladora Farallon S. de RL. de C.V. v. Cargill Fin. Servs. Int'l Inc.*,
    666 F. Appx. 17 (2d Cir. 2016) (summary order) .................................................13

*Discover Group, Inc. v. LexMark Intern., Inc.*,
    333 F. Supp. 2d 78 (E.D.N.Y. 2004) ...................................................................33

*Doe v. Nat'l Conference of Bar Examiners*,
    2017 WL 74715 (E.D.N.Y. Jan. 6, 2017) ............................................................48

*Elliott v. Nestle Waters N. Am. Inc.*,
    2014 WL 1795297 (S.D.N.Y. May 6, 2014) ........................................................18

*Elmaliach v. Bank of China Ltd.*,
    110 A.D.3d 192 (1st Dep't 2013) ........................................................................19

*Emergency Enclosures, Inc. v. Nat'l Fire Adjustment Co., Inc.*,
    68 A.D.3d 1658 (2d Dep't 2009)..........................................................................43

*Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*,
    414 F.3d 325 (2d Cir. 2005).................................................................................19

*Fink v. Time Warner Cable,*
714 F.3d 739 (2d Cir. 2013)....................................................................................11

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,*
2007 WL 926916 (S.D.N.Y. Mar. 27, 2007) ..........................................................37

*Freihofer v. Hearst Corp.,*
65 N.Y.2d 135 (1985) ......................................................................................40, 43

*G.K.A. Beverage Corp. v. Honickman,*
55 F.3d 762 (2d Cir. 1995)...............................................................................26, 34

*Gant v. Wallingford Bd. of Educ.,*
69 F.3d 669 (2d Cir. 1995).....................................................................................4

*In re Gaston & Snow,*
243 F.3d 599 (2d Cir. 2001)..................................................................................18

*Gifford v. Guilderland Lodge, No. 2480,*
178 Misc.2d 707 [Sup Ct 1998], *aff'd sub nom. Gifford v Guilderland Lodge, No. 2480,
B.P.O.E. Inc.*, 272 AD2d 721 [3d Dept 2000] ..........................................................43

*Gladstone Bus. Loan, LLC v. Randa Corp.,*
2009 WL 2524608 (S.D.N.Y. Aug. 17, 2009)..........................................25, 28, 30

*Goldstein v. Pataki,*
516 F.3d 50 (2d Cir. 2008), *cert. denied*, 554 U.S. 930 (2008)..............................11

*Golub v. Esquire Pub. Inc.,*
124 A.D.2d 528 (1st Dep't 1986) ...............................................................40, 42, 43

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
564 U.S. 915 (2011)..............................................................................................51

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.,*
17 F. Supp. 2d 275 (S.D.N.Y. 1998)................................................................24, 27

*Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,*
50 N.Y.2d 183 (1980) ...........................................................................................32

*Hannex Corp. v. GMI, Inc.,*
140 F.3d 194 (2d Cir.1998)..............................................................................31, 33

*Hassan v. Deutsche Bank A.G.,*
515 F.Supp.2d 426 (S.D.N.Y.2007).......................................................................32

*Hidden Brook Air, Inc. v. Thabet Aviation Intern. Inc.,*
241 F. Supp. 2d 246 (S.D.N.Y. 2002)....................................................................20

viii

*Hitchcock v. Woodside Literary Agency*,
  15 F. Supp. 2d 246 (E.D.N.Y. 1998) ................................................................20

*Holborn Corp. v. Sawgrass Mut. Ins. Co.*,
  304 F. Supp. 3d 392 (S.D.N.Y. 2018).........................................................18, 21

*Hood v. Ascent Med. Corp.*,
  691 Fed. Appx. 8 (2d Cir. 2017) (summary order).................................47, 49, 51

*Int'l Minerals & Res., Inc. v. Pappas*,
  1992 WL 354504 (S.D.N.Y. Nov. 17, 1992)...............................................23, 29

*Jaffer v. Stone*,
  1993 WL 106379 (S.D.N.Y. Apr. 8, 1993).........................................................26

*Jones v. Allen*,
  2010 WL 3260081 (S.D.N.Y. Aug. 9, 2010)......................................................14

*Katz v. Travelers*,
  241 F. Supp. 3d 397 (E.D.N.Y. 2017), *reconsideration denied*, 2017 WL 4180012 (E.D.N.Y.
  Sept. 20, 2017) ...................................................................................................39

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir.2006)........................................................................23, 25, 27

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in
  Amministrazione Straordinaria*,
  937 F.2d 44 (2d Cir. 1991)..................................................................................50

*Kolbeck v. LIT Am., Inc.*,
  939 F.Supp. 240 (S.D.N.Y.1996)..................................................................36, 37

*In re: Lyondell Chem. Co.*,
  543 B.R. 428 (Bankr. S.D.N.Y. 2016) ...............................................................21

*L-7 Designs, Inc. v. Old Navy, LLC*,
  647 F.3d 419 (2d Cir. 2011)................................................................................11

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413, (1996) ........................................................................................23

*In re Lehman Bros. Holdings Inc.*,
  2019 WL 2323775 (Bankr. S.D.N.Y. May 30, 2019).....................................16, 53

*In re Lehman Bros. Holdings Inc.*,
  535 B.R. 608 (Bankr. S.D.N.Y. 2015).................................................................55

ix

*In re Lehman Bros. Holdings Inc.*,
   544 B.R. 16 (Bankr. SDNY 2015)......................................................................................50

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir.2006).............................................................................................36

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   2019 WL 1331830, at *3 (S.D.N.Y. Mar. 25, 2019) ...................................51, 52, 54

*Licci ex. Rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013).............................................................................................52

*In re LightSquared Inc.*,
   504 B.R. 321 (Bankr. S.D.N.Y. 2013) .....................................................25, 31, 32

*Lopez v. Shopify, Inc.*,
   2017 WL 2229868 (S.D.N.Y. May 23, 2017) ..........................................................48

*Luciano v. Handcock*,
   78 A.D.2d 943 (3d Dep't 1980) ..................................................................................44

*In re M/V MSC FLAMINIA*,
   107 F. Supp. 3d 313 (S.D.N.Y. 2015)........................................................................49

*Maricultura Del Norte, S. de R.L. de C.V. v. Umami Sustainable Seafood, Inc.*,
   769 F. Appx. 44 (2d Cir. 2019) (Summary Order) ..................................................24

*Maricultura Del Norte, S. de R.L. de C.V. v. Worldbusiness Capital, Inc.*,
   2015 WL 7730980 (S.D.N.Y. Nov. 24, 2015)..................................................13, 22

*Medtech Products Inc. v. Ranir, LLC*,
   596 F.Supp.2d 778 (S.D.N.Y. 2008)..................................................................23, 24, 29

*Mercer Health & Benefits LLC v. DiGregorio*,
   307 F. Supp. 3d 326 (S.D.N.Y. 2018)........................................................................50

*Michele Pommier Models, Inc. v. Men Women Ny Model Mgmt., Inc.*,
   173 F.3d 845 (2d Cir. 1999)......................................................................................24, 29

*Miller v. Geloda/Griarwood Corp.*,
136 Misc. 2d 155 (Sup. Ct. N.Y. Cty. 1987) ...............................................................43

*Mina Investment Holdings Ltd. v. Steven W. Lefkowitz*,
   16 F.Supp.2d 355 (S.D.N.Y. 1998)..............................................................................25

*Nat'l Nutritional Foods Ass'n v. Whelan*,
   492 F.Supp. 374 (S.D.N.Y. 1980)........................................................................39, 44

01104277.6

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*,
    87 N.Y.2d 614 (1996) ........................................................................................32

*OSRecovery, Inc. v. One Groupe Int'l, Inc.*,
    354 F.Supp.2d 357 (S.D.N.Y.2005).....................................................................37

*OTG Brands, LLC v. Walgreen Co.*,
    2015 WL 1499559 (S.D.N.Y. Mar. 31, 2015) .......................................................14

*Papasan v. Allain*,
    478 U.S. 265 (1986).....................................................................................11, 38

*Pierre v. Lieberman*,
    2017 WL 9565660 (S.D.N.Y. June 14, 2017) ......................................................14

*Rates Technology Inc. v. Cequel Comms., LLC*,
    15 F. Supp. 3d 409 (S.D.N.Y. 2014).....................................................................54

*Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*,
    638 Fed. Appx. 43 (2d Cir. 2016) (summary order).............................................21

*In re Refco Inc. Sec. Litig.*,
    2011 WL 13168450 (S.D.N.Y. Dec. 8, 2011) ......................................................36

*Ritani, LLC v. Aghjayan*,
    880 F.Supp.2d 425 (S.D.N.Y. 2012).....................................................................34

*Romano v. Romano*,
    2 A.D.3d 430 (2d Dep't 2003)...............................................................................25

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, 387 F. Appx. 72 (2d Cir. 2010) (Summary
    Order) .......................................................................................................... *passim*

*Sanchez v. Abderrahman*,
    2012 WL 1077842 (E.D.N.Y. Mar. 30, 2012) ......................................................26

*Sharma v. Skaarup Ship Management Corp.*,
    699 F.Supp. 440 (S.D.N.Y.1988), *aff'd*, 916 F.2d 820 (2d Cir.1990) ..............................25, 41

*Sharma v. Skaarup Ship Mgmt. Corp.*,
    916 F.2d 820 (2d Cir. 1990)..................................................................................24

*Silverman v. Rosewood Hotels & Resorts, Inc.*,
    2004 WL 1823634 (S.D.N.Y. Aug. 16, 2004)................................................20, 22

*Small v. Lorillard Tobacco Co.*,
    94 N.Y.2d 43 (1999) .............................................................................................36

*Sonera Holding B.V. v. Cukorova Holding A.S.*,
750 F.3d 221 (2d Cir. 2014)............................................................................48

*Sotheby's, Inc. v. Stone*,
2019 WL 3069989 (S.D.N.Y. July 1, 2019) ...................................................16

*Statek Corp. v. Coudert Bros. LLP*,
2018 WL 834227 (D. Conn. Feb. 12, 2018) ...................................................47

*Strauss v. Credit Lyonnais, S.A.*,
242 F.R.D. 199 (E.D.N.Y. 2008) ....................................................................12

*Sunward Elecs., Inc. v. McDonald*,
362 F.3d 17 (2d Cir. 2004)..............................................................................51

*In re Terrorist Attacks on Sept. 11, 2001*,
714 F.3d 659 (2d Cir. 2013).............................................................................52

*In re Terrorist Attacks on September 11, 2001*,
295 F. Supp. 3d 416 (S.D.N.Y. 2018)..............................................................49

*Terrydale Liquidating Trust v. Barness*,
611 F.Supp. 1006 (S.D.N.Y.1984)...................................................................37

*In re Tornheim*,
181 B.R. 161 (S.D.N.Y. 1995)..........................................................................50

*Twin Labs., Inc. v. Weider Health & Fitness*,
900 F.2d 566 (2d Cir. 1980)........................................................................40, 41

*Tyler Fire Equip., LLC v. Oshkosk Corp.*,
2015 WL 3756372 (W.D.N.Y. June 16, 2015)................................................35

*Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*,
455 Fed.Appx. 102 (2d Cir.2012).....................................................................31

*Walden v. Fiore*,
571 U.S. 277 (2014).........................................................................................51

*Walsh Bros., Inc. v. Jacob Ruppert*,
7 A.D.2d 896 (1st Dep't 1959) ........................................................................43

*White Plains Coat & Apron Co. v. Cintas Corp.*,
460 F.3d 281 (2d Cir. 2006).......................................................................19, 20

*Wilder v. News Corp.*,
2015 WL 5853763 (S.D.N.Y. Oct. 7, 2015).................................45, 46, 47, 49

*Winderbaum v. Winderbaum*,
   39 Misc.2d 478 (Sup. Ct. Bronx County 1963) ....................................................43

*Wolff v. Rare Medium, Inc.,* 171, F.Supp.2d 354 (S.D.N.Y.2001) ...............................23

*World Wide Commc'ns, Inc. v. Rozar,*
   1997 WL 795750 (S.D.N.Y. Dec. 30, 1997) .......................................................23

*In re WorldCom. Inc. Sec. Litig.,*
   382 F.Supp.2d 549 (S.D.N.Y.2005).................................................................37

*Woytisek v. JP Morgan Chase & Co.,*
   46 A.D.3d 331 (1st Dep't 2007) ....................................................................45

*Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC,*
   286 F.Supp. 3d 634 (S.D.N.Y. 2017)...............................................................14

**Statutes**

11 U.S.C. § 1501 ...........................................................................................56

11 U.S.C. § 1509(b) ......................................................................................56

11 U.S.C. § 1520 ...........................................................................................17

FCC Article 1830 ....................................................................................13, 15

FCC Article 1910 .....................................................................................*passim*

FCC Article 2108 ....................................................................................13, 17

FCC Article 2109 ...........................................................................................13

FCC Article 2109 ...........................................................................................17

FCC Article 2110 ....................................................................................13, 17

**Other Authorities**

Fed. Rule Bankr. Proc. 7004(f) .......................................................................46

Fed. Rule Bankr. Proc. 7012 ......................................................................10, 45

Fed. R. Civ. Proc. 12 ...........................................................................10, 45, 49

Fed. R. Civ. Proc. 44.1 ..................................................................................12

01104277.6

## PRELIMINARY STATEMENT

Seadrill Limited ("Seadrill") and Fintech Advisory Inc. ("Fintech"), by their counsel, submit this memorandum of law in support of their joint motion to dismiss in the above-captioned adversary proceeding (the "Adversary Proceeding"). The foreign representative (the "Foreign Representative") of Perforadora Oro Negro, S. De R.L. De C.V. ("Perforadora") and Integradora De Servicios Petroleros Oro Negro, S.A.P.I. De C.V. ("Integradora"), the above-captioned Chapter 15 debtors (together, "Oro Negro"), commenced this Chapter 15 proceeding on April 20, 2018.  On June 6, 2019, the successor to the Foreign Representative, Gonzalo Gil-White, commenced this adversary proceeding by filing a complaint [ECF #1] against Seadrill and Fintech and other defendants as set forth in the caption above (the "Complaint"). The Complaint was eventually refiled on June 12 [ECF #4] and July 10 [ECF #4-1] to address non-substantive issues.

The Complaint's 129 pages contain little about Seadrill or Fintech, yet the Foreign Representative somehow cobbles together twelve claims against them. The same alleged facts underlie all of those claims, and they boil down to this: Seadrill at some point analyzed whether to acquire Oro Negro, the competitor of Seadrill and Fintech Investment Limited's joint venture, SeaMex Limited ("SeaMex"), but did not acquire it; Seadrill and Fintech agreed with the Ad-Hoc Group Defendants[1] that SeaMex would manage the Rigs in the event that the Bondholders took over the Rigs from Oro Negro, which never came to pass; and Oro Negro's former Chief Operating Officer ("COO") provided confidential information to Seadrill and the Ad-Hoc Group Defendants while he was COO.

That's it, which is nowhere near what is required to allege any of the Foreign

---

[1] Capitalized terms have the meaning ascribed to them in the Complaint, unless otherwise defined in this brief.

1

Representative's claims under the laws of either Mexico or New York. Though he presents them as a colorful bouquet, all of the Foreign Representative's claims have the same theme: purported interference with Oro Negro's contracts with Pemex and with the Singapore Rig Defendants. And they all fail as a matter of law.

As a preliminary matter, the Court can easily dispose of the six claims (Counts Five, Six, Seven, Eight, Fifteen, and Sixteen) that the Foreign Representative asserts under Mexican law because they are not cognizable under Mexican law, as set forth in Point I below. Though he characterizes these as claims for "intentional tort" or "negligent tort," their supporting allegations establish that in reality they are tortious interference claims, which Mexican law does not recognize. The Complaint's failure to set forth necessary elements of liability under the Mexican statutory provision that the Foreign Representative invokes provides an additional, separate basis for dismissal of these claims.

As set forth in Point II below, the Court should dismiss the six remaining claims against Seadrill and Fintech – which the Foreign Representative asserts are "common law" claims (the "Common Law Claims") – because they likewise fail under Mexican law. A choice of law analysis, which is appropriate here given the stark conflict between Mexican law (which does not recognize tortious interference claims) and New York law (which does), demonstrates that the Court should apply Mexican law rather than New York law because the location of the alleged torts is Mexico.

As set forth in Point III below, however, even if the Court applies New York law to the Common Law Claims, it must dismiss them all. The claims for tortious interference, and conspiracy to tortiously interfere, with the Oro Negro Contracts (Count One) and the Bareboat Charters (Count Thirteen) fail, among other things, to allege that Seadrill and Fintech

2

intentionally procured the purported contractual breaches on which the Foreign Representative bases his claims. The Foreign Representative also states no claim for tortious interference, or conspiracy to tortiously interfere, with Oro Negro's business relationship with Pemex (Count Three), given that the Complaint omits every one of the claim's required elements under New York law: a continuing business relationship not amounting to a formal contract, interference with that relationship by the defendants, and wrongful means. The claims for aiding and abetting tortious interference with the Oro Negro Contracts (Count Two) and with the business relationship with Pemex (Count Four) are similarly deficient in that the Foreign Representative does not properly allege any of the elements necessary to state such a claim under New York law. Finally, the prima facie tort claim (Count Nineteen) is fatally deficient because it fails to allege that the sole motivation for Seadrill and Fintech's alleged actions was disinterested malevolence, fails to plead special damages, and rests on the very same allegations as the other defective Common Law Claims.

Further, as set forth in Point IV below, this Court lacks personal jurisdiction over Seadrill and therefore should dismiss Seadrill from this action.

Finally, as set forth below in Point V, the Court should dismiss the Adversary Proceeding, which the Foreign Representative chose to file before this Chapter 15 Court, because it does not comport with the purposes of Chapter 15.

In addition to the arguments outlined above, Seadrill and Fintech adopt all other defendants' arguments in favor of dismissal to the extent they are applicable to Seadrill and Fintech.

## I.   <u>STATEMENT OF ALLEGED FACTS</u>

Despite having had the benefit of Seadrill and Fintech's production of nearly 10,000 pages and more than fifteen hours of deposition testimony by their principals before he filed the

Complaint, the Foreign Representative ignores or grossly mischaracterizes substantial documentary and testimonial evidence that contradicts his self-serving narrative. Nevertheless, solely for purposes of this dismissal motion, Seadrill and Fintech accept as true any non-conclusory factual allegations set forth in the Complaint. *See Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995).

A.    <u>**Relevant Parties and Non-Parties**</u>

The plaintiff in the Adversary Proceeding is Gonzalo Gil-White, Integradora's former Chief Executive Officer. (Compl. ¶ 16.)  Though Mr. Gil-White purports to bring this action "personally and in his capacity as the foreign representative of" Oro Negro (*id*. at 1), it is indisputable that he is no longer Oro Negro's foreign representative.[2]

Oro Negro is a Mexican oil services company. (*Id*. at ¶ 1.) Its registered office and principal place of business are in Mexico City, Mexico. (*Id*. ¶ 18.) Before its bankruptcy, Oro Negro's only client was Pemex, which exercises monopoly-like power over oil production in Mexico. (*Id*. ¶ 5.) Mexico owns and controls Pemex.  (*Id. ¶* 5.)

According to the Complaint, non-party SeaMex is Oro Negro's "primary" and "largest" competitor. (*Id*. ¶¶ 8, 12, 68, 151, 434, and 436.) SeaMex leases five rigs to Pemex under contracts that were entered into in 2014 (the "<u>Pemex-SeaMex Contracts</u>"). (*Id*. ¶ 151.)

SeaMex is a joint venture between Seadrill and non-party Fintech Investment Limited. (*Id*.) Defendant Seadrill "is a company established and with its principal place of business in Bermuda." (*Id*. ¶ 72.) Defendant Fintech is an investment manager incorporated in Delaware, with its principal place of business in New York. (*Id.* ¶¶ 65, 69, 70.)

---

[2] Nevertheless, in keeping with the Complaint, Seadrill and Fintech refer to Mr. Gil-White as the "Foreign Representative."

### B.    The Pemex-SeaMex Contracts

The Foreign Representative alleges that the Pemex-SeaMex Contracts contain terms that are significantly more favorable to SeaMex compared to the terms of Pemex's other leases with other drillers, including: (a) higher daily rates; (b) significant limitations on the ability of Pemex to terminate; (c) longer terms; and (d) virtually no penalties for deficient operation and maintenance of the rigs. (*Id.* ¶¶8, 152-55.)

The Foreign Representative does not claim that those favorable terms are the result of any wrongdoing by Seadrill or Fintech (or non-party SeaMex). Rather, he notes that ███████████ ██████████████████████ Seadrill – which, unlike Oro Negro, operates internationally (*id.* ¶¶72-74) – ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ And while the Foreign Representative alludes to a high-profile corruption scandal uncovered by Brazilian law enforcement agencies, he does *not* allege that Seadrill, Fintech, or SeaMex had any involvement in the scandal. (*Id.* ¶¶ 156-57.)

### C.    The "Core" of the Foreign Representative's Case

In the Foreign Representative's own words, "the core of this case" is "efforts by the Ad-Hoc Group, advised by AMA, and [non-party] Pemex" – *not* any conduct by Fintech or Seadrill (or their subsidiary SeaMex). (*Id.* at ¶ 9). The Foreign Representative alleges that the Ad-Hoc Group and Pemex tried "to purport to terminate the Oro Negro Contracts so that the Ad-Hoc Group could take over the Rigs and hand them over to SeaMex for SeaMex to lease the Rigs to Pemex," beginning with Pemex's demand "to dramatically amend the Oro Negro Contracts, including by reducing its payments to Oro Negro, and refusing to pay Oro Negro over $100

01104277.6

million in past due invoices" and "culminat[ing] in Pemex purporting to cancel the Oro Negro Contracts, which led to Oro Negro's financial distress and the Ad-Hoc Group successfully taking over the Rigs." (*Id*.)

The Foreign Representative goes on to allege that "[t]hroughout 2017 and 2018, the Ad-Hoc Group and Pemex closely coordinated and strategized – colluded – on how best to cancel the Oro Negro Contracts, what to do with the Contracts after their termination and what to do with the Rigs." (*Id*. at ¶ 10). He also tacks on a conclusory allegation that "throughout, Pemex and the Ad-Hoc Group and its advisors and co-conspirators, including AMA, Seadrill and Fintech, likewise coordinated to have the Oro Negro Contracts assumed by Seamex." (*Id*.)

### D.    The Foreign Representative's Minimal Allegations Concerning Seadrill and Fintech

The Complaint is devoid of any factual allegations that Seadrill and Fintech coordinated with Pemex and the Ad-Hoc Group (or anyone else) to cause termination of any contract to which Oro Negro was a party. Instead, the Foreign Representative alleges that Seadrill and Fintech engaged in the following innocuous conduct:

### 1.    Seadrill Analyzes Potential Acquisition Of Competitor

The Foreign Representative alleges that, ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ The Foreign Representative also alleges ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ Self-servingly, the Foreign Representative ignores the discovery

6

showing tha █████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

### 2.    Seadrill and Fintech Discuss Potential Business Opportunity

The Complaint also includes allegations concerning a management agreement (*id.* ¶ 450)

that never materialized: the Foreign Representative alleges that, █████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

The Foreign Representative also alleges that Fintech and Seadrill "stood to reap

substantial profits by destroying Seamex's largest competitor, while absorbing the Rigs, the Oro

Negro Contracts and, ultimately, the entire Oro Negro business." (*Id.* ¶ 436.) ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████ Nor does he allege that

Fintech or Seadrill ever took over the Rigs, the Oro Negro Contracts, or the Oro Negro business.

### 3.    Oro Negro's Former COO Leaks Information

According to the Complaint, Oro Negro offered non-party Ole Aagaard Jensen

("Aagaard") the role of Chief Operating Officer ("COO") in March 2017 despite knowing that at that time he was a consultant for the Bondholders. (*Id.* ¶ 400.) The Foreign Representative also claims that Aagaard was "a mole for the Defendants" who reported "to them on the status of Oro Negro." (*Id.* ¶ 401.). Between September 19, 2017 and October 11, 2017, Aagaard allegedly "leaked confidential information of Oro Negro to the Ad-Hoc Group and Seadrill." (*Id.* ¶ 179.) For example, ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ The Foreign Representative does not, however, allege that Seadrill or Fintech solicited such information or had some duty to prevent Oro Negro's COO from providing it.

The Foreign Representative alleges that Aagaard resigned from his position as Oro Negro's COO on October 12, 2017. (*Id.* ¶ 180.)

E.   **Pre-Complaint Discovery**

The Foreign Representative commenced the Chapter 15 Proceeding in April 2018 (*Id.* ¶ 16); [ECF 2] and subsequently received discovery from several entities, including Seadrill and Fintech. (Compl. ¶ 293).

F.   **The Complaint**

The Foreign Representative filed his Complaint on June 6, 2019. [ECF 4-1]. Below is a chart setting forth the twelve causes of action he asserts against Seadrill and Fintech.

| Count No. | Count | Count No. | Count |
|---|---|---|---|
| *Count One*<br><br>(Common Law) | Tortious Interference and Conspiracy to Tortiously Interfere with the Oro Negro Contracts | *Count Eight*<br><br>(Mexican Law) | Alternative to Count Seven –<br>Negligent Torts under Mexican Law in Connection with Integradora's and Perforadora's Reorganization Efforts |

8

| Count Two (Common Law) | Aiding and Abetting Tortious Interference with the Oro Negro Contracts | Count Thirteen (Common Law) | Tortious Interference and Conspiracy to Tortiously Interfere in the Bareboat Charters |
|---|---|---|---|
| Count Three (Common Law) | Tortious Interference and Conspiracy to Tortiously Interfere with Perforadora's Business Relationship with Pemex | Count Fifteen (Mexican Law) | Alternative to Counts Sixteen and Seventeen – Intentional Torts under Mexican Law in Connection with the Bareboat Charters |
| Count Four (Common Law) | Aiding and Abetting Tortious Interference with Pemex's Relationship with Perforadora | Count Sixteen (Mexican Law) | Alternative to Count Fifteen – Negligent Torts under Mexican Law in Connection with the Bareboat Charters |
| Count Five (Mexican Law) | Alternative to Counts One through Four – Intentional Torts Under Mexican law | Count Nineteen (Common Law) | Prima Facie Tort |
| Count Six (Mexican Law) | Alternative to Count Five – Negligent Torts under Mexican Law | | |
| Count Seven (Mexican Law) | Intentional Torts under Mexican Law in Connection with Integradora's and Perforadora's Reorganization Efforts | | |

## ARGUMENT

## I.    RULE 12(B)(6) MOTION[3] TO DISMISS STANDARDS

The Court must dismiss any complaint that does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although the Court must liberally construe complaints, accepting the factual allegations as true and drawing all reasonable inferences in favor of the plaintiff, *see Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008), *cert. denied*, 554 U.S. 930 (2008), it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see*

---

[3] Rule 7012 of the Federal Rules of Bankruptcy Procedure incorporates Rule 12(b)(6) of the Federal Rules of Civil Procedure by reference.

01104277.6

*also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. In other words, plausibility "'depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable.'" *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011)).

## II.    THE MEXICAN LAW CLAIMS FAIL UNDER MEXICAN LAW

As a preliminary matter, the Court can dispense with the claims that the Foreign Representative asserts against Seadrill and Fintech under Mexican law (the "Mexican Law Claims") because Mexican law does not support them.

There are six Mexican Law Claims in total. Two (Counts Five and Six, alleging intentional and negligent torts under Mexican law) are in the alternative to the tortious interference claims set forth in Counts One through Four. The remaining Mexican Law Claims (Counts Seven, Eight, Fifteen, and Sixteen) likewise allege intentional and negligent torts, under the same Mexican statutory provision that the Foreign Representative invokes in Counts Five and Six.

But none of these causes of action is cognizable under Mexican law, and the Court therefore must dismiss all of them. In addition, the Mexican Law Claims are fatally deficient because (i) they fail to allege conduct by Seadrill or Fintech that is unlawful or "against

10

recognized usage," a required element for liability under the very statutory provision on which the Foreign Representative relies; (ii) they fail to allege damages recoverable under Mexican law; and (iii) they fail to allege that Seadrill or Fintech was the actual cause of any of the purported harm to Oro Negro.

### A.    Mexican Tort Law: Background

Mexican tort law differs from New York tort law.  Mexico uses a civil law system rather than a common law one. Asali Decl. at ¶ 4.[4] Thus, in Mexico, codified statutes – not case law – are paramount.  Asali Decl. at ¶ 5. The concept of tort is very limited in Mexico, and binding case law on tort liability is scarce. Asali Decl. at ¶ 11.

Here, the Foreign Representative brings every one of the Mexican Law Claims under Article 1910 of the Mexican Federal Civil Code ("FCC").[5] Article 1910 provides:

> Any person acting illegally or against good customs, causing damage to another, is obliged to provide relief, unless said person demonstrates that the damage occurred is a result of fault or inexcusable negligence of the victim.

Asali Decl. at ¶8. To state a claim under Article 1910, a plaintiff must allege three core elements: (1) commission of an act that violates "public order law" or is "against good custom" (unlawful conduct), as set forth in Article 1830 of the FCC; (2) actual damage, in the form of harm to assets or lost profit, as set forth in Articles 2108 and 2109 of the FCC; and (3) a "direct and immediate" causal relationship between the unlawful act and the damage, as set forth in Article 2110 of the FCC.  Asali Decl. at ¶ 9.

---

[4] "Asali Decl." refers to the Declaration of Luis Asali Harfuch, dated August 26, 2019, concerning Mexican law. Mr. Asali is an attorney practicing in Mexico City, Mexico, and it is appropriate for the Court to consider Mr. Asali's Declaration concerning Mexican law. *See Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 207-8 (E.D.N.Y. 2008) (considering declaration of French attorney in connection with objection to plaintiffs' motion to compel based on French law); Fed. Rules Civ. Proc. 44.1.
[5] The Complaint also cites Article 1910 of the Mexico City Civil Code, which is identical to Article 1910 of the FCC. Asali Decl. at ¶ 7.

01104277.6

### B.    <u>Mexican Law Does Not Recognize the Asserted Claims</u>

It is well-established that a claim for tortious interference is not cognizable under Mexican law. *See Desarrolladora Farallon S. de RL. de C.V. v. Cargill Fin. Servs. Int'l Inc.*, 666 F. Appx. 17, 25 (2d Cir. 2016) (summary order) ("tortious interference claim is not cognizable under the law of Mexico"); *Coufal Abogados v. AT&T, Inc.*, 223 F.3d 932, 935 (9th Cir. 2000) (same); *Maricultura Del Norte, S. de R.L. de C.V. v. Worldbusiness Capital, Inc*., 2015 WL 7730980 *12 (S.D.N.Y. Nov. 24, 2015) (same). *See also* Asali Decl. ¶ 12 (neither the FCC, Mexican regulations, nor Mexican case law support the existence of any tortious interference claim). Nor does Mexican law recognize any cause of action for "conspiracy" to tortiously interfere or "aiding and abetting" tortious interference.  Asali Decl. ¶ 12.

No doubt aware that tortious interference is not actionable under Mexican law, the Foreign Representative carefully avoids characterizing the Mexican Law Claims as "tortious interference" claims and instead styles them as "Intentional Torts" or "Negligent Torts." (*E.g.*, Compl. at 106-110). In determining whether a claim should be dismissed, however, the Court should look to the substance of the claim, not the label the plaintiff has chosen for it.  *See Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F.Supp. 3d 634, 650-51 (S.D.N.Y. 2017) (dismissing claim pursuant to provision barring certain claims based on purchase or sale of securities though plaintiff took "pains to avoid using the term 'securities' in the Complaint"); *OTG Brands, LLC v. Walgreen Co.*, 2015 WL 1499559, at *5 (S.D.N.Y. Mar. 31, 2015) ("the fraud claims are not viable because they are merely breach of contract claims dressed up in the garb of fraud"); *Jones v. Allen*, 2010 WL 3260081, at *4 (S.D.N.Y. Aug. 9, 2010) ("Plaintiff has not asserted a claim cognizable in this Court and that is true regardless of how this pro se plaintiff's claim is characterized."). "In order to define the 'claims' in a complaint … the court must look beyond any formal distinctions among 'counts,' 'causes of action,' and 'claims,' and

examine the facts alleged and the legal relief sought." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 343 F. Supp. 3d 94, 100 (E.D.N.Y. 2018).

Here, the Mexican Law Claims are tortious interference claims in all but name: they rely on the same set of facts as the Foreign Representative's other tortious interference claims (Compl. ¶¶ 470, 477, 484, 490, 535, 541) (incorporating by reference and re-alleging previous allegations), and the Foreign Representative even expressly alleges that two of them (Counts Five and Six[6]) are in the alternative to his tortious interference claims. (Compl. at 106-7).

Given that the Mexican Law Claims are not cognizable under Mexican law, the Court must dismiss them. *See*, *e.g.*, *Pierre v. Lieberman*, 2017 WL 9565660, at *10 (S.D.N.Y. June 14, 2017), *report and recommendation adopted*, 2017 WL 3316266 (S.D.N.Y. Aug. 3, 2017).

### C.    The Complaint Omits Prerequisites to Liability Under Article 1910

As set forth above, the Court must dismiss the Mexican Law Claims because tortious interference claims – as well as related claims for "conspiracy" and "aiding and abetting" – are not actionable under Mexican law. Even if the law of Mexico did permit such claims, however, the Court would have to dismiss the Mexican Law Claims because the Foreign Representative fails to allege elements necessary for liability under FCC Article 1910, the provision he invokes.

### 1.    The Foreign Representative Fails to Allege Unlawful Conduct

The Mexican Law Claims are fatally deficient because the Foreign Representative fails to allege a key element under FCC Article 1910: conduct that is unlawful or "against recognized usage."

Under Mexican law, an unlawful act is one that is either against the public order laws, or contrary to good custom, *i.e.*, immoral. *See* FCC Article 1830; Asali Decl. at ¶ 18. Similarly, an

---

[6] The Foreign Representative alleges that Count Five is in the alternative to Counts One through Four, and that Count Six is in the alternative to Count Five.

act "against good custom" is one that contravenes the morals accepted in a given place and time, which it is within the judge's discretion to determine. Asali Decl. at ¶ 19. Competition is neither unlawful nor against good custom.  Asali Decl. at ¶ 21.  Nor does Mexican law or custom forbid exploring business opportunities, offering services at lower prices than competitors, or negotiating favorable contracts. Asali Decl. at ¶ 21.

Here, the Mexican Law Claims allege no conduct by Seadrill or Fintech that is unlawful or against recognized usage under Mexican law. At most, the Foreign Representative claims (i) that Seadrill and Fintech ███████████████████ and "agreed" to manage the Rigs once the Ad-Hoc Group Defendants had taken them over (*id*. ¶ 450), though he simultaneously concedes that neither Seadrill nor Fintech (nor SeaMex, which is not a party to this action) ever actually assumed the Oro Negro Contracts or management of the Rigs (*Id*. ¶¶ 424 ("the Oro Negro Contracts … remained in place"); 12 (Seadrill and Fintech "stood to gain in eliminating from the market Seamex's largest competitor…."); 152-3 (the contracts between SeaMex and Pemex are favorable).[7]  As set forth above, however, Mexican law and custom do not prohibit business competition, favorable contracts, or analysis or pursuit of potential business opportunities, Asali Decl. at ¶¶ 21, 24, and thus the Complaint is devoid of any allegations that Seadrill or Fintech engaged in unlawful or "against recognized usage" conduct that could support liability under FCC Article 1910.

---

[7] The Foreign Representative also makes conclusory allegations that Seadrill and Fintech "conspired" with the Ad-Hoc Group and AMA to cause Pemex to terminate the Oro Negro Contracts so SeaMex could manage the Rigs (*e.g*., Compl. ¶ 304), which the Court should disregard given that they are conclusory. *See*, *e.g*., *In re Lehman Bros. Holdings Inc.*, 2019 WL 2323775, at *6 (Bankr. S.D.N.Y. May 30, 2019).  Further, as set forth above, the Foreign Representative makes no allegation that SeaMex (or Seadrill or Fintech) ever took over the Oro Negro Contracts or the Rigs.

01104277.6

The Foreign Representative's failure to allege this necessary element of the Mexican Law Claims is fatal to those claims. *See*, *e.g.*, *Sotheby's, Inc. v. Stone*, 2019 WL 3069989, at *6 (S.D.N.Y. July 1, 2019).

## 2. The Foreign Representative Fails to Allege Recoverable Damages Under Mexican Law

The Mexican Law Claims also fail to state a claim for an additional, independent reason: the alleged damages are not recoverable under Mexican law.

Under the FCC, consequential or punitive damages are not recoverable: a litigant may only recover actual losses, *i.e.*, the actual detriment to the plaintiff's assets, or lost profits where those are direct damages. Asali Decl. ¶ 32; FCC Article 2108. Lost profits are the lawful earnings that the plaintiff would have obtained but for the defendant's unlawful conduct, minus costs. Asali Decl. ¶ 36; FCC Article 2109.

The damages must be the direct and immediate consequence of the unlawful act. FCC Article 2110; Asali Decl. ¶ 25. Failure to allege and prove such damages is fatal to a claim under FCC Article 1910. Asali Decl. at ¶ 37.

Here, the Foreign Representative fails to allege any damage that is the direct and immediate result of any purported act by Seadrill or Fintech. Rather, he alleges Oro Negro was injured by: Pemex's purported termination of the Oro Negro Contracts (Compl. ¶¶ 438-40); the failure to receive funds that the Mexican government and the Ad-Hoc Group allegedly control (*id*. ¶ 441); the alleged failure of the Singapore Rig Owners to pay certain costs (*id*. ¶ 442); purported violations, by the Ad-Hoc Group, the Singapore Rig Owners, and Mexico, of 11 U.S.C. § 1520 and certain Court orders (*id*. ¶¶ 11, 385-6, 444); and alleged abuse by the Ad-Hoc Group and the Singapore Defendants of criminal proceedings in Mexico (*id*. ¶ 445). Thus, the

Complaint implicitly admits that neither Seadrill nor Fintech was the direct or immediate cause of any of Oro Negro's purported damages.

Moreover, the Foreign Representative improperly alleges categories of damages that are not recoverable under FCC Article 1910 in any circumstance. For example, he seeks punitive damages (*Id.* ¶¶ 476, 483, 489, 495, 540 and 565), which Mexican law prohibits with respect to Article 1910. Asali Decl. ¶ 32. To the extent the Foreign Representative is seeking the purported equity value of Integradora (*id.* ¶ 437), Mexican law likewise prohibits such recovery because that value is speculative.  Asali Decl. ¶ 41. Finally, Mexican law does not permit recovery of legal fees and costs (Compl. ¶ 443) under FCC Article 1910 for two reasons. First, legal fees and costs are not direct damages but rather *indirect* consequences of an unlawful act. Second, procedural rules limit awards of legal fees and costs to specific cases that are outside the realm of FCC Article 1910. Asali Decl. ¶ 42.

### III. THE COMMON LAW CLAIMS FAIL UNDER MEXICAN LAW, WHICH GOVERNS THEM

The Foreign Representative asserts the remaining six claims against Seadrill and Fintech under the "common law" (together, the "Common Law Claims").[8] Under the relevant choice-of-law analysis, Mexican law applies. And given that the Common Law Claims fail under Mexican law, the Court must dismiss them.

#### A. Choice of Law Analysis Shows That Mexican Law Applies

Where "the relevant facts are sufficiently clear," a choice of law analysis concerning common law claims is appropriate at the motion to dismiss stage. *Holborn Corp. v. Sawgrass*

---

[8] Although the Foreign Representative does not specifically identify on which jurisdiction's common law he is relying, given that he asserts his claims in this Adversary Proceeding in New York we presume he is relying on New York law.

01104277.6

*Mut. Ins. Co.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018); *Elliott v. Nestle Waters N. Am. Inc.*, 2014 WL 1795297, at *9 (applying choice of law analysis at motion to dismiss stage).

Except where the state law claims at issue "implicate federal policy concerns," bankruptcy courts generally apply the choice-of-law rules of the state in which they sit. *In re Gaston & Snow*, 243 F.3d 599, 601-02 (2d Cir. 2001); *see also In re B.C.I Finances Pty. Ltd.*, 583 B.R. 288, 207 (Bankr. S.D.N.Y. 2018) (in Chapter 15 proceeding, applying New York choice of law rules to question of which law would govern determination of situs of claims where "[n]o party has convincingly identified – and the Court is unaware of – any overriding federal interest here"). Accordingly, this Court should apply New York's choice of law rules.

That requires a two-step analysis: First, the Court must determine whether there is an actual conflict between the laws that could apply to the Common Law Claims. *See*, *e.g.*, *In re Allstate Ins. Co. (Stolarz-N.J. Mfrs. Ins. Co.)*, 81 N.Y.2d 219, 223 (N.Y. 1993). An actual conflict exists where the potentially applicable laws "provide different substantive rules ... that are 'relevant' to the issue at hand and have a "significant possible effect on the outcome ....'" *Elmaliach v. Bank of China Ltd.*, 110 A.D.3d 192, 200 (1st Dep't 2013) (quoting *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005)).

Here, there is an actual conflict between New York and Mexican law: as set forth in more detail above at Section III.A., Mexican law does not recognize claims for tortious interference, claims for conspiracy to tortiously interfere, or claims for aiding and abetting tortious interference. In contrast, such claims are cognizable under New York law. *See* below at Section V.A.1.–2.

As a result, it is necessary to move on to the second step, the choice-of-law analysis. *See, e.g.*, *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006), *certified*

*question accepted*, 7 N.Y.3d 830 (2006), and *certified question answered*, 8 N.Y.3d 422 (2007) ("a choice of law analysis is necessary because the elements of tortious interference with contract in the relevant states differ"). For tort claims, courts applying New York choice of law rules employ an "interest" test, which asks whether the foreign jurisdiction has a greater interest than New York in applying its own law to the dispute. *See id.* (New York applies an "interests" analysis to determine which law governs); *B.C.I. Finances*, 583 B.R. at 297 (applying New York's "greatest interest" test). This "is a flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issues raised in the litigation." *AllGood Entertainment, Inc. v. Dileo Entertainment and Touring, Inc.*, 726 F. Supp. 2d 307, 315-6 (S.D.N.Y. 2010) (internal quotation marks omitted).

Where the conflicting laws at issue are "conduct-regulating laws…the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."[9] *White Plains Coat*, 460 F.3d at 284. Additionally, courts may consider "the place where the injury occurred, the place where the conduct causing the injury occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship, if any, between the parties is centered." *AllGood Entertainment*, 726 F. Supp. 2d at 315.

Tortious interference and prima facie tort claims are considered "conduct-regulating laws." *See AllGood Entertainment*, 726 F. Supp. 2d at 315-6 (tortious interference with contract);

---

[9] The presumption generally applies except where application of the foreign law would violate either "fundamental notions of justice" or "prevailing concepts of prevailing morals." *Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1031 (2d Cir. 1996)); *see also Silverman v. Rosewood Hotels & Resorts, Inc.*, 2004 WL 1823634, at *4 (S.D.N.Y. Aug. 16, 2004) ("Even the wrongful death of one of New York's citizens is insufficient, without more, to overcome the presumption that the situs of the tort has a greater interest in having its laws applied within its borders.").

*Hidden Brook Air, Inc. v. Thabet Aviation Intern. Inc.*, 241 F. Supp. 2d 246, 277 (S.D.N.Y. 2002) (tortious interference with contractual relations); *Hitchcock v. Woodside Literary Agency*, 15 F. Supp. 2d 246, 251-2 (E.D.N.Y. 1998) (prima facie tort).

Generally, the place where the plaintiff suffers damage is considered to be the "place of the wrong" and determines which substantive law should apply. *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 277 (S.D.N.Y. 2002). In cases of tortious interference, "where the solicited customer and the aggrieved plaintiff are both within a given state, that state has the greatest interest in regulating the behavior at issue, even if the allegedly tortious solicitation originates in a different state." *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 638 Fed. Appx. 43, 46-47 (2d Cir. 2016) (summary order).[10] *See also Arista Records, Inc. v. Mp3Board, Inc..*, 2002 WL 1997918, at *16 (S.D.N.Y. Aug. 29, 2002) ("By applying the New York choice of law rules, the Court finds that California tort law applies in this matter; California has the greater interest in the litigation of this issue due to the fact that MP3Board is located in California and its contractual relationship with another California corporation was allegedly interfered with in California.").

Here, Mexico clearly has a greater interest than New York in applying its law to the Common Law Claims given that they all involve purported interference with (i) a Mexican company's contracts regarding oil Rigs located in Mexico and (ii) its relationship with a customer owned and controlled by Mexico, which provides Mexico's largest source of revenue (*e.g.*, Compl. ¶¶ 1, 5, 449). Application of Mexican law is warranted given that, "[o]n balance,

---

[10] While the court in *Holburn*, 304 F. Supp. 3d at 398, looked to the place of the allegedly wrongful conduct where the allegedly tortious conduct and resulting injury happened in different locations, that was not a tortious interference case.

… the majority of contacts related to the alleged tortious conduct are" in Mexico. *AllGood Entertainment*, 726 F. Supp. 2d at 315-6 (tortious interference with contract case).

Indeed, there is also a presumption that Mexico is the "location" of the tort because Oro Negro's principal place of business (Compl. ¶ 18), and thus the alleged damage, is located there. *See In re: Lyondell Chem. Co.*, 543 B.R. 428, 450 (Bankr. S.D.N.Y. 2016) ("The jurisdiction with the greatest interest is that of the principal place of business, where any injury as a consequence of any aiding and abetting [alleged breach of fiduciary duty] would have been suffered."); *Maricultura Del Norte*, 2015 WL 7730980, at *11 ("The locus of the tort is thus Mexico, where Plaintiffs suffered the damages that would make Defendants liable."); *see also Silverman*, 2004 WL 1823634, at *4 (finding Mexico law proper for injury in Mexican hotel, even where defendant operated an office in New York).

Finally, that "any recovery will be distributed to foreign creditors through the [Mexican] proceeding" also favors application of Mexican law. *B.C.I. Finances*, 583 B.R. at 297.

### B.    The Common Law Claims Do Not State a Claim Under Mexican Law

All but one of the Common Law Claims consist of claims for tortious interference with contract and business relationships, conspiracy to so tortiously interfere, and aiding and abetting such tortious interference. Given that such claims are not cognizable under Mexican law, see above at Section III, this Court must dismiss them. *See, e.g.*, *Atlantic Richfield Co. v. Arco-Globus Int'l Co.*, 1996 WL 742863 (S.D.N.Y. Dec. 31, 1996).

Further, all of the Common Law Claims fail under Mexican Law because the Foreign Representative fails to allege the prerequisites for liability under the applicable statute, Article 1910, for the same reasons set forth in more detail above at Section III.C.

01104277.6

## IV. THE COMMON LAW CLAIMS FAIL UNDER NEW YORK LAW

Even if this Court were to apply New York law to the Common Law Claims – which it should not, for the reasons set forth above – dismissal would be warranted because the Foreign Representative fails to state any cause of action against Seadrill and Fintech under New York law.

### A. The "Tortious Interference and Conspiracy to Tortiously Interfere with the Oro Negro Contracts" Claim (Count I) Fails

#### 1. Elements of Tortious Interference With Contract

To state a claim under New York law for tortious interference with contract, a plaintiff must allege "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract';[11] and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 401–02 (2d Cir.2006) (quoting *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424 (1996)). "[T]he law requires some factual specificity in pleading tortious interference." *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 405 (S.D.N.Y. 2009), *aff'd,* 387 F. Appx. 72 (2d Cir. 2010) (quoting *World Wide Commc'ns, Inc. v. Rozar,* 1997 WL 795750, at *7 (S.D.N.Y. Dec. 30, 1997) (citation omitted)).

With respect to the second element, a tortious interference plaintiff must "provide specific allegations" of the defendant's actual knowledge of the contract and cannot survive a motion to dismiss by making merely a "conclusory assertion" of knowledge. *Medtech Products Inc. v. Ranir, LLC*, 596 F.Supp.2d 778, 813 (S.D.N.Y. 2008) (quoting *Wolff v. Rare Medium,*

---

[11] To the extent that other defendants address the issue of "actual breach," Seadrill and Fintech respectfully refer the Court to those papers for discussion of that issue.

*Inc.,* 171, F.Supp.2d 354, 359 (S.D.N.Y.2001). "Although a defendant need not be aware of all the details of a contract to be liable for tortious interference, it must have actual knowledge of a specific contract." *Int'l Minerals & Res., Inc. v. Pappas,*1992 WL 354504, *3 (S.D.N.Y. Nov. 17, 1992); *see also Burns Jackson Miller Summit & Spitzer v. Lindner,* 88 A.D.2d 50, 72, 452 N.Y.S.2d 80 (2d Dept.1982). "Industry practice" relating to agreements cannot, standing alone, support the conclusion that the defendant had actual knowledge about a particular agreement. *See Medtech Products*, 596 F.Supp.2d at 813-14.

To plead the third, "intentional procurement" element, a plaintiff must allege that the third party would not have breached the contract "*but for*" the defendant's conduct. *Maricultura Del Norte, S. de R.L. de C.V. v. Umami Sustainable Seafood, Inc.*, 769 F. Appx. 44, 54 (2d Cir. 2019) (summary order) (citing *Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 828 (2d Cir. 1990)*; Michele Pommier Models, Inc. v. Men Women Ny Model Mgmt., Inc.*, 173 F.3d 845 (2d Cir. 1999). A conclusory statement to that effect is not enough to save the claim from dismissal. *See In re Am. Express Co. Shareholder Litig.,* 39 F.3d 395, 400–01 n. 3 (2d Cir.1994) ("conclusory allegations of the legal status of the defendant's acts need not be accepted as true for the purposes of ruling on a motion to dismiss").

Moreover, courts have rejected tortious interference claims based on general assertions that multiple defendants worked in concert to procure third parties' breaches. *See RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 410 (S.D.N.Y. 2009) (dismissing claim because, *inter alia*, the complaint merely states that each defendant "in his own way is an integral part of the deliberate scheme to interfere with [the plaintiff's] exclusive contract and economic relationship with [the third-party], and therefore a cause-in-fact and proximate cause of Plaintiffs' damages"), *aff'd,* 387 F. Appx. 72 (2d Cir. 2010). Further, alleging that one of the purportedly conspiring

parties is a party to the contract with which the defendants tortiously interfered precludes satisfaction of the "but for" causation requirement. *See*, *e.g.*, *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 293–94 (S.D.N.Y. 1998) ("collusion involving a party to the contract indicates as a matter of law that the party involved was predisposed to breach its contractual obligations; thus, the allegedly interfering party cannot be the 'but for' cause of the breach"); *Mina Investment Holdings Ltd. v. Steven W. Lefkowitz,* 16 F.Supp.2d 355, 97 (S.D.N.Y. 1998) (dismissing tortious interference with contract claim for failure to allege "but for" causation where plaintiffs alleged that defendant conspired or acted in concert with the breaching party, and the allegations demonstrated that the breaching party was not inclined to fulfill its contractual obligations); *Sharma v. Skaarup Ship Management Corp.,* 699 F.Supp. 440, 447 (S.D.N.Y.1988) ("The allegation that the Skaarup defendants acted in concert with Chemical implies that Chemical would have breached its obligations even without the involvement of the Skaarup defendants. In no way do plaintiffs allege that Skaarup defendants were the motivating force behind Chemical's breach."), *aff'd,* 916 F.2d 820 (2d Cir.1990).

## 2.    Elements of Conspiracy to Tortiously Interfere

"'New York does not recognize an independent tort of conspiracy.'" *In re LightSquared Inc.,* 504 B.R. 321, 356 (Bankr. S.D.N.Y. 2013) (Chapman, J.) (quoting *Kirch.*, 449 F.3d at 401). Thus, "[a] claim of conspiracy 'cannot stand alone' and must be dismissed if the underlying independent tort has not been adequately pleaded." *Gladstone Bus. Loan, LLC v. Randa Corp.,* 2009 WL 2524608 at *6 (S.D.N.Y. Aug. 17, 2009) (quoting *Romano v. Romano*, 2 A.D.3d 430, 432 (2d Dep't 2003)).

It is possible, though, to allege civil conspiracy "for the purpose of showing that an *otherwise actionable tort* was committed *jointly by the conspirators* and that, because of the conspirators' common purpose and interest, the acts of one may be imputed to the others." *DDR*

*Const. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 659 (S.D.N.Y. 2011) (emphasis

added and internal quotation marks omitted). Such a claim must, among other things, specify the

"what, when, where, and how of the conspiracy" as well as "identify the actionable torts that

were the objects of the alleged conspiracy." *Davis v. 1568 Broadway Hotel Mgt. LLC

DoubleTree Hotel Times Sq.*, 2018 WL 317849, at *4 (S.D.N.Y. Jan. 5, 2018) (quoting *DDR

Const.*, 770 F. Supp. 2d at 659. Conclusory, "bald[]" allegations of conspiracy are insufficient.

*E.g., Sanchez v. Abderrahman*, 2012 WL 1077842, at *8 (E.D.N.Y. Mar. 30, 2012). Lumping

defendants together in "general allegations of conspiracy" is likewise improper. *Jaffer v. Stone*,

1993 WL 106379, at *1 (S.D.N.Y. Apr. 8, 1993).

### 3. The Foreign Representative Fails to Plead Necessary Elements

#### a. The Third Element (Intentional Procurement of Breach) Is Missing

At most, the Foreign Representative vaguely alleges that "[t]he Ad-Hoc Group

Defendants and [Seadrill and Fintech] … interfer[ed] with the Oro Negro Contracts" (*id*. ¶ 451)

"without justification" (*id.* ¶ 452) and that Seadrill and Fintech "agreed with the Ad-Hoc Group

Defendants" to manage the Rigs once Pemex had "unlawfully breached the Oro Negro Contracts

by unlawfully terminating them and the Ad-Hoc Group [had] prevailed in unlawfully taking over

the Rigs" (*id.* ¶ 450). These allegations are insufficient to plead intentional procurement of

breach for three reasons.

First, they are wholly conclusory. *See*, *e.g., RSM Prod.*, 643 F. Supp. 2d at 410. Indeed,

the Complaint fails to allege a *single* instance in which Seadrill or Fintech communicated or

interacted with Pemex regarding the Oro Negro Contracts. *See G.K.A. Beverage Corp. v.

Honickman*, 55 F.3d 762, 768 (2d Cir. 1995) (affirming dismissal of claim because the plaintiff

failed to allege that the "target" of the defendants' conduct was the plaintiff's contractual arrangements with the third party).

Second, the Complaint does not even purport to allege that Seadrill or Fintech intentionally procured Pemex's purported breach of the Oro Negro Contracts. *See Kirch*, 449 F.3d at 401-2. To the contrary, the Foreign Representative attributes such procurement to other defendants. (Compl. ¶ 449 ("The *Ad-Hoc Group Defendants* intentionally caused, or conspired to cause, Pemex to breach the Oro Negro Contracts….")(emphasis added)).  And far from claiming that Seadrill or Fintech was the "but for" cause of Pemex's alleged breach of the Oro Negro Contracts, the Complaint sets forth numerous reasons for the Oro Negro Contracts' termination that do not involve any conduct whatsoever by Seadrill or Fintech. (*Id.* ¶¶ 187, 406 (alleging an agreement between Pemex and some of the Ad-Hoc Group Defendants under which Pemex would terminate the Oro Negro Contracts if Oro Negro failed to accept the 2017 Proposed Pemex Amendments that were made in March 2017); ¶¶ 403-407 (alleging communications between Pemex and the Ad-Hoc Group in connection with such an agreement);  ¶ 158 (alleging that "Mexico retaliated against Oro Negro by imposing the drastic 2015 and 2016 Amendments and ultimately purporting to cancel the Oro Negro Contracts" due to Oro Negro's refusal to pay bribes to Mexican officials).

Third, the Foreign Representative's allegations that Pemex participated in the purported "collusion" to terminate the Oro Negro Contracts (*e.g.*, Compl. ¶ 10) bar any tortious interference claim related to their alleged breach because those allegations "indicate[] as a matter of law that [Pemex] was predisposed to breach its contractual obligations" and "thus, the allegedly interfering party cannot be the 'but for' cause of the breach." *Granite Partners, L.P.*, 17 F. Supp. 2d at 293–94.

### b.    Styling the Claim As "Conspiracy" Cannot Save It

Hedging his bets, the Foreign Representative styles Count I as not just "tortious interference" but also "conspiracy to tortiously interfere," including a conclusory allegation that "Seadrill and Fintech Advisory conspired with the Ad-Hoc Group and AMA… to cause Pemex to terminate the Oro Negro Contracts…." (Compl. ¶ 304).

As a matter of law, however, the Foreign Representative fails to state any claim for conspiracy to tortiously interfere with the Oro Negro contracts because he fails to state a claim for tortious interference of those contracts, as set forth above at Section V.A.  *See*, *e.g.*, *Gladstone*, 2009 WL 2524608 at *6.

In addition, the conspiracy claim is deficient because the Complaint does not specify the "what, when, where and how of the conspiracy," *Davis*, 2018 WL 317849, at *4, and instead rests on conclusory allegations that Seadrill and Fintech acted in concert with thirteen other defendants.[12] (Compl. ¶ 304).

### B.    Claim For "Tortious Interference and Conspiracy to Interfere in the Bareboat Charters" (Count 13) Fails

With respect to Seadrill and Fintech, the Foreign Representative's claim for "Tortious Interference and Conspiracy to Interfere In the Bareboat Charters" boils down to the following conclusory allegations: that "[t]he Ad-Hoc Group Defendants, the Seamex Defendants and the Singapore Directors knew that the Bareboat Charters existed" and that they "intentionally caused, or conspired to cause, the Singapore Rig Owners to breach the Bareboat Charters by causing the Singapore Rig Owners to unlawfully terminate the Bareboat Charters based solely on Pemex's unlawful termination of the Oro Negro Contracts, which the Ad-Hoc Group, its co-conspirators and agents had caused." (Compl. ¶ 523-4.)

---

[12] There are thirteen Ad-Hoc Group Defendants, including AMA. (Compl. at 1).

01104277.6

This claim is even more hopelessly deficient than Count One: it contains no factual allegation that Seadrill or Fintech even knew about the Bareboat Charters, let alone that they intentionally procured the Charters' breach.

### 1.    The Second Element (Actual Knowledge) Is Missing

The Complaint lacks any "specific allegations" that Seadrill or Fintech actually knew of the existence of the Bareboat Charters, the agreements pursuant to which the Singapore Rig Owners leased the Rigs to Perforadora. (Compl. ¶ 79). *Medtech*, 596 F. Supp. 2d at 813; *Int'l Minerals*, 1992 WL 354504, at \*3.    The Foreign Representative's single, unsupported, conclusory allegation that they "knew" of the Charters' existence is insufficient as a matter of law. *See id.*

### 2.    The Third Element (Intentional Procurement) Is Missing

The Complaint is devoid of *any* facts to support its conclusory – and thus insufficient, *see*, *e.g.*, *Am. Express*, 39 F.3d at 400-01 n.3 – allegation that Seadrill and Fintech caused the Singaporean Rig Owners' purported breach of the Bareboat Charters (Compl. ¶ 524).  Moreover, the Foreign Representative's own allegations establish that Seadrill and Fintech were not the but-for cause of the alleged breach, *see Michele Pommier Models,* 173 F.3d 845, because he expressly attributes that causation to *other* defendants. (Compl. ¶¶  237 ("In gaining control of the Singapore Rig Owners, the Ad-Hoc Group positioned itself to cause the termination of the Bareboat Charters…."); 251 ("The Ad-Hoc Group caused the Singapore Rig Owners to attempt to terminate the Bareboat Charters so that the Ad-Hoc Group could take over the Rigs and lease them back to Pemex."); 415-16 (the "Ad-Hoc Group positioned itself to cause the termination of the Bareboat Charters upon Pemex's terminations of the Oro Negro Contracts"); 431 (the "Singaporean Rig Owners, acting under the unlawful *control of the Ad-Hoc Group*, purported to terminate the Bareboat Charters on the *sole ground* that Pemex validly terminated the Oro Negro

27

Contracts") (emphasis added).

### 3.    Styling the Claim as "Conspiracy" Cannot Save It

Like his claim asserting conspiracy to tortiously interfere with the Oro Negro Contracts, the Foreign Representative's claim for conspiracy to tortiously interfere with the Bareboat Charters is fatally deficient because he has failed to plead necessary elements of the underlying tortious interference claim. *See*, *e.g.*, *Gladstone*, 2009 WL 2524608 at *6.

His utterly vague and unsupported allegation that Seadrill and Fintech might have conspired to cause the Singapore Rig Owners to breach the Bareboat Charters is also unavailing. *See*, *e.g.*, *Davis*, 2018 WL 317849, at *4 (requiring allegations of the "what, when, where and how of the conspiracy").

### C.    Claim For Tortious Interference and Conspiracy to Tortiously Interfere With Perforadora's Business Relationship with Pemex (Count 3) Fails

### 1.    Elements of Tortious Interference With Business Relationship

Pleading a claim for tortious interference with a business relationship under New York law is even more onerous than pleading one for tortious interference with contract. The elements of a claim for tortious interference with a business relationship are: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.,* 547 F.3d 115, 132 (2d Cir.2008).[13]

To adequately allege the first element ("business relations"), the plaintiff must allege that

---

[13] "Tortious interference with prospective economic advantage" and "tortious interference with business relations" are interchangeable. *See Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.,* 455 Fed.Appx. 102, 105 (2d Cir.2012) (stating that "tortious interference with business relations and tortious interference with prospective economic advantage are not distinct causes of action.").

01104277.6

at the time of the alleged interference, plaintiff was engaged in "a continuing business or other customary relationship not amounting to a formal contract" with the third party. *See Hannex Corp. v. GMI, Inc.,* 140 F.3d 194, 205 (2d Cir.1998) (quoting Restatement (Second) of Torts § 766B cmt. c (1979)). "Plaintiffs cannot merely re-package their tortious interference with contract claim as a claim for tortious interference with prospective business relations." *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 411 (S.D.N.Y. 2009).

Also, as with claims for tortious interference with contract, the defendant's conduct must be the "but for" cause of the consequence of the alleged injury. *See In re LightSquared Inc.*, 504 B.R. 321, 353 (Bankr. S.D.N.Y. 2013) (Chapman, J.) ("to the extent the purported interference claims rest on Harbinger's speculation that the Debtors might have fared better in various plan and exit financing negotiations but for SPSO's alleged misconduct, Harbinger has not adequately pled that any such missed opportunity necessarily would have materialized but for the Ergen Defendants' purported tortious interference"); *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 217 F. Supp. 2d 423, 440-41 (S.D.N.Y. 2002).

While these elements are similar to those for tortious interference with contract, a showing of "'more culpable conduct on the part of the defendant'" is necessary to satisfy the third element, *i.e.*, wrongful purpose. *In re Bernard L. Madoff Inv. Sec. LLC*, 440 B.R. 282, 295 (Bankr.S.D.N.Y.2010 (quoting *NBT Bancorp*, 641 N.Y.S.2d 581, 664 N.E.2d at 496) (describing the interference with business relations tort by an alternative name, "interference with prospective contractual relations," and describing the third element as "wrongful means"). "The standard is more demanding because a plaintiff's mere interest or expectation in establishing a contractual relationship must be balanced against the 'competing interest of the interferer,' as well as the broader policy of fostering healthy competition." *Catskill Dev., L.L.C.*, 547 F.3d at

132 (2d Cir. 2008) (quoting *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 622-23 (1996)).

"Wrongful means" sufficient to satisfy the third element have been defined to include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure [,]" but not "persuasion alone." *LightSquared,* 504 B.R. at 351; *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 191 (1980) (same) (quoting Restatement (Second) of Torts §§ 768 cmt. E; 767 cmt. C (1979)). Generally, to establish "wrongful means" the plaintiff must show that the alleged interferer's conduct amounted to a crime or an independent tort. *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 343 (S.D.N.Y. 2008) (citing *Carvel Corp. v. Noonan,* 3 N.Y.3d 182 (2004).[14] Further, "[a] party acting out of economic self interest does not commit tortious interference with business relations…." *Black Bear Fuel Oil, Ltd. v. Swan Lake Developers LLC*, 128 A.D.3d 1191, 1195 (3d Dep't 2015). *See also Discover Group, Inc. v. LexMark Intern., Inc.*, 333 F. Supp. 2d 78, 86-7 (E.D.N..Y 2004) ("Defendant was plainly competing with plaintiffs for the State of Michigan's toner cartridge business and was not motivated solely, if at all, by a desire to harm plaintiffs.").

Here, the Court must dismiss the tortious interference with business relations claim as against Seadrill and Fintech for at least five independent reasons.

---

[14] "[I]n the years since *Carvel II* was decided, courts have been stingy in their interpretation of this tort, and have resisted invitations to go beyond the language of the Court of Appeals." *Darby Trading,* 568 F. Supp. 2d at 346 (collecting cases). The means of interference with the business relationship need not be "wrongful" if the interference is taken "for the sole purpose of inflicting intentional harm to plaintiffs." *RSM Prod.,* 643 F. Supp. 2d at 412 (quoting *Carvel II,* 3 N.Y. 3d 182, 190-91). But if the action is taken in "economic self-interest" then interference must amount to "wrongful means," such as a crime or independent tort. *Id. See also Hassan v. Deutsche Bank A.G.,* 515 F.Supp.2d 426, 430 (S.D.N.Y.2007) ("A motive of 'normal economic self-interest' is inconsistent with a sole purpose of inflicting intentional harm."). As the Complaint makes clear that SeaMex was Oro Negro's largest competitor and that "Seadrill and Fintech . . . stood to reap substantial profits by destroying [Oro Negro]," (Compl. ¶ 436), there should be no question that the Complaint is not excused from satisfying the "wrongful means" element of the claim.

### 2.    The First Element ("Business Relations") Is Missing

*First*, the Foreign Representative cannot adequately plead the first element because his tortious interference with business relations claim is simply a re-packaging of his claim for tortious interference with the Oro Negro Contracts. *See RMS Prod.*, 643 F. Supp. 2d at 411.

Like the claim for tortious interference of those contracts, the interference with business relations claim is premised on Pemex's purported breach of the Oro Negro Contracts. *Compare* Compl. ¶ 449 with ¶ 461.

Further, the Foreign Representative does not even purport to identify (Compl. ¶ 459) any "continuing business … relationship not amounting to a formal contract," *Hannex*, 140 F.3d at 205, with Pemex: to the contrary, the Oro Negro Contracts, which he contends have never been validly terminated, encapsulate the entirety of Oro Negro's business relationship with Pemex. (Compl. ¶¶ 5, 151.)

The Foreign Representative's complete failure to allege the first element of a tortious interference with business relations claim dictates its dismissal.  *See RSM Prod. Corp.*, 643 F. Supp. 2d at 411 ("There is no distinction in the Third Amended Complaint between Plaintiffs' claims for tortious interference with contract and tortious interference with prospective business relations. Indeed, in attempting to establish the elements of this cause of action, Plaintiffs repeatedly refer to the alleged contract between" the plaintiff and the third party).

### 3.    The Second Element (Interference) Is Missing

*Second*, the Complaint is devoid of any factual allegation that Seadrill or Fintech "interfered" with Perforadora's relationship with Pemex.[15] See above at Section I.  In particular,

---

[15] Indeed, even *conclusory* allegations of such interference are noticeably lacking. Instead, the Foreign Representative claims that the Ad-Hoc Group Defendants – not Seadrill or Fintech – interfered with the business relationship. (Compl. ¶ 461). The only references to any purported "interference" by Seadrill or Fintech – which the

01104277.6

the Complaint fails to allege a *single* instance where Seadrill or Fintech communicated or interacted with Pemex in connection with the Oro Negro Contracts. *See G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 768 (2d Cir. 1995) (affirming dismissal of claim where the plaintiffs, which were distributors, failed to allege that defendants, which were bottling companies seeking to establish a monopoly, had "any contact with the distributors' customers or that [the bottling companies] tried to convince the customers to make contracts with them rather than the distributors"); *Ritani, LLC v. Aghjayan,* 880 F.Supp.2d 425, 451 (S.D.N.Y.2012) (holding that complaint must allege defendant directly interfered with and convinced third party not to do business with plaintiff).

### 4.    The Third Element (Wrongful Means) Is Missing

*Third*, the Complaint contains no allegation that Seadrill or Fintech used wrongful means – such as a crime or an independent tort, *see Darby Trading*, 568 F. Supp. 2d at 343 – to carry out any purported interference.   The Foreign Representative merely alleges that, to obtain "profits" (Compl. ¶ 436), Seadrill and Fintech "agreed" with the Ad-Hoc Group that SeaMex would manage the Rigs if the Bondholders ever obtained possession of them (Compl. ¶ 450). Pursuing a potentially profitable business opportunity is simply not a crime or a tort.  Nor is receiving "leaked" confidential information (Compl. ¶ 179).  *See Tyler Fire Equip., LLC v. Oshkosh Corp.*, 2015 WL 3756372, at *12 (W.D.N.Y. June 16, 2015) ("The allegations … are that Defendants spread rumors that Plaintiffs were going out of business and that Pierce was going to choose another company to sell its products, *and disclosed confidential information in*

---

Court should disregard because they are entirely conclusory, see above at Section I – are lumped in with allegations involving other defendants. (Compl. ¶¶ 463 ("The Ad-Hoc Group Defendants and the Seamex Defendants knowingly damaged Integradora and Perforadora by interfering in Pemex's business relationship with Perforadora…."); 464 ("The Ad-Hoc Group Defendants and the Seamex Defendants had no justification for interfering in Perforadora's business relationship with Pemex….")).

01104277.6

*breach of the confidentiality agreements.* The Court sides with the majority of other courts that have found this alleged behavior does not meet the requirement of a 'crime or an independent tort' set by the New York Court of appeals.") (emphasis added).

### 5.    The Fourth Element (Injury) Is Missing

Nor does the Complaint even purport to claim that but for Seadrill or Fintech's alleged conduct – a conditional "agreement" to manage the Rigs on behalf of the Bondholders and receipt of confidential information from Oro Negro's COO (Compl. ¶¶ 450, 170) – its relationship to Perforadora would have escaped injury, as is required under New York law. *See RSM Prod.,* 643 F. Supp. 2d at 412, note 3; *Catskill Dev.,* 217 F. Supp. 2d at 440-41.

### 6.    Styling the Claim As "Conspiracy" Cannot Save It

As with his other tortious interference claims, the Foreign Representative throws an allegation of "conspiracy" into his tortious interference with business relations claim. (Compl. ¶ 461). This fails to state a claim for the same reasons set forth above at Section V.B.3.

### D.    Claims For Aiding and Abetting Tortious Interference (Counts 2 and 4) Fail

Based on the same minimal allegations that underlie the previous claims, the Foreign Representative asserts "aiding and abetting" claims against Seadrill and Fintech, alleging that they aided and abetted the Ad-Hoc Group's purported tortious interference with the Oro Negro Contracts (Count 2) and with Pemex's business relationship with Perforadora (Count 4).

There is no independent "aiding and abetting" tort under New York law. *See Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57 (1999). To state a cause of action for aiding and abetting, the plaintiff must allege: (1) the existence of a violation by the primary wrongdoer; (2) the aider and abettor's knowledge of that violation; and (3) proof that the aider and abettor substantially assisted the primary wrongdoer. *Chemtex, LLC v. St. Anthony Enterprises, Inc.*, 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007) (citing *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 292 (2d

01104277.6

Cir.2006)). *See also In re Refco Inc. Sec. Litig.*, 2011 WL 13168450, at *19 (S.D.N.Y. Dec. 8, 2011) (dismissing claim for aiding and abetting tortious interference with contractual relations).[16] For the reasons set forth below, the Complaint fails to adequately allege any of the elements of an aiding and abetting claim.

New York law requires that the alleged aider and abettor have "actual," as opposed to merely constructive, knowledge of the primary wrong. *See Chemtex, LLC v. St. Anthony Enterprises, Inc.*, 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007); *Lerner,* 459 F.3d at 292 (citing *Kolbeck v. LIT Am., Inc.,* 939 F.Supp. 240, 246 (S.D.N.Y.1996)). As courts in this federal district have recognized, "'[t]he burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one.' " *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 2007 WL 926916 (S.D.N.Y. Mar. 27, 2007) (quoting *Terrydale Liquidating Trust v. Barness,* 611 F.Supp. 1006, 1027 (S.D.N.Y.1984)).

With respect to the third element, a defendant provides substantial assistance only if it "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the primary violation] to proceed." *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996), *aff'd,* 152 F.3d 918 (2d Cir. 1998); *accord In re WorldCom. Inc. Sec. Litig.,* 382 F.Supp.2d 549 (S.D.N.Y.2005) (quoting *OSRecovery, Inc. v. One Groupe Int'l, Inc.,* 354 F.Supp.2d 357, 378 (S.D.N.Y.2005)). Mere failure to act cannot constitute substantial assistance, however, unless the defendant has an independent duty to the plaintiff. *See, e.g., Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) ("Inaction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance ... except when ... it was in

---

[16] There is a dearth of case law involving aiding and abetting tortious interference claims under New York law. Unless otherwise stated, all decisions cited in connection with the Foreign Representative's Aiding and Abetting Claims involve an underlying tort other than tortious interference with business relationship or contract.

conscious and reckless violation of a duty to act."); *Kolbeck*, 939 F. Supp. At 247 ("inaction or a failure to investigate, constitutes actionable participation only when a defendant owes a fiduciary duty directly to the plaintiff; that the primary violator owes a fiduciary duty to the plaintiff is not enough").

### 1.    The First Element (A Violation) Is Missing

The Complaint fails to state a cause of action against the Ad-Hoc Group Defendants for tortious interference with the Oro Negro Contracts or with Pemex's business relationship.  *See generally* above at Sections V.A.1. and V.C.1. (setting forth the elements of such claims).  To the extent that the Ad-Hoc Group Defendants address this issue in their dismissal motion, Seadrill and Fintech respectfully refer the Court to that discussion.

Given the Foreign Representative's failure to state either of the underlying claims for tortious interference against the Ad-Hoc Group Defendants, as a matter of law neither of his aiding and abetting claims against Seadrill and Fintech can survive.  *See Chemtex,* LLC, 490 F. Supp. 2d at 546.

In addition, the aiding and abetting claims fail for the independent reasons set forth below.

### 2.    The Second Element (Actual Knowledge) Is Missing

Here, the Complaint fails to allege any facts showing that Seadrill or Fintech had actual knowledge of any alleged tortious interference by the Ad-Hoc Group Defendants.  Indeed, the only specific communications alleged between Seadrill or Fintech and any Ad-Hoc Group Defendant are those in September and October 2017 pertaining to the purported agreement that SeaMex would manage the Rigs if the Bondholders gained possession of them. (Compl. ¶ 462). This cannot support the aiding and abetting claims because there is no allegation that Seadrill or

Fintech knew that the Bondholders' possession would come about wrongfully.[17] *See*, *e.g.*, *Chemtex*, 490 F. Supp. 2d at 548 ("a secured lender has the right to protect its own interests when making decisions to enforce its contractual foreclosure rights" and such decisions cannot support an aiding and abetting claim).

### 3.    The Third Element (Substantial Assistance) Is Missing

Here, the Complaint does not allege that Seadrill or Fintech provided any assistance to the Ad-Hoc Group Defendants at all, let alone "substantial assistance." The purported "management agreement" on which the Foreign Representative bases his claims (Compl. ¶ 462) was never even consummated. Nor can the Foreign Representative's allegations that Oro Negro's COO "leak[ed]" confidential information cure this deficiency: there is no allegation that Seadrill or Fintech provided such information to the Ad-Hoc Group, and to the contrary he alleges that the COO leaked the information *to* the Ad-Hoc Group as well as Seadrill (*Id*. ¶ 179).

Given that the Foreign Representative has not properly pleaded a single element of an aiding and abetting claim under New York law, the Court should dismiss Counts Two and Four to the extent that it applies New York law to the claims.[18]

### E.    Prima Facie Tort Claim (Count Nineteen) Fails

The prima facie tort claim that the Foreign Representative tacks onto the end of his Complaint also fails as a matter of New York law.

The prima facie tort is "highly disfavored." *Katz v. Travelers*, 241 F. Supp. 3d 397, 405

---

[17] To the extent that the Foreign Representative is alleging that the purported agreement that SeaMex would eventually manage the rigs included agreement that Pemex would "unlawfully breach[] the Oro Negro Contracts" or that the Ad-Hoc Group would "unlawfully tak[e] over the Rigs" (Compl. ¶¶ 455, 467), the Court must disregard that because it is wholly conclusory. *See*, *e.g.*, *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

[18] In the event that this Court sustains the aiding and abetting claims, however, that provides an additional basis to dismiss the claims asserting conspiracy to tortiously interfere because those are duplicative. *See Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*, 2012 WL 1193353, at *9 (S.D.N.Y. Apr. 10, 2012) ("[T]he allegations in support of the conspiracy claim are essentially the same allegations that support the aiding and abetting claim. Therefore the conspiracy claim is duplicative of the aiding and abetting claim.") (citations omitted).

01104277.6

(E.D.N.Y. 2017), *reconsideration denied*, 2017 WL 4180012 (E.D.N.Y. Sept. 20, 2017). It is a very limited doctrine reserved for that rare circumstance where harm for which there is absolutely no justification is done yet the acts complained of do not otherwise constitute a known tort. *See Nat'l Nutritional Foods Ass'n v. Whelan*, 492 F.Supp. 374, 382 (S.D.N.Y. 1980). "Prima facie tort may be found only in the narrow circumstance when harm is deliberately caused with no purpose but that harm, rather than even partially for other reasons." *Cartelli v. Lanier Worldwide, Inc*., 872 F.Supp. 1253 (S.D.N.Y. 1995).

The elements of a cause of action for prima facie tort are "(1) intentional infliction of harm, (2) resulting in special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful." *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 332 (1983). *See also Freihofer v. Hearst Corp*., 65 N.Y.2d 135,142-43 (1985); *Curiano v. Suozzi*, 63 N.Y.2d 113, 117 (1984).

The Court must dismiss the prima facie claim here because the Complaint omits the first three elements of such a claim.

## 1.    The First and Third Elements (Disinterested Malevolence) Are Missing

Courts generally analyze the first and third elements of a prima facie claim – acting with intent and acting without excuse or justification – together, requiring the plaintiff to allege that the defendant acted with "disinterested malevolence." *See Burns*, 59 N.Y.2d at 332-3. As the New York Court of Appeals has explained:

> there is no recovery in prima facie tort unless malevolence is the *sole motive* for defendant's otherwise lawful act or, … unless defendant acts from "disinterested malevolence" by which is meant that the genesis which will make a lawful act unlawful must be a malicious one *unmixed with any other and exclusively directed* to injury and damage of another.

37

*Burns, supra*, at 333 (emphasis added) (internal citations and quotations omitted).  Put another way, "the harmful act must be committed for the sake of the harm as an end in itself." *Cartelli v. Lanier Worldwide, Inc.*, 872 F.Supp. 1253 (S.D.N.Y. 1995). *See also Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1980) ("The touchstone [of a prima facie tort claim] is 'disinterested malevolence', meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm."); *Golub v. Esquire Pub. Inc.*, 124 A.D.2d 528, 529 (1st Dep't 1986) ("In order to properly plead a cause of action for prima facie tort, it is necessary to allege that the action complained of was solely motivated by malice or 'disinterested malevolence.'").

Thus, "motives other than disinterested malevolence, such as profit, self-interest, or business advantage will defeat a prima facie tort claim." *Twin Labs.*, 900 F.2d at 571 (internal quotation marks omitted). *Accord Sharma v. Skaarup Ship Mgt. Corp.*, 699 F. Supp. 440, 445 (S.D.N.Y. 1988), *aff'd*, 916 F.2d 820 (2d Cir. 1990). For example, in *Benton v. Kenney-Van Saun Mfg. & Corp.*, 2 A.D.2d 27 (2d Dep't 1956), the plaintiff asserted claims for prima facie tort and tortious interference based on allegations that the defendant had interfered with a contract between the plaintiff and the Republic of Haiti, with the result that the contract was breached and then granted to a different contractor with financial ties to the defendant. The trial court granted the defendant's motion to dismiss and the Appellate Division affirmed, holding with regard to prima facie tort claim that, despite the plaintiff's allegations that the defendant's actions had harmed him, plaintiff could not properly allege a cause of action for prima facie tort given that the defendant had a profit motive.

Accordingly, courts frequently dismiss prima facie tort claims brought against competitors. *See Twin Labs.*, 900 F.2d at 571 (on summary judgment, dismissing prima facie

01104277.6

tort claim against competitor where plaintiff "does not, and could not, suggest that [defendant's] primary motive was not based on self-interest"); *Sharma v. Skaarup Ship Mgmt. Corp.*, 699 F. Supp. 440, 446 (S.D.N.Y. 1988), *aff'd*, 916 F.2d 820 (2d Cir. 1990) (in action against competitor, dismissing prima facie tort claim with prejudice "because the existence of a business or profit motive appears on the face of the complaint"); *AREP Fifty-Seventh, LLC v. PMGP Assocs., L.P.*, 115 A.D.3d 402 (1st Dep't 2014) (dismissing cause of action for prima facie tort where competitor was motivated by an intent to delay plaintiff's competing project); *Christopher Lisa Matthew Policano, Inc. v. North Am. Precis Syndicate, Inc.*, 129 A.D2d 488, 490 (1st Dep't 1987) (in suit against competitor and competitor's chief executive officer, dismissing prima facie claim where plaintiff did "not allege, as required, that 'malevolence' was the sole motive for the individual defendant's actions").

Here, the Foreign Representative's own allegations doom his prima facie tort claim: the Complaint contains multiple allegations that Seadrill and Fintech had a profit motive for their purported conduct. For example:

"Seadrill and Fintech similarly stood to gain in eliminating from the market Seamex's largest competitor, while absorbing the Rigs and the Oro Negro Contracts." (Compl. ¶12.)

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

"Seadrill and Fintech similarly stood to reap substantial profits by destroying Seamex's largest competitor, while absorbing the Rigs, the Oro Negro Contracts and, ultimately, the entire Oro Negro business." (*Id.* ¶436.)

Accordingly, the Court must dismiss the prima facie tort claim as against Seadrill and

Fintech.  *See*, *e.g.*, *Golub*, 124 A.D.2d at 529.

## 2.    The Second Element (Special Damages) Is Missing

In addition, the Complaint omits the second required element of a cause of action for prima facie tort: special damages, which are specific identifiable losses (not round numbers) that are causally related to the particular tort.  *See generally Emergency Enclosures, Inc. v. Nat'l Fire Adjustment co., Inc.*, 68 A.D.3d 1658, 1661 (2d Dep't 2009); *Gifford v. Guilderland Lodge, No. 2480,*178 Misc.2d 707, 713 [Sup Ct 1998], *aff'd sub nom. Gifford v Guilderland Lodge, No. 2480, B.P.O.E. Inc.*, 272 AD2d 721 [3d Dept 2000]. "Broad and conclusory terms are insufficient to fulfill this critical element of prima facie tort."  *Miller v. Geloda/Griarwood Corp.*, 136 Misc.2d 155, 157 (Sup. Ct. New York County 1987) (dismissing counterclaim for prima facie tort in part because the allegation that defendant suffered special damages in the form of parking fees and legal fees was not specific enough).  *See also Freihofer, supra,* at 143 ("a critical element of the cause of action is an allegation that plaintiff suffered specific, measurable loss, which requires an allegation of special damages"); *Golub*, *supra* at 529 (same).

Here, the Complaint is devoid of any allegation of special damages causally related to the prima facie tort claim against Seadrill and Fintech. Indeed, the Foreign Representative alleges the prima facie tort damages in only the most general of terms: "[a]s a result of the foregoing, Integradora and Perforadora seek damages, including punitive damages,[19] in an amount to be proven at trial." (Compl. ¶ 569.) And while the Complaint does contain a section titled "Damages" (*Id.*. at 100), that does not even purport to identify any specific identifiable losses causally related to the Foreign Representative's prima facie tort claim against Seadrill and

---

[19] The Foreign Representative's request for punitive damages in connection with his prima facie tort claim (Compl. ¶ 569) fails as a matter of law because punitive damages are never recoverable for prima facie tort.  *Walsh Bros., Inc. v. Jacob Ruppert*, 7 A.D.2d 896 (1st Dep't 1959) ("The law is clear that for prima facie tort only actual damages may be recovered"); *Winderbaum v. Winderbaum*, 39 Misc.2d 478 (Sup. Ct. Bronx County 1963) (same).

Fintech (or any of the Foreign Representative's other claims against them). Rather, the Foreign

Representative alleges the value of the five Rigs and approximate future payments it supposedly

expected under the Oro Negro Contracts and further claims that the alleged collective actions of

all the defendants and all the alleged causes of action together "have caused substantial damage

to both Perforadora and Integradora, effectively wiping out hundreds of millions of dollars in

equity value of Integradora."   (Compl. ¶ 437).   These general allegations are insufficient as a

matter of law to meet the requirement of pleading special damages, which "must be alleged with

sufficient particularity to identify actual losses and be related causally to alleged tortious acts."

*Luciano v. Handcock*, 78 A.D.2d 943 (3d Dep't 1980).

> ### 3.    The Court Must Dismiss the Prima Facie Tort Claim Because It Is Based On The Same Alleged Facts as the Defective Tortious Interference Claims

Where a prima facie tort claim is based on the same set of operative facts as another tort

claim that is dismissed for failing to state a claim, the Court must dismiss the prima facie tort

claim as well.   *See Church of Scientology of California v. Siegelman*, 94 F.R.D. 735 (S.D.N.Y.

1982).   In other words, "a prima facie tort may not rest upon conduct that is well within the area

of activity meant to be regulated by a traditional tort, and which is sufficient to establish that

tort."   *National Nutritional Foods Ass'n v. Whelan*, 492 F.Supp. 374, 383 (S.D.N.Y. 1980). As

the New York Appellate Division recognized in *Belsky v. Lowenthal*, 62 A.D.2d 319 (1st Dep't

1978):

> It would make little sense to hold that plaintiff may not prevail on
> a cause of action, having failed to establish certain elements, which
> are essential thereto, and then in the exercise of flexibility, apply a
> different name to it, and without correcting any of the fatal defects,
> permit the cause of action (absent a unique quality) to stand. . . .
> The just and reasonable concept that the law should never suffer an
> injury and adamage without a remedy has its limitations. To
> blindly accept this rationale should not be an occasion for setting
> aside large bodies of case law which have defined our limits,

established our guidelines and set forth the essential elements of traditional tort. Prima facie tort should not become a "catch-all" alternative for every cause of action which cannot stand on its legs.

*Id*. at 322 (internal citations and quotations omitted).

Here, the prima facie tort claim is based on the very same allegations as those that underlie the defective tortious interference and aiding and abetting claims: the Foreign Representative alleges no unique facts in support of its prima facie claim. (Compl. ¶ 566). Given that the other tortious interference and aiding and abetting claims fail under New York law for the reasons set forth above at Sections V.A.–D., the Court must dismiss the prima facie tort claim against Seadrill and Fintech as well. *See, e.g., Woytisek v. JP Morgan Chase & Co.*, 46 A.D.3d 331 (1st Dep't 2007) (upholding dismissal of claim for prima facie tort when it was based on the same allegations as the dismissed claim for intentional infliction of emotional distress).[20]

## V.    THE COURT MUST DISMISS SEADRILL FROM THE ADVERSARY PROCEEDING FOR LACK OF PERSONAL JURISDICTION

In addition, the Court must dismiss Seadrill from this Adversary Proceeding because it lacks personal jurisdiction over Seadrill, for the reasons set forth below.

### A.    General Standards

Fed. Rule Civ. Proc. 12(b)(2), which Fed. Rule Bankr. Proc. 7012(b) incorporates, provides for a defendant's dismissal from a lawsuit based on lack of personal jurisdiction. *See in re CIL Ltd.*, 582 B.R. 46, 70 (Bankr. S.D.N.Y. 2018), *amended on reconsideration*, 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018). In the face of a Rule 12(b)(2) motion to dismiss, the plaintiff bears the burden of establishing personal jurisdiction over the defendant

---

[20] If the Court were to sustain any of the other tort claims against Seadrill and Fintech, dismissal of the prima facie tort claim would be appropriate because "once a traditional tort is established, the cause of action for prima facie tort disappears." *Curiano v. Suozzi*, 63 N.Y.2d 113 (1984). *See also Curiano v. Suozzi*, 63 N.Y.2d 113, 118 (1984) (citations and quotations omitted).

by making a "prima facie showing" that such jurisdiction exists. *See*, *e.g.*, *Wilder v. News Corp.*, 2015 WL 5853763, at \*5 (S.D.N.Y. Oct. 7, 2015).

Under Bankruptcy Rule 7004(f), a Bankruptcy Court may exercise jurisdiction over a properly served defendant only "[i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States." Thus, the relevant inquiry here is whether this Court's exercise of personal jurisdiction over Seadrill in this Adversary Proceeding is consistent with the Fifth Amendment's Due Process clause. *See CIL*, 582 B.R. at 70. "That analysis has two components: (i) whether the defendants have the requisite minimum contacts with the relevant forum such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice, and (ii) whether the exercise of jurisdiction is reasonable in the circumstances." *Id.* (internal quotation marks omitted).  The reasonableness inquiry "evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant needs to show in terms of unreasonableness to defeat jurisdiction." *Id*. at 79.

"[C]ontacts with the forum may confer two types of jurisdiction-specific and general." *Wilder*, 2015 WL 5853763, at \*5 (S.D.N.Y. Oct. 7, 2015). *See also Bristol-Myers Squibb Co. v. Superior Ct. of Calif., San Francisco County*, 137 S.Ct. 1773, 1779-80 (2017) (recognizing "two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction."). General jurisdiction over a defendant gives a court the power to "hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State," while specific jurisdiction only gives a court the power to adjudicate "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb*, 137 S.Ct. at 1780 (emphasis in original).

01104277.6

If the threshold "minimum contacts" are present, courts then move on to the issue of whether exercising personal jurisdiction "over a defendant is reasonable, based upon the following factors: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *CIL*, 582 B.R. at 71.

Here, the Foreign Representative fails to allege any basis for either general or specific jurisdiction over Seadrill.

## B.    General Jurisdiction Is Lacking

For general jurisdiction to exist, the foreign corporation's "affiliations with the State" must be "so continuous and systematic as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 137, 139 (2014) (internal quotation marks omitted). "The 'paradigm' bases for the assertion of general jurisdiction are the corporation's place of incorporation and principal place of business." *CIL*, 582 B.R. 46; *accord Daimler*, 571 U.S. 137; *Bristol-Myers Squibb*, 137 S.Ct. at 1780. "Being essentially at home in a place is a very high bar, almost never found for corporations where they are neither incorporated nor headquartered." *Statek Corp. v. Coudert Bros. LLP*, 2018 WL 834227, at *12 (D. Conn. Feb. 12, 2018) (internal quotation marks omitted). Only in an "exceptional case" will a court exercise general jurisdiction somewhere other than the corporation's place of incorporation or principal place of business. *E.g.*, *Hood v. Ascent Med. Corp.*, 691 Fed. Appx. 8, 10 (2d Cir. 2017) (summary order) (internal quotation marks omitted); *Wilder*, 2015 WL 5853753, at *6 (same).

Nothing in the Complaint establishes that Seadrill is "essentially at home" in the United States. As set forth above, a corporation's place of incorporation and principal place of business

are the "paradigm" bases for asserting general jurisdiction. Here, Seadrill "is a company established and with its principal place of business in Bermuda" (Compl. ¶ 72), not the United States.

And the Foreign Representative's other paltry jurisdictional allegations pertaining to Seadrill come nowhere near establishing that the existence of general jurisdiction. For example, he alleges that Seadrill trades on the New York Stock Exchange (Compl. ¶ 32), but that is insufficient to create general jurisdiction. *See Sonera Holding B.V. v. Cukorova Holding A.S.*, 750 F.3d 221, 226 (2d Cir. 2014) (no general jurisdiction where defendant allegedly sold American Depository Shares to London underwriter, which subsequently offered them for sale on New York Stock Exchange); *Lopez v. Shopify, Inc.*, 2017 WL 2229868, at *7 (S.D.N.Y. May 23, 2017) (defendant's "collective contacts," which include trading on the New York Stock Exchange, "cannot support general jurisdiction").

Similarly, that current or former members of the Board of Directors are purportedly "New York-based" is unavailing.[21] (Compl. ¶ 74). *See Doe v. Nat'l Conference of Bar Examiners*, 2017 WL 74715, at *6 (E.D.N.Y. Jan. 6, 2017) ("the mere fact that a board member resides in New York is not enough to confer jurisdiction") (internal quotation marks omitted).

Nor can the Foreign Representative's vague and conclusory claim that Seadrill "conducts business in the United States through Seadrill Americas, Inc., one of Seadrill's United States-based subsidiaries, and through Sevan Drilling, Ltd., a Seadrill subsidiary that conducts significant business in the United States" establish general jurisdiction. (Compl. ¶ 74). Merely having subsidiaries conducting business in a jurisdiction does not automatically render the parent

---

[21] Both of the current directors Seadrill references are "independent, non-executive director[s] and have no involvement in the day-to-day operations of Seadrill." [ECF No. 172, Ex. 4] (February 18, 2019 Declaration of Eugene I. Davis) ¶ 4; [ECF No. 172, Ex. 5] (February 18, 2019 Declaration of Scott D. Vogel ¶ 4). Further, Mr. Davis works and resides in New Jersey, not New York. [ECF No. 172, Ex. 4] ¶ 3.

defendant "at home" in the jurisdiction and thus is insufficient to allege general jurisdiction. *See*

*Daimler,* 571 U.S. at 136 (even assuming subsidiary was "at home in California," there was no

general jurisdiction over parent because its "slim contacts with the State hardly render it at home

there"). And, to the extent that the Foreign Representative intends to allege that the acts of the

purported subsidiaries ought to be imputed to Seadrill because they are "agents" of Seadrill

(Compl. ¶ 94),[22] that is not sufficient to establish general jurisdiction because (i) he does not

even purport to allege a basis for imputing subsidiaries' acts to a parent under the agency theory,

such as "a disregard for the separate corporate existence" of the alleged subsidiaries, *Wilder*,

2015 WL 5853763, at *6; and (ii) even if the subsidiaries' alleged acts were imputed to Seadrill,

that would be insufficient to render Seadrill "at home" in the United States given that he fails to

allege facts sufficient to establish that the *subsidiaries* are "at home" there. *See Hood*, 691 Fed.

Appx. at 10 ("In any event, asserted bases for general jurisdiction over the Delaware entities, *i.e.*,

the existence of product sales and an office in New York, are legally insufficient."); *In re M/V*

*MSC FLAMINIA*, 107 F. Supp. 3d 313, 319 (S.D.N.Y. 2015) ("if imputing the in-state contacts

of the domestic affiliate to the foreign parent does not render the foreign parent 'at home' in the

state, then there is no basis to subject the foreign parent to general jurisdiction in the state").[23]

Nor does Seadrill's commencement of a Chapter 11 proceeding in the U.S. Bankruptcy

Court for the Southern District of Texas in 2017 (Compl. ¶ 75) form the basis for the exercise of

general jurisdiction in this Adversary Proceeding. Courts have generally analyzed filings in

---

[22]It is unclear whether the Foreign Representative's vague allegation of agency, which he refers to in a paragraph concerning "personal jurisdiction over each Defendant" (Compl. ¶ 94), even alludes to Seadrill's purported subsidiaries. Moreover, the Court should disregard the allegations set forth in paragraph 94 of the Complaint because they are conclusory. *See*, *e.g.*, *In re Terrorist Attacks on September 11, 2001, 295 F. Supp. 3d 416, 424 (S.D.N.Y. 2018) ("In assessing personal jurisdiction on a Rule 12(b)(2) motion, the court is neither required to draw argumentative inferences in the plaintiff's favor nor must it accept as true a legal conclusion couched as a factual allegation.") (citations and internal quotation marks omitted).

[23] Further, it is unclear whether "agency" is even a viable theory of personal jurisdiction in the wake of *Daimler*. *See Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 344 (S.D.N.Y. 2018).

bankruptcy proceedings in the context of specific jurisdiction, not general jurisdiction.[24] *See In re Lehman Bros. Holdings Inc.*, 544 BR 16, 33 (Bankr. SDNY 2015) (in analyzing specific jurisdiction in adversary proceeding brought by "LBSF," holding that defendants' filing of proof of claim in LBSF's Chapter 11 did not confer jurisdiction given that it was withdrawn and expunged prior to the commencement of the adversary proceeding; the Court also noted, without reaching the argument, that defendants' argument that the claims were "insufficient to establish consent to jurisdiction for purposes of this adversary proceeding because such claims were filed against LBHI, not LBSF, the plaintiff in this adversary proceeding" was also "a compelling argument."). *See also Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 50 (2d Cir. 1991) n.2 ("A party's consent to jurisdiction in one case … extends to that case alone. It in no way opens that party up to other lawsuits in the same jurisdiction in which consent was given, where the party does not consent and no other jurisdictional basis is available."); *In re Tornheim*, 181 B.R. 161, 167 (S.D.N.Y. 1995) (rule that "a debtor submits to the jurisdiction of the bankruptcy court when he or she files a petition … may not apply to adversary proceedings that require the service of a summons and complaint").

Thus, general jurisdiction is lacking. *See*, *e.g.*, *Hood*, 691 Fed. Appx. at 10 (no general jurisdiction where plaintiff "fails to demonstrate that defendants were incorporated or principally did business in New York, or that this is otherwise an extraordinary case in which general jurisdiction would be appropriate"); *CIL*, 582 B.R. at 82 (no general jurisdiction where the defendant's "place of incorporation and principal place of business is the Netherlands").

---

[24] Although the Southern District of New York in 2010 looked to the signing and filing of a Chapter 11 petition in New York in holding that it had general jurisdiction over the individual defendant, *see In re Bozel S.A.,* 434 B.R. 86, 98 (Bankr. S.D.N.Y. 2010), that is distinguishable from this case because, among other things: (i) it pre-dated *Daimler* and (ii) extensive other contacts were present as well.

### C.    <u>Specific Jurisdiction Is Lacking</u>

The exercise of "specific personal jurisdiction 'depends on an affiliatio[n] between the forum and the underlying controversy.'" *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015), *on rearg. in part sub nom. In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 11 MD 2262 (NRB), 2016 WL 1301174 (S.D.N.Y. Mar. 31, 2016) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Thus, "'the defendant's suit-related conduct must [have] create[d] a substantial connection with the forum,'" *Libor*, 2015 WL 6243526, at *27 (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)). *See also CIL*, 582 B.R. at 75 ("it is not enough that the alleged conduct has some connection to the forum; the alleged conduct must have a substantial connection"). Further, a plaintiff asserting specific jurisdiction has to "'establish the court's jurisdiction with respect to *each* claim asserted." *Libor*, 2015 WL 6243526, at *27 (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis in original)). Thus, each claim "must arise out of or relate to the defendant's contacts with the forum." *Libor,* 2015 WL 6243526, at *27.

In determining whether minimum contacts exist, the Court considers whether the defendant has "purposefully established minimum contacts within the forum," through "'purposeful availment'" of the "'privilege of doing business in the forum'" or "'purposeful direction' of intentional, allegedly tortious acts 'expressly aimed at the forum.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985); *Licci ex. Rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013)). "'[R]andom, fortuitous, or attenuated contacts" are insufficient, as is "'the unilateral activity of another party or a third person.'" *Libor*, 2015 WL 624352628, at *27 (quoting *Burger King Corp.*, 471 U.S. at 475).

48

Where the alleged contacts with the forum are not connected to the suit, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb*, 137 S.Ct. at 1781. Courts within the Second Circuit generally require that there be a "'but for' connection between the defendant's forum-directed activities and the claim" in order to find minimum contacts for purposes of specific jurisdiction. *Libor*, 2015 WL 624352628, at *28.

Further, even for acts allegedly related to the litigation, "specific personal jurisdiction also requires a defendant to purposefully direct[] his activities toward the forum." *CIL*, 582 B.R. at 75 (internal quotation marks omitted). "[I]ncidental" activities are insufficient. *See id.* (internal quotation marks omitted).

Here, the Foreign Representative does not allege a "but for" connection – or any connection – between Seadrill's alleged activities within the United States and any of the Mexican Law Claims or the Common Law Claims.

For example, he does not claim (nor could he) that his claims in this Adversary Proceeding arise from Seadrill's Chapter 11 proceeding in Texas. Moreover, unlike the Chapter 15 Proceeding, in which the Foreign Representative sought discovery in aid of a Mexican insolvency proceeding (*e.g.*, Compl. ¶ 9), he now asserts financial recovery for tortious interference claims. *In re Bernard L. Madoff Inv. Sec. LLC*, 525 B.R. 871, 888 (Bankr. S.D.N.Y. 2015) is analogous. Although the defendants there had filed Securities Investor Protection Act ("SIPA") claims, which were the equivalent of filing a bankruptcy proof of claim, jurisdiction was lacking with respect to the trustee's subsequent fraudulent transfer action: "the adversary proceeding does not implicate the claims allowance process. Instead, the Trustee is seeking legal relief in the form of the recovery of money damages, and [defendants] did not subject themselves

01104277.6

to personal jurisdiction with respect to the Trustee's fraudulent transfer action by filing SIPA claims." *Id.* at 888. *See also id.* at 887 (although "filing a claim subjects the creditor to the equitable power of the bankruptcy court because it triggers the process of allowance and disallowance of claims," that "submission to personal jurisdiction is limited to litigation concerning the claims allowance process"); *Lehman Bros.*, 544 B.R. at 34 (proofs of claim withdrawn before plaintiff commenced proceedings at issue could not "serve as the basis for submission to this Court's jurisdiction … for purposes of adjudicating this adversary proceeding").

Nor does the Foreign Representative contend that his claims against Seadrill arose out of directors' purported residence in New York or the supposed transaction of business by Seadrill subsidiaries (Compl. ¶ 74). *See, e.g.*, *Cortlandt St. Recovery Corp. v. Deutsche Bank AG, London Branch*, 2015 WL 5091170, at *6 (S.D.N.Y. Aug. 28, 2015) ("even if [subsidiary's] contacts were imputed to [defendant], the fact that [defendant] or [subsidiary] sold *other* subordinated notes in New York to *other* investors cannot alone support specific jurisdiction over [defendant] with respect to the subordinated notes at issue here"). Moreover, any agency theory must fail because the Complaint contains no allegation that any purported acts by the subsidiaries or directors within the forum were as agents for Seadrill. *See*, *e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2019 WL 1331830, at *3 (S.D.N.Y. Mar. 25, 2019) (agency theory failed for, *inter alia*, failure to allege agents were acting "for the benefit of, with the knowledge and consent of, and under some control by" the defendant); *Rates Technology Inc. v. Cequel Comms., LLC*, 15 F. Supp. 3d 409, 416 (S.D.N.Y. 2014) (no "agency" for jurisdictional purposes where plaintiff did not allege facts establishing that purported agents' actions were "done solely at the behest of [the defendant] and not for other clients…." and where there were no allegations

50

01104277.6

that purported agent "would have the ability to contractually bind or otherwise make decisions on behalf of" the defendant).

Thus, Seadrill's alleged activities within the United States do not "support a finding of specific personal jurisdiction because those contacts are not related, in any way, to the matters at issue in the Amended Complaint." *CIL*, 582 B.R. at 82.  The Foreign Representative's failure to show that the allegations of United States activity on which he purports to base jurisdiction "g[a]ve rise to the causes of action asserted against" Seadrill precludes any finding of specific jurisdiction. *Id.*

**D.**    **Exercising Jurisdiction Over Seadrill In This Adversary Proceeding Would Be Unreasonable**

The Court need not engage in a reasonableness analysis given that the requisite minimum contacts are lacking. *See In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 624 (Bankr. S.D.N.Y. 2015).  Even if the Foreign Representative had alleged sufficient minimum contacts to support general jurisdiction or specific jurisdiction, however, this Court's exercise of personal jurisdiction over Seadrill in the Adversary Proceeding would not comport with Due Process because such exercise would be unreasonable under the factors set forth above at Section VI.A. For example, the "interests of the forum state in adjudicating the case," *CIL*, 582 B.R. at 71, are nonexistent given that, as set forth above at Section IV.A., Mexican law governs all of the claims asserted against Seadrill. *See id.* ("the Trustee has not articulated what interest a Court sitting in New York has, and what substantive social policies would be advanced by U.S. courts, in adjudicating a litigation between a foreign plaintiff and mostly foreign defendants over a transaction that took place almost entirely outside of the United States"). Further, the burden to a corporation headquartered overseas of defending against 12 claims in a New York federal court is significant. *See Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Calif., Solano Cty.*, 480 U.S.

102, 115 (1987) ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.").

## VI.   THE ADVERSARY PROCEEDING IS INCONSISTENT WITH CHAPTER 15

Finally, the Court should dismiss the Adversary Proceeding because the Foreign Representative's filing of the Adversary Proceeding before this Chapter 15 Court does not comport with Chapter 15's purposes.

Chapter 15 applies where "assistance is sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding." 11 U.S.C. § 1501(b). It "was not designed to encourage forum shopping or hear disputes with no connection to the forum." *In re Bancredit Cayman Ltd.*, 50 Bankr. Ct. Dec. 257 (Bankr. S.D.N.Y. Nov. 25, 2008).

In the Adversary Proceeding, the Foreign Representative is not seeking this Court's assistance in connection with the Mexican *concurso*. Instead, he is seeking this Court's determination of a variety of tort claims governed by Mexican law concerning alleged acts and actors located in Mexico. The Adversary Proceeding does not advance the purposes of Chapter 15, *see* 11 U.S.C. § 1501(a)(1), and the Court therefore should dismiss it.  *See* 11 U.S.C. § 1509(b) (providing that after recognition of a foreign proceeding foreign representative can sue in the United states "subject to any limitations that the court may impose consistent with the policy of this chapter").

## CONCLUSION

Based on the foregoing, Seadrill and Fintech respectfully request that the Court dismiss, as to them, Counts One through Eight, Thirteen, Fifteen, Sixteen, and Nineteen, with prejudice.

Dated:          August 26, 2019
                New York, New York

                                        **WILK AUSLANDER LLP**

                                        By: ____/s/ Julie Cilia_____
                                                Jay S. Auslander
                                                Eric J. Snyder
                                                Natalie Shkolnik
                                                Julie Cilia
                                                Eloy A. Peral
                                                Robert C. Reiland
                                        1515 Broadway, 43rd Floor
                                        New York, New York 10036
                                        (212) 981-2300

                                        *Counsel for Seadrill Limited and Fintech
                                        Advisory Inc.*

01104277.6